46. On May 16, 2007, Defendant Slezak, on behalf of the Lessor Defendants, hand-delivered a letter to counsel for LaBella that purported to terminate the Lease pursuant to Section 11 of the Lease which provides as follows:

> "11. In case the Premises shall be rendered untenantable by fire, explosion or other casualty, Lessor may, at his option, terminate this lease or repair the Premises within sixty days. If the Lessor does not repair the Premises within said time, or the building containing the Premises shall have been wholly destroyed, the term hereby created shall cease and determine."

47. On June 8, 2007, Defendant Slezak sent LaBella another letter purporting to terminate the Lease which stated in part:

> "the above Premises were rendered uninhabitable on or about February 28, 2007. Although there have been discussions they have not eventuated in restoration of the Premises. Paragraph #11 of the Lease states, *"In case the Premises shall be rendered untenantable by fire, explosion, or other casualty, Lessor may, at his option, terminate this lease or repair the Premises within sixty days. If Lessor does not repair the Premises within said time or the building containing the Premises shall have been wholly destroyed, the term hereby created shall cease and determine."* Pursuant thereto your lease has been terminated."

48. The Lessor Defendants' purported termination of the Lease pursuant to paragraph 11 is invalid and is in breach of the Lease because:

  A. The Lessor Defendants, through their own negligence, caused the fire which they are relying on to terminate the Lease, and such conduct on their part cannot be used to deprive the Plaintiff of the quiet enjoyment of the leased Premises;

  B. Rider 2 of the Lease requires the Lessor Defendants, without qualification, to keep the roof over the Premises in good order, repair and condition, and the Lessor Defendants cannot use the fire

    to negate the covenant to repair the roof and/or as the basis for termination of the Lease; and

C.     Rider 2 of the Lease requires the Lessor Defendants to keep the roof over the Premises in good condition and repair, and the LaBella restaurant itself remained tenantable and would have reopened within 60 days, provided the Lessor Defendants repaired the roof as required by Rider 2 of the Lease.

49.     At no time material to this action were the demised Premises rendered untenantable.

50.     As a result of the Lessor Defendants' breach of the Lease, the Plaintiff has been unable to reopen its restaurant, has suffered the loss of its personal property, has lost the quiet enjoyment of the Premises, has lost profits from operation of the restaurant, and has suffered a significant diminution in the value of its business.

Wherefore, the Plaintiff prays for entry of judgment for an amount greater than $30,000; for its costs; for a final and binding declaration that Section 11 of the Lease does not apply to terminate the Lease because the Premises was not rendered untenable so as to make Section 11 of the Lease applicable; and for such further relief as this Court deems appropriate, including punitive damages for their intentional, willful and malicious conduct in attempting to terminate the Lease and attempting to force LaBella to move.

## COUNT V – FRAUD
### WINNETKA II, BJB, SLEZAK, AND PURCELL

51.     Plaintiff re-alleges paragraphs 1 through 25 of the Introduction, and paragraphs 39 through 43 of Count III, and paragraphs 44 through 50 of Count IV as paragraph 51 of this Count V.

52. At all times, the Lease provided in material part that the Lessor Defendants were to maintain and repair the roof above the Premises at their expense pursuant to Rider 2 of the Lease.

53. Between February 28, 2007 and May 16, 2007, at numerous times, the Lessor Defendants made material representations to LaBella that they would repair the roof timely, and were making efforts towards fulfilling this obligation as promptly as possible. Those representations were false; they were known to be false when made and they were made to induce Plaintiff into not acting immediately to seek appropriate judicial relief.

54. LaBella relied on these representations and took no action to compel the Lessor Defendants to repair the roof during this period of time, at all times relying upon the Lessor Defendants' representations that the roof over the Premises would be repaired timely and in a manner which would allow LaBella to initiate and complete repairs to the interior of the restaurant so that LaBella could reopen to the public promptly.

55. At no time did the Lessor Defendants intend to take prompt action to repair the roof above the Premises, and they knew and/or believed at all times that their representations to LaBella were not true.

56. On May 16, 2007, a representative for the Lessor Defendants, Slezak, hand-delivered counsel for LaBella a letter attempting to terminate the Lease. The letter states, in part, that:

> "pursuant to Section 11 of the Lease Agreement dated May 6, 1993
> as amended, that agreement is terminated."

57. The May 16, 2007 letter was in furtherance of the Lessor Defendants' intent, scheme and artifice to defraud LaBella by delaying the repairs to the roof of the Premises until such time as the Lessor Defendants could unlawfully assert that the Lease was terminated,

thereby freeing up the Lessor Defendants to rent the Premises to another tenant of the building and a newly-planned tenant.

58. The Lessor Defendants knew at all times that LaBella would rely on their untrue representations that they would repair the roof in a timely and prompt manner, and they made these untrue representations publicly and to various representatives of the Village of Winnetka and other interested parties who were seeking to repair the fire damage, all the while knowing that LaBella would rely on them to its detriment so the Lessor Defendants could attempt to terminate the lease and lease the Premises to other tenants.

59. LaBella did in fact rely on the Lessor Defendants' untrue representation that they would repair the roof in a timely manner, and LaBella did so to its economic detriment.

60. Additionally, the Lessor Defendants knew when they sent this letter to LaBella that the claim of termination was not true because Section 11 of the Lease did not operate to terminate the lease agreement for the following reasons:

    (a) Section 11 of Lease could not apply to terminate the Lease, as the Premises themselves have not been rendered untenantable so as to apply Section 11, as the delay in reopening LaBella would not exist but for the actions and delay of the Lessor Defendants.

    (b) The Lessor Defendants' obligation to keep the roof in repair under Paragraph 5 of Rider 2 to the Lease supersedes Section 11 of the Lease.

61. LaBella's reliance on the Lessor Defendant's misrepresentations was reasonable and justifiable under the circumstances.

62. As a result of the Lessor Defendants' false representations that they would repair the roof in a timely, workmanlike manner, LaBella has been forced to seek another location for its restaurant, has lost income and its reputation, and will have to invest substantial time and financial resources before it can reopen and begin to operate a new LaBella Winnetka restaurant

in the manner consistent with its highly successful operation of its Italian restaurant prior to the fire on the roof above the Premises.

63. The actions of the Lessor Defendants were malicious, intentional and willful.

Wherefore, the Plaintiff prays for entry of judgment for an amount greater than $30,000, for its costs, and for such further relief as this Court deems appropriate, including punitive damages for the Lessor Defendants' intentional, willful and malicious conduct.

### COUNT VI - PIERCE THE CORPORATE VEIL OF WINNETKA II

64. Plaintiff re-alleges paragraphs 1 through 25 of the Introduction as paragraph 64 of this Count VI.

65. On information and belief, Winnetka II is, and at all relevant times, has been inadequately capitalized and used as part of a series of sham entities designed to prevent access to the personal assets of the real parties in interest.

66. Winnetka II's undercapitalization and failure to operate as a bona fide corporate entity has resulted in ongoing lack of repair and maintenance of the roof over the Premises in a commercially reasonable timeframe and workmanlike manner.

67. On information and belief, Slezak and Purcell, as employees and owners of BJB and Winnetka II, and BJB and its related entities doing business as BJB Commercial Development, BJB North Shore and Oak I, have acted on behalf of Winnetka II in their dealings with LaBella as set out in Counts II through V of this Complaint. As a result of their commingling of interests, ownership, and authority with Winnetka II, Slezak, Purcell, and BJB and its related entities must be treated as one and the same with Winnetka II.

68. There is such unity of interest, actions and ownership between Winnetka II and Slezak, Purcell, and BJB and its related entities known as Oak I, BJB Commercial Development

and BJB North Shore, that the separate entity known as Winnetka II does not really exist, and this unity of interest and ownership continues.

69. Adherence to the fiction of a separate existence of Winnetka II, which has insufficient assets to satisfy a judgment, thereby allowing Slezak, Purcell and BJB and its related entities to escape personal liability would promote injustice, sanction fraud or other inequitable circumstances, including the unlawful use of the limited liability company form of ownership to evade personal responsibility.

70. As a result, Slezak, Purcell, BJB and its related entities doing business as Oak I, BJB Commercial Development and BJB North Shore, are each personally liable for the liability asserted by LaBella against Winnetka II in this Complaint.

WHEREFORE, Plaintiff LaBella respectfully prays that any judgment entered against Winnetka II shall also be entered against Slezak, Purcell, and BJB and its related entities consisting of Oak I, BJB Commercial Development and BJB North Shore, and for such other and further relief as may be just and proper, including reasonable attorneys' fees, costs, and the imposition of punitive damages for the failure to operate Winnetka II as a lawful, fully capitalized entity as well as the intentional willful, malicious and knowingly wrongful conduct in depriving LaBella of the opportunity to reopen its Italian restaurant, of which these defendants were repeatedly advised was the entire livelihood of its owners.

## COUNT VII - BREACH OF INSURANCE POLICY
### GENERAL CASUALTY

71. Plaintiff realleges paragraphs 1 through 25 of the Introduction as paragraph 71 of this Count VII.

72. On or about September 13, 2006, LaBella entered into an insurance policy with General Casualty for comprehensive insurance coverage for the Premises, policy number CCI

046511 (the "Policy"). The Policy covered the period from September 13, 2006 to September 13, 2007. A copy of the Policy is attached as Exhibit B.

73. On or about February 28, 2007, an employee of Avondale negligently started a fire while working on the roof above LaBella's restaurant and Premises. The fire caused serious damage to the roof over LaBella and also caused damage to the interior of the restaurant, both fire damage and smoke and water damage. As a result of the fire damage, LaBella was unable to continue its restaurant operations and was forced to close its doors at that time.

74. As a result of the fire on the roof above the Premises and in awaiting the Lessor Defendants to complete the restoration, repair and/or replacement the roof over LaBella's restaurant, LaBella has not been able to reopen its doors and continue its operations, its business has been suspended, and it has lost business income for the period from the date of the fire on February 28, 2007 to the present.

75. Under the terms of the Policy, General Casualty is required to pay LaBella for, but not limited to, the following:

> Actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during "the period of restoration". The "suspension" must be caused by direct physical loss or damage to property at the described premises. Exhibit B, Policy.

76. The Plaintiff has lost business income as a result of the fire and continues to suffer loss of business income until such time as the repair and replacement of the roof over the Premises is completed, which is required before the Plaintiff can resume its operations and reopen the LaBella restaurant.

77. LaBella has coverage under its Policy with General Casualty for Loss of Business Income and other losses, and General Casualty has improperly denied coverage to LaBella,

including full and complete coverage for lost business income and other losses caused by the suspension of its restaurant operations as a result of the fire of the roof over the Premises.

78. Additionally, Plaintiff states, on information and belief, that General Casualty and its agents or assigns, have met separately with the Lessor Defendants and others, including various insurance carriers and adjusters, to conspire with them to deny LaBella monies to which it was lawfully entitled under the Policy, to cause construction activity to restore the Plaintiff's demised Premises to cease, and to force LaBella to execute a complete release of all claims against General Casualty as a condition precedent to receiving any further money owed under Policy.

79. Plaintiff has fully complied with the terms of the Policy and through no fault of its own, has been damaged by General Casualty's willful refusal to honor the terms of the Policy relating to coverage for Loss of Business Income and other losses sustained by LaBella as a result of the fire and events thereafter.

80. General Casualty has vexatiously and unreasonably failed to comply with the terms of the Policy, and by reason of this conduct, General Casualty has breached the covenant of good faith and fair dealing implied in the insurance contract.

81. As a result of General Casualty's breach of the Policy, its vexatious and unreasonable failure to comply with the Policy, and its breach of the covenant of good faith and fair dealing, Plaintiff has been deprived of the full and complete insurance proceeds to which it is entitled under the Policy.

82. In addition, LaBella is entitled to reasonable attorneys' fees pursuant to Section 155 of the Illinois Insurance Code, 215 ILCS 5/155, based on General Casualty's unreasonable and vexatious delay in complying with the terms of the insurance Policy.

83. Additionally, as a consequence of General Casualty's tortious, intentional, willful and conspiratorial conduct, LaBella is entitled to an award of punitive damages.

Wherefore, the Plaintiff prays for entry of judgment for an amount greater than $30,000, for its attorneys' fees and costs, and for such further relief as this Court deems appropriate.

Dated:

Respectfully submitted,

By: _____

DYKEMA GOSSETT PLLC
10 South Wacker Drive
Suite 2300
Chicago, IL 60606
Phone: (312) 876-1700
Fax: (312) 876-1155
Firm ID #42297

CHICAGO\2387975.4
ID\LTH