UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LABELLA WINNETKA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  07 C 6633 |
| | ) | |
| THE VILLAGE OF WINNETKA and | ) | Judge Virginia M. Kendall |
| DOUGLAS WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff LaBella Winnetka, Inc. ("LaBella" or "Plaintiff") filed suit against Defendants Village of Winnetka (the "Village") and Douglas Williams ("Williams") (collectively "Defendants") alleging various claims related to the enforcement of Village ordinances and codes in Winnetka. This Action involves two federal claims (Counts I-II) and two state claims (Counts III-IV): (1) violation of its equal protection rights under 42 U.S.C § 1983 and the Fourteenth Amendment; (2) deprivation of substantive due process under 42 U.S.C § 1983 and the Fourteenth Amendment; (3) breach of duty; and (4) intentional interference with a lease and prospective business expectancy. Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6).  For the reasons stated below, the Motion is granted.

## PLAINTIFF'S ALLEGATIONS

The following facts are taken as true, as the Court is required to do at the motion to dismiss stage.  *See Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995).  LaBella is a corporation that operates an Italian restaurant in Winnetka, Illinois.  (Compl. ¶ 2.)  The Village is municipal corporation located in Cook County, Illinois that is governed by the Village Council of Winnetka.

(Compl. ¶ 3.) Williams, the Village Manager of Winnetka, directs and controls the business affairs of the Village regarding the enforcement of Village ordinances and building codes. (Compl. ¶ 4.) Williams manages the Village pursuant to authority granted to him by the Village Council, State statutes, and Village ordinances. (Compl. ¶ 4.)

Since 1993, LaBella has leased property in Winnetka from a private party ("the Landlord") pursuant to an agreement that remains in effect until July 31, 2008 (the "Lease"). (Compl. ¶ 8.) Through its fourteen years of operation, LaBella has fostered a broad customer base, earned a reputation for excellent Italian dining, and expended large sums of money for its kitchen and dining areas as well as its operating equipment. (Compl. ¶¶ 10-11.) In addition, LaBella has continued to obtain and maintain a restaurant license, liquor license, and other appropriate licenses and permits for its restaurant. (Compl. ¶ 13.)

On numerous occasions beginning in 2006, LaBella informed the Defendants of a defective condition of the restaurant's roof as well as the failure of the Landlord to maintain the roof of LaBella's restaurant in compliance with the Village's code. (Compl. ¶ 18.) Defendants did not require the Landlord to repair the roof or comply with the Village's building codes and ordinances. (Compl. ¶ 19.) Ultimately, the Landlord attempted to repair the roof using hot tar, torches, and other flammable materials. (Compl. ¶¶ 16-17.) Although Defendants knew or should have known that the roof work involved such materials, they did not require the Landlord to obtain work or building permits mandated by the Village's building codes. Defendants further failed to enforce compliance with the Village's building code and safety requirements, or stop the Landlord from performing roof work that created the potential for fire hazards in spite of LaBella's complaints. (Compl. ¶¶16-17.) Nor did they inspect the work performed by the roofers. (Compl. ¶ 17.)

On February 28, 2007, LaBella again informed Defendants of the unsupervised roof work, the roofers use of flammable materials, and the Landlord's failure to obtain a building permit. (Compl. ¶ 20.)  Neither the Village nor Williams responded to the complaint.  (Compl. ¶ 21.)  That same day, the roof work caused a fire on the roof of the building.  As a result, LaBella was forced to close its restaurant. (Compl. ¶ 22.)

When LaBella submitted permit applications to the Village to conduct minor repair work within the restaurant after the fire, Defendants refused to process the permits.  (Compl. ¶ 22.)  In addition, Defendants refused to allow Labella to partially reopen the restaurant until and unless the Landlord repaired and replaced the roof above the restaurant to comply with the Village code. (Compl. ¶ 22.)  Defendants knew or should have known that the Landlord did not attempt to replace the roof and, as a result, LaBella was forced to remain closed without income or any projected date of reopening.  (Compl. ¶ 24.)

Defendants engaged in selective enforcement of the Village's ordinances and codes to deprive LaBella of its "right" to keep its restaurant business and to force it out of business while simultaneously favoring other restaurants and businesses.  (Compl. ¶¶ 26-27, 37.)  Defendants enforced Village ordinances, building codes, health and sanitation standards, liquor license requirements, and safety requirements to the benefit of certain favored restaurants, including Corner Cooks, Jerry's Restaurant, O'Neils Restaurant, and Little Ricky's.  (Compl. ¶ 27.)  Village employees referred to these favored restaurants as "Friends of Doug." (Compl. ¶ 27.)

With respect to "selective enforcement" of village ordinances and building codes, Defendants: (1) allowed Corner Cooks, a restaurant located in the same building as LaBella, to violate sign ordinances when it placed oversized vinyl banners in its window, but cited LaBella and

gave it 24-hours to remove a string of Christmas lights from its restaurant, (Compl. ¶ 28(B)(i)); (2) intentionally ignored Corner Cooks' non-compliance with exhaust system requirements, (Compl. ¶ 27(B)(iii)-(v)); and (3) permitted Corner Cooks to open Jerry's Restaurant and approved permits and designs that would allow Corner Cooks and Jerry's Restaurant to occupy a portion of LaBella's leased premises (Compl. ¶ 27(B)(vi)). With respect to health and sanitation standards, LaBella alleges that: (1) Williams instructed a sanitation official to issue a citation to LaBella's maitre d' because he was sitting outside the restaurant with a broken leg, (Compl. ¶ 27(C)(iii)), and (2) Williams ordered a sanitation official to withdraw and/or revoke numerous sanitation citations and a restaurant closing order against O'Neil's/Little Ricky's that were issued for health and safety violations related to storage and handling of food (Compl. ¶ 27(C)(i)). In addition, LaBella alleges that, while Defendants overlooked violations of the Village sanitation requirements committed by certain Winnetka restaurants, Defendants threatened LaBella with the loss of its various licenses if LaBella did not correct minor sanitation violations. (Compl. ¶ 27(D).) Finally, with respect to liquor license requirements, Defendants: (1) issued liquor licenses and special use ordinances to Corner Cooks to accommodate its non-compliant activities and failed to require the customary evaluation that LaBella was required to and did comply with, (Compl. ¶ 27 B(ii)), and (2) allowed O'Neils and/or Little Ricky's to remain open, despite the issuance of multiple citations for liquor ordinance violations (Compl. ¶ 27(C)(ii)).

## **STANDARD**

When considering a motion to dismiss under Rule 12(b)(6), a court must accept as true all facts alleged in the complaint and construe all reasonable inferences in favor of the plaintiff. *See Murphy*, 51 F.3d at 717. To state a claim upon which relief can be granted, a complaint must

contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not allege all facts involved in the claim. *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994). However, in order to survive a motion to dismiss for failure to state a claim, the claim must be supported by facts that, if taken as true, at least plausibly suggest that the plaintiff is entitled to relief. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Such a set of facts must "raise a reasonable expectation that discovery will reveal evidence" of illegality. *Id.* at 1965.

## DISCUSSION

### I. Equal Protection Clause (Count I)

In Count I, LaBella alleges that Defendants violated its equal protection rights under the Fourteenth Amendment. "The purpose of the Equal Protection Clause of the Fourteenth Amendment is to 'secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Smith v. City of Chicago*, 457 F.3d 643, 650 (7th Cir. 2006) (citation omitted).

LaBella attempts to proceed under a "class of one" equal protection theory. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("[T]he number of individuals in a class is immaterial for equal protection analysis."). Class of one equal protection cases are those "in which the plaintiff does not claim to be a member of a class that the defendant discriminates against, but argues only that he is being treated arbitrarily worse than some one or ones identically situated to him." *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005). To state such a claim, the plaintiff must allege that: (1) the defendant intentionally treated the plaintiff differently from others who are

similarly situated; and (2) there is no rational basis for the different treatment or the cause of the different treatment is based on the defendant's "totally illegitimate animus" toward the plaintiff. *See St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 638 (7th Cir. 2007). A "similarly situated" individual is defined as "someone who is prima facie identical in all relevant respects." *See Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002); *see also Stachowski v. Town of Cicero*, 425 F.3d 1075, 1078 (7th Cir. 2005). While the existence of similarly situated comparators is generally a question of fact, *see McDonald v. Vill. of Winnetka,* 371 F.3d 992, 1002 (7th Cir. 2004), a complaint is subject to dismissal pursuant to Rule 12(b)(6) when the plaintiff fails to allege that he was treated differently than similarly situated individuals, *see Stachowski*, 435 F.3d at 1078-79.

LaBella alleges that Defendants discriminated against LaBella through "vindictive[ly],"
"selective[ly]" and "arbitrarily" enforcing ordinances with the "express purpose" of forcing it out of business. (Compl. ¶ 35-37; *see also* Pl. Surreply 4.) In doing so, LaBella appears to adopt the "illegitimate animus" equal protection approach. As noted above, to state a claim under this theory LaBella must allege that the government treated LaBella differently from others "'who are prima facie identical in all relevant respects.'" *Levenstein v. Salafsky*, 414 F.3d 767, 775 (7th Cir. 2005) (*quoting Nevel v. Vill. of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002)); *see also Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995).

Defendants contend that Count I must be dismissed because LaBella has failed to sufficiently allege this "similarly situated" requirement. In response, LaBella argues, among other things, that the Complaint contains sufficient allegations of comparators with respect to Defendants' selective enforcement of license requirements, sign ordinances, and health and sanitation requirements.

(Compl. ¶¶ 4, 27(A), 32-36; Pl. Resp. Mem. 5).  Specifically, LaBella alleges that Defendants engaged in the following acts of selective enforcement: (1) Defendants "failed to conform with Village ordinances and emasculated the customary [required] evaluation" when it issued Corner Cooks certain licenses, (Compl. ¶ 27(B)(ii)); (2) Defendants allow Corner Cooks to operate despite its non-compliant exhaust system, (Compl. ¶ 27(v)); (3) Defendants cited LaBella and required that LaBella remove items such as Christmas lights while allowing Corner Cooks to hang large banners in violation of the Village's sign ordinance, (Compl. ¶ 27(B)(i)); and (4) Defendants required LaBella to comply with health and sanitation requirements and threatened that LaBella would lose its license if it did not correct even minor problems, but overlooked the health and sanitation violations of other restaurants (Compl. ¶¶ 27(C)-(D), 35).[1]  These allegations sufficiently allege the existence of similarly situated entities treated differently.  The problem, however, lies not in LaBella's similarly situated allegations, but in the scope of LaBella's equal protection claim as currently pled.  As Defendants note, LaBella narrows the scope of its equal protection claim in Count I by framing the claim in the context of and seeking relief based upon the forced closure of its restaurant and its inability to reopen its restaurant.  (Compl. ¶ 37.)  Absent from the Complaint are any allegations causally linking the injuries suffered, damages incurred and relief sought in Count I to its allegations regarding the selective enforcement of sign, liquor, occupancy, or health and sanitation requirements.  Instead, LaBella restricts its "class of one" theory by alleging that the disparate treatment at issue forced LaBella out of business and prevented LaBella from subsequently

---

[1]  The Court also notes the confusion resulting from LaBella's use of the passive voice with respect to its allegations regarding the enforcement of liquor license and exhaust system requirements.  Specifically, LaBella alleges that LaBella "was required to comply" with a customary liquor license evaluation and that "LaBella is obligated to and has complied" with certain exhaust system requirements at issue. (Compl. ¶ 27(B)(ii), (iii).)  It is unclear from these allegations whether Defendants affirmatively acted to require LaBella's compliance or whether LaBella was "required to comply" as a matter of law and did so upon its own initiative.

reopening or operating its business.

Nor does the Complaint contain sufficient allegations with respect to this narrower "forced closure/inability to reopen" theory to state a plausible entitlement relief.  In support of its argument to the contrary, LaBella contends, among other things, that its allegations regarding Defendants' treatment of Corner Cooks after the fire as compared to LaBella establishes a class of one claim.  Specifically, LaBella argues that Corner Cooks and LaBella "were in similar if not identical positions before and after the fire" because the two restaurants were subject to the same potential risks as a result of the fire and were located on the same floor and immediately adjacent to one another.  (*See* Pl. Resp. Mem. 6, 8; Pl. Sur-Reply 3.)  LaBella further asserts that Defendants permitted Corner Cooks to reopen and recommence its operations after the fire.  (*Id.*)  While such allegations would support LaBella's "class of one" theory as currently pled (and prove the missing causal link), LaBella failed to include any such allegations in the Complaint.[2]  Thus, while the brief suggests that LaBella may have a plausible entitlement to relief under a "class of one" theory, the necessary allegations are noticeably absent from the Complaint.[3]

In light of the foregoing, the Court dismisses Count I with leave to replead consistent with this Opinion within three weeks.  LaBella may add to or clarify its allegations with respect to any of its "similarly situated" theories or its equal protection claim in general.  In addition, LaBella may

---

[2]    LaBella would be well-served to amend its Complaint and include the factual assertions stated above in support of its equal protection claim.

[3] LaBella also points to allegations that Defendants allowed O'Neils and Little Ricky's to remain open, despite their non-compliance with Village ordinances, and contends that these restaurants are sufficient comparators with respect to its inability to reopen its restaurant after the fire.  Such allegations are too attenuated, standing alone, to state a plausible entitlement to relief under a class of one theory.  *See Indiana Teachers Ass'n v. Bd. of Sch. Comm'rs*, 101 F.3d 1179, 1181-1182 (7th Cir. 1996) (["W]hen as in the present case the government is treating unequally two persons that are prima facie unequal in a rationally relevant respect . . . the equal protection clause is inapplicable.").

expand the scope of its equal protection claim and prayer for relief as necessary in order to accommodate any clarifications or additions to Count I.

II. <u>Substantive Due Process (Count II)</u>

LaBella also alleges that Defendants deprived LaBella of its property interest in its Lease and its restaurant business, thereby violating LaBella's rights to substantive due process. "[W]hen a substantive-due-process challenge involves only the deprivation of a property interest, a plaintiff must show 'either the inadequacy of state law remedies or an independent constitutional violation.'" *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003).

Defendant argues that LaBella's substantive due process claim should be dismissed because LaBella fails to allege the inadequacy of state remedies or an independent constitutional violation. LaBella does not dispute that it failed to allege the inadequacy of its state law remedies. Instead, LaBella contends that the claim survives because it has alleged an independent equal protection claim. However, as noted above, the Court has already dismissed the equal protection claim. In light of LaBella's failure to plead the inadequacy of state law remedies and the dismissal of LaBella's equal protection claim, the Court dismisses LaBella's substantive due process claim without prejudice.

III. <u>Municipal Liability</u>

The Village also contends that Counts I and II should be dismissed with respect to the Village because LaBella failed to sufficiently allege municipal liability under 42 U.S.C. § 1983. While this argument is moot in light of the Court's dismissal of Counts I and II, the Court will consider the parties' arguments in the interest of efficiency, should LaBella filed an amended complaint with the Court.

The doctrine of *respondeat superior* cannot be utilized to hold local governmental units liable for § 1983 violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A municipality may only be held liable under § 1983 when its policy or custom results in a constitutional injury to the plaintiff. *See id.* at 694 ("[I]t is when the execution of a government's policy or custom, whether made by lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). To establish a policy or custom, a plaintiff must allege either: (1) "'an express policy that, when enforced, causes a constitutional deprivation;'" (2) the act of a person with final policymaking authority caused the constitutional injury; or (3) "'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (*quoting Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994)). Within the second prong, a plaintiff may allege that a policymaker ratified the unconstitutional conduct of a subordinate. *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998). In the case at bar, LaBella does not allege any facts establishing an express policy. LaBella contends, however, that the Complaint contains sufficient allegations to support a municipal liability claim of the latter two theories.

## A. *Act by a Final Policymaker*

To state a claim for liability under the "final policymaker" theory, the plaintiff must first allege that a defendant has final policymaking authority or, alternatively, that a person with such authority ratified the defendant's actions. *Killinger v. Johnson*, 389 F.3d 765, 772 (7th Cir. 2004). "In order to have final policymaking authority, an official must possess 'responsibility for making

law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'" *Killinger*, 389 F.3d at 772 (*citing Rasche v. Village of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003)). The authority to implement pre-existing rules does not constitute final policymaking authority. *Id.* Whether a person has final policymaking authority is a question of state or local law. *Id.*

Defendants contend that the Complaint fails to establish municipal liability under the "act by a final policymaker" theory of municipal liability because LaBella fails to sufficiently allege that Williams possessed final policymaking authority sufficient to hold the Village liable for his actions. LaBella alleges that the Village is governed by the Village Council and that Williams managed the Village pursuant to the authority granted to him by the Village Council, State statutes, and Village ordinances (Compl. ¶¶ 3-4.) Further, allegations directed towards Williams focus on his ability to enforce and method of enforcing rules rather than his ability to create and adopt policy. (*See* Compl. ¶¶ 4, 36, 28, 41.) The Complaint is devoid of any allegations indicating or implying that Williams had final policymaking authority. Further, to the extent that LaBella refers to state or local law when defining the scope of Williams' authority, the Court notes that nothing in the Illinois Municipal Code or the Winnetka Village Code allows for an inference that Williams had final policymaking authority as a matter of course.[4] To the contrary, these laws seemingly indicate that Winnetka Village Council, as the "legislative body of the Village," generally possesses the relevant final policymaking authority for the Village absent a delegation of such authority. *See* Def. Ex. 1, Winnetka Village Code § 2.04.010 ("the Village Council shall be the legislative body of the

---

[4] In support of its Motion to Dismiss for lack of municipal liability, Defendants cite to and attach a set of ordinances from the Winnetka Village Code. Despite LaBella's assertion to the contrary, the Court may take judicial notice of the ordinances. *See Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002) ("[A] district court can always rely on public statutes"); *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) ("[M]atters of public record such as state statutes, city charters, and city ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice").

Village"); § 2.12.010 (the Village Manager "shall be the chief administrative officer of the

Village"); § 2.12.050(I) (the Village Manager shall attend Village Council meetings, but shall not

have the right to vote); 65 ILCS 5/5-3-6. Thus, the Court concludes that LaBella has failed to allege

that Williams is a final policymaker, as relevant to the current Action.[5]

The Court also concludes that the Complaint does not state a plausible entitlement to relief

under the ratification theory of municipal liability. Under the "final policymaker" theory of liability,

"a municipality may also be liable for the actions of an employee who lacks final policymaking

authority if that employee's actions were 'ratified' by the municipality." *Killinger*, 389 F.3d at 772

(*citing Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998)). To state a claim under this

theory, a plaintiff "'must allege that a municipal official with final policymaking authority approved

the subordinate's decision and the basis for it.'" *Id.* (*citing Baskin v. City of Des Plaines*, 138 F.3d

701, 705 (7th Cir. 1998)). "[A] plaintiff cannot establish a § 1983 claim against a municipality by

simply alleging that the municipality failed to investigate an incident or to take punitive action

against the alleged wrongdoer." *Baskin*, 138 F.3d at 705; *see also Wilson v. City of Chicago*, 6 F.3d

1233, 1240 (7th Cir. 1993) ("Deliberate or reckless indifference to complaints must be proved in

order to establish that an abusive practice has actually been condoned and therefore can be said to

have been adopted by those responsible for making municipal policy[;]" the mere failure to eliminate

a practice does not constitute an approval of the practice). Similarly, the mere failure to correct the

unconstitutional violation in not enough. *Fiorenzo v. Nolan*, 965 F.2d 348, 351 (7th Cir. 1992).

---

[5] While the Defendants urge the Court to conclude that Williams is not a final policymaker as a matter of law, the Court declines to do so at this time. While a person's status as a final policymaker is generally governed by state and local law, such authority may also be delegated by an official having final policymaking authority. *Rasche v. Beecher*, 336 F.3d 588, 600 (7th Cir. 2003). Winnetka local laws leave open the possibility of delegation by noting that the Village Manager's powers and duties "may be prescribed by statute or by ordinance *or by resolution of the Council.*" (Def. Ex. 1, Winnetka Village Code, § 2.12.050) (emphasis added).

In the present case, LaBella alleges that the Village Council knew or should have known of the selective enforcement of ordinances. (Compl. ¶ 28.) In addition, the Village Council was aware of the "discriminatory, unconstitutional conduct," but "knowingly and intentionally" failed to act to correct or prohibit the conduct. (Compl. ¶ 28.) These bare allegations - peppered with legal conclusions - do not state a plausible entitlement to relief under the ratification theory. *See, e.g., Singleton v. Chicago School Reform Bd. of Edu.*, No. 00 C 395, 2000 U.S. Dist. LEXIS 8484, *48-50 (N.D. Ill. June 14, 2000) (dismissal warranted where plaintiff failed to plead facts indicating that final policymakers condoned, facilitated, or acted with deliberate or reckless indifference).

B.  *Widespread Practice*

Absent evidence of a formal express policy or an act by a final policymaker, LaBella may establish municipal liability by demonstrating the existence of a widespread policy or custom with the force of law. "*Monell* authorizes the imposition of liability against a municipal entity 'for constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decisionmaking channels.' " *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993). "Custom" has been defined as "a widespread practice that, although not codified in written law or regulation, is so permanent and well-settled that it has the force of law." *Looper Maint. Serv. v. City of Indianapolis*, 197 F.3d 908, 912 (7th Cir. 1999). Although the practice of unconstitutional conduct may lack official approval, it can still provide the basis of municipal liability if the plaintiff can demonstrate that the policymaker acquiesced to the practice. *McNabola,* 10 F.3d at 511.

In a typical "widespread practice" scenario, a court focuses on the application of a policy to many different individuals. *See Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006).

Defendants contend that LaBella failed to state a claim under the "widespread practice" theory of liability because LaBella's allegations concern only Defendants treatment of LaBella and such isolated experiences are insufficient to establish custom. (Def. Reply Mem. 10). As recently noted by the Seventh Circuit in *Phelan v. Cook County*, however, a plaintiff should not "be foreclosed from pursuing *Section 1983* claims where [the plaintiff] can demonstrate that repeated actions directed at [the plaintiff] truly evince the existence of a policy." *Phelan*, 463 F.3d at 790. Isolated experiences may demonstrate a widespread practice if the experiences, taken as a whole, show a cognizable policy that is so "permanent and well-settled" that is has the force of law. *Id.*

In light of *Phelan* and this Court's duty to read the Complaint liberally, LaBella's allegations present this Court with a closer question of municipal liability than those presented under the "final policymaker" theory. Because the Court has dismissed LaBella's § 1983 claims and concludes that its determination regarding this issue will be affected by the allegations associated with Counts I and II, it will not determine at this time whether the Complaint states a plausible entitlement to relief under the "widespread policy" theory of municipal liability.[6]

V. <u>Breach of Duty and Tortious Interference (Counts III and IV)</u>

Defendants contend that the Complaint fails to state a plausible entitlement to relief for breach of duty (Count III) or tortious interference (Count IV) under Illinois law. Alternatively, Defendants urge this Court to dismiss Counts III and IV under 28 U.S.C. § 1367(a). The Court declines to exercise its discretion to retain supplemental jurisdiction over these state law claims. *See* 28 U.S.C. § 1367(a); *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("The

---

[6] Defendants also move for dismissal of Counts I and II as against Williams, arguing that Williams was sued in his official capacity, rather than his individual capacity, and any claim against Williams in his official capacity is equivalent to a suit against the municipality itself. In addition, Defendants move to dismiss any punitive damages requested in Counts I and II. Both arguments are moot in light of the Court's dismissal of Counts I and II.

14

general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits."). As such, Counts III and IV are dismissed without prejudice.

While the Court has dismissed Counts III and IV under 28 U.S.C. § 1367(a), it will again consider the parties' alternative arguments in the interest of efficiency.

A. Breach of Duty (Count III)

With respect to Count III, Defendants contend that LaBella has failed to sufficiently allege a cognizable duty or, alternatively, that they are immune from liability pursuant to the Illinois Local Government and Governmental Employees Tort Immunity Act ("Tort Immunity Act"), 745 ILCS 10/1-101 *et seq.* The Tort Immunity Act does not create and impose new duties on public employees; it merely enumerates and confers immunities and defenses that apply to certain government operations. *Ware v. City of Chicago*, 873 N.E.2d 944, 948 (Ill. App. Ct. 2007). Thus, the issue of duty and the issue of immunity must be analyzed separately. *Id.* When a court determines that a duty exists, it may then address whether the governmental unit or employee is immune under the Tort Immunity Act. *Vill. of Bloomingdale v. CDG Enters., Inc.*, 752 N.E.2d 1090, 1096 (Ill. 2001). Because the Court concludes that LaBella has failed to sufficiently allege a duty owed by Defendants, it need not determine whether the Tort Immunity Act shields them from liability.

In Count III, LaBella alleges that Defendants owed a duty "not to permit code or ordinance violations" that endangered LaBella, its patrons, or the public and "not to permit dangerous and unsafe conditions called to their attention to continue." (Compl. ¶¶ 45, 47.) LaBella further alleges that the Defendants breached this duty by, among other things, intentionally refusing to take any

15

affirmative action by inspecting or halting the dangerous roof work at issue, although it was within their authority to do so. (Compl. ¶¶47-49.) In support of their Motion to Dismiss Count III, Defendants contend that the Complaint fails because governmental units and employees do not owe a general duty to the public to prove governmental services. (Def. Mem. Mot. Dismiss 11-12.) Defendants are correct that, under the "public duty" doctrine, "a governmental entity and its employees owe no duty of care to individual members of the general public to provide governmental services, such as police and fire protection." *Zimmerman v. Village of Skokie*, 697 N.E.2d 699, 702 (Ill. 1998). Consistent with this doctrine, Illinois courts have also determined that "'there is no common law duty to the general public for a municipality's failure to enforce an ordinance or building code.'" *Ware*, 873 N.E.2d at 948 (*quoting Millerick v. Vill. of Tinley Park,* 652 N.E.2d 17 (Ill. App. Ct. 1995)).

LaBella does not dispute that this doctrine, standing alone, would negate its breach of duty claim. Instead, LaBella argues that it alleges a claim for breach of duty under the "special duty" exception to the public duty doctrine. (Pl. Resp. Mem. 15.) Under Illinois law, a plaintiff must prove four elements to invoke the special duty exception: "(1) unique awareness of a particular danger or risk to which the plaintiff was exposed; (2) specific acts or omissions; (3) specific acts that are affirmative or willful in nature; and (4) injury to the plaintiff while under the direct and immediate control of municipal employees or agents." *Moran v. City of Chicago*, 676 N.E.2d 1316, 1320 (Ill. App. Ct. 1997). In response, Defendants contend that LaBella cannot satisfy the elements of the "special duty" exception because it fails to allege that it was under the "direct and immediate control" of the Village or Williams. (Def. Reply Mem. 13.)

"Generally, the control element is established by allegations that the defendants initiated the

circumstances which created the dangerous condition or that the defendants called the plaintiff into

a position of peril." *Moran*, 676 N.E.2d at 1320. It is not enough that the municipality was aware

of another's need for protection. *See Ware*, 873 N.E.2d at 953. In the present case, LaBella alleges,

among other things, that Defendants knew of the dangerous conditions and risk to LaBella and that

Defendants failed to act, despite LaBella's requests that Defendants stop the Landlord's roof work

and LaBella's reliance on Defendants to remedy the situation. (Compl. ¶¶ 44-49.) Upon review of

the allegations, the Court concludes that LaBella's allegations do not rise to the level of "control"

required to state a plausible entitlement to relief under the "special duty" doctrine. *See Ware*, 872

N.E.2d at 953.

B.  Tortious Interference (Count IV)

        LaBella alleges that Defendants tortiously interfered with the Lease and with LaBella's

prospective restaurant business. To succeed on a claim for tortious interference with a contract, a

plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) that defendant was

aware of the contract; (3) defendant intentionally and unjustifiably induced a breach; (4) the breach

was caused by defendant's wrongful conduct; and (5) damages. *HPI Health Care Servs., Inc. v. Mt.*

*Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989) (citations omitted). To state a claim for tortious

interference with prospective business advantage under Illinois law, the plaintiff must allege: "(1)

a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge

of the expectancy; (3) an intentional and unjustified interference by the defendant that induced or

caused a breach or termination of the expectancy; and (4) damage to the plaintiff resulting from the

defendant's interference." *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996) (*citing*

*Fellhauer v. City of Geneva,* 568 N.E.2d 870, 878 (1991)).        Defendants contend that

LaBella's tortious interference claims must be dismissed because the Lease at issue was not an enforceable contract, and, therefore any allegation that LaBella had an entitlement to the Lease or reasonable expectation of continuing business must fail. Specifically, Defendants argue that, under the terms of the Lease, the Landlord had a unilateral right to terminate the agreement pursuant to the Lease's Fire and Casualty provision. (Def. Mem. Mot. Dismiss 13.) The Fire and Casualty provision provides as follows: "In case the Premises shall be rendered untenantable by fire . . . , the Lessor may . . . terminate this lease or repair the Premises within sixty days. If Lessor does not repair the Premises within said time, or the building containing the Premises shall have been wholly destroyed, the term hereby shall cease and determine."[7] (Def. Ex. 2, Lease Agreement 2.) Contrary to Defendants' assertions, this provision does not unambiguously preclude LaBella's recovery. At a minimum, it remains unclear whether the Premises at issue were "rendered untentantable" by the fire.[8] Thus, the Court determines that the Lease does not unambiguously foreclose on LaBella's tortious interference claims.

Defendants also argue that LaBella fails to state a claim because the Landlord, not Defendants, terminated the lease and, therefore, any breach of contract or damages suffered stem from the Landlord's actions rather than the actions of Defendants. As a preliminary matter, the

---

[7] While LaBella did not attach the Lease to the Complaint, the Court may take judicial notice of the document. Courts may consider documents attached to a motion to dismiss, but not to the complaint, when the complaint refers to those documents and they are central to the plaintiff's claim. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). LaBella repeatedly refers to the Lease throughout the Complaint and in Count IV specifically. (*See* Compl. ¶¶ 8, 11, 24, 25, 53, 54, 55.) Further, the Lease is central to LaBella's claim in Count IV, which alleges that Defendants intentionally interfered with the Lease and LaBella's prospective restaurant business. *See, e.g., Allstate Life Insurance Co. v. Peoplesoft, Inc.*, No. 03 C 7025, 2004 U.S. Dist. LEXIS 9457, at *5-6 (N.D. Ill. May 26, 2004) (collecting cases). Thus, the Court may consider the Lease without converting the current motion to dismiss to a motion for summary judgment.

[8] In addition, it is also unclear how this right to terminate is affected by other provisions in the Lease. For instance, Rider 2 of the Lease requires the Lessor to "keep the . . . roof of the premises . . . in good order, repair and condition." (Def. Ex. 2, Lease Agreement, Rider 2 ¶ 5.)

Court notes that this argument is premised upon allegations contained within a state complaint filed by LaBella in state court. (Def. Mem. Mot. Dismiss 13.) Defendants both cite to and attach the state complaint to the Memorandum In Support of Its Motion to Dismiss. (Def. Mem. Mot. Dismiss 13; Def. Mem. Mot. Dismiss, Ex. 3.) LaBella objects to use of this document and argues that this Court may not take judicial notice of the allegations contained therein. The Court need not decide whether it may consider such allegations because, even if it did, this would not defeat LaBella's tortious interference claims. Defendants' argument overlooks the nature of LaBella's tortious interference claims. The tortious interference with a contract claim focuses on a Defendants' "intentional and unjustified inducement" of the Landlord to breach the Lease. *See HPI Health Care Servs., Inc.*, 545 N.E.2d at 154-55. In a similar vein, LaBella's tortious interference with prospective business advantage claim is an attempt to hold Defendants liable for their involvement in defeating LaBella's expectancy of future restaurant business. Thus, Count IV allows LaBella to hold Defendants liable if their conduct falls within the scope of activity prohibited by the claim and if the conduct caused the Landlord to breach the Lease agreement or the eliminated any future business expectancy.

Finally, Defendants assert that the Court should dismiss Count IV because LaBella allegations concern only Defendants' failure to act and that such allegations cannot state a claim for tortious interference. While the Complaint includes allegations of a failure to intervene, LaBella also includes multiple allegations related to affirmative actions taken by Defendants. For instance, LaBella alleges, among other things, that the Defendants intentionally: (1) worked with representatives and others to deprive LaBella of its lease and its right to reopen, (Compl. ¶ 24(E)); (2) met with the Village, D'Onofrio, representatives from the Landlord and other businesses, insurers, and adjustors for the express purpose of keeping LaBella closed, (Compl. ¶ 24(E)); (3)

19

instructed LaBella that it could not repair the interior of the restaurant until the Landlord repaired the roof and refused to process permit applications regarding the same, (Compl. ¶¶ 24(F), 53); and (4) worked with and encouraged Corner Cooks to expand its space and to bring in Jerry's Restaurant with the knowledge that such expansion would interfere with LaBella's quiet enjoyment of its lease, (Compl. ¶¶ 25, 53). LaBella also alleges that, as a result of Defendants' actions, LaBella no longer has access to its leased space and has been forced to close its restaurant business for the remainder of the Lease. (Compl. ¶¶ 55-56.)

In the alternative, Defendants argue that they are immune from a claim for tortious interference under sections 2-103, 2-104, 2-105, 2-202, 2-205, 2-206, 2-207, and 2-110 of the Tort Immunity Act. Under the Illinois Tort Immunity Act, "Illinois adopted the general principle that local governmental units are liable in tort, but limited this liability with an extensive list of immunities based on specific government functions." *Vill. of Bloomingdale, Inc.*, 752 N.E.2d at 1095 (citations omitted). Defendants are correct that, in certain circumstances, the aforementioned sections of the Tort Immunity Act shield public employees for their failure to enforce laws, issue permits, and inspect private property. Construing all reasonable inferences in favor of the plaintiff, as the Court must when considering a motion to dismiss, the Court concludes that LaBella's allegations go beyond the mere failure to enforce laws, issue permits, or inspect property. Because the conduct at issue could extend beyond the scope of the Tort Immunity Act, Defendants' request for dismissal on the basis of immunity is also unpersuasive.

Nevertheless, because this Court has dismissed all of LaBella's federal claims, the Court declines to exercise its discretion to retain supplemental jurisdiction over this state law claim. As

such, Count IV is dismissed without prejudice pursuant to 28 U.S.C. § 1367(a).[9]

## CONCLUSION AND ORDER

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss.  All claims are dismissed without prejudice.  Plaintiff is given 21 days to file an amended complaint.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:  March 13, 2008

---

[9] Defendants also move for dismissal of any punitive damages sought by LaBella in its prayer for relief in Counts III and IV.  This argument is moot in light of the Court's dismissal of Counts III and IV.