# EXHIBIT 1

STORE LEASE
(REPLACES FORMS 9 & 9-B)

No 9
FEBRUARY 1956

GEORGE E. COLE*
LEGAL FORMS

# STORE LEASE

CAUTION: Consult a lawyer before using or acting under this form. Neither the publisher nor the seller of this form makes any warranty with respect thereto, including any warranty of merchantability or fitness for a particular purpose.

| DATE OF LEASE | TERM OF LEASE | | MONTHLY RENT |
|---|---|---|---|
| | BEGINNING | ENDING | |
| May 6, 1993 | August 1, 1993 | July 31, 1996 | *$3116.67/Mo= |

**Location of Premises:** *$2566.67/Mo. Lease payment subject to 3% annual increase on August 1
One Chestnut Court, Winnetka of each year. *$550.00 Represents taxes to year 1993. Percentage of any
*increase thereafter in subsequent years

**Purpose:** *Square footage 2160 plus 20% of 200 sq. ft. as common elements. All parties
Restaurant agree to remeasure after work is completed. **Rider provides for two additional
five year terms which Lessee may execute.

**LESSEE**
NAME · Marianne Gigiolio and Marion Gajek,
a Partnership
ADDRESS 422   Ridge Avenue
CITY Winnetka, IL 60093

**LESSOR**
NAME · LARS NILSSON
ADDRESS · 874 GREEN BAY RD.,
CITY WINNETKA, IL. 60093

In consideration of the mutual covenants and agreements herein stated, Lessor hereby leases to Lessee and Lessee hereby leases from Lessor solely for the above purpose the premises designated above (the "Premises"), together with the appurtenances thereto, for the above Term.

**RENT**

1. Lessee shall pay Lessor or Lessor's agent as rent for the Premises the sum stated above, monthly in advance, until termination of this lease, at Lessor's address stated above or such other address as Lessor may designate in writing.

**WATER, GAS AND ELECTRIC CHARGES**

2. Lessee will pay, in addition to the rent above specified, all water rents, gas and electric light and power bills taxed, levied or charged on the Premises, for and during the time for which this lease is granted, and in case said water rents and bills for gas, electric light and power shall not be paid when due, Lessor shall have the right to pay the same, which amounts so paid, together with any sums paid by Lessor to keep the Premises in a clean and healthy condition, as herein specified, are declared to be so much additional rent and payable with the installment of rent next due thereafter.

**SUBLETTING; ASSIGNMENT**

3. The Premises shall not be sublet in whole or in part to any person other than Lessee, and Lessee shall not assign this lease without, in each case, the consent in writing of Lessor first had and obtained; nor permit to take place by any act or default of himself or any person within his control any transfer by operation of law of Lessee's interest created hereby; nor offer for lease or sublease the Premises, nor any portion thereof, by placing notices or signs of "To Let," or any other similar sign or notice in any place, nor by advertising the same in any newspaper or place or manner whatsoever without, in each case, the consent in writing of Lessor first had and obtained. If Lessee, or any one or more of the Lessees, if there be more than one, shall make an assignment for the benefit of creditors, or shall be adjudged a bankrupt, Lessor may terminate this lease, and in such event Lessee shall at once pay Lessor a sum of money equal to the entire amount of rent reserved by this lease for the then unexpired portion of the term hereby created, as liquidated damages. Lessor will not unreasonably withhold subletting under the terms of fire and/or storm Clause.

**LESSEE NOT TO MISUSE**

4. Lessee will not permit unlawful or immoral practice, with or without his knowledge or consent, to be committed or carried on in the Premises by himself or by any other person. Lessee will not allow the Premises to be used for any purpose that will increase the rate of insurance thereon, nor for any purpose other than that hereinbefore specified. Lessee will not keep or use or permit to be kept or used in or on the Premises or any place contiguous thereto any flammable fluids or explosives, without the written permission of Lessor first had and obtained. Lessee will not lead floors beyond the floor load rating prescribed by applicable municipal ordinances. Lessee will not use or allow the use of the Premises for any purpose whatsoever that will injure the reputation of the Premises or of the building of which they are a part.

**CONDITION ON POSSESSION**

5. Lessee has examined and knows the condition of the Premises XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**REPAIRS AND MAINTENANCE**

6. Lessee shall keep the Premises and appurtenances thereto in a clean, sightly and healthy condition, and in good repair, all according to the statutes and ordinances in such cases made and provided, and the directions of public officers thereunto duly authorized, all at his own expense, and shall yield the same back to Lessor upon the termination of this lease, whether such termination shall occur by expiration of the term, or in any other manner whatsoever, in the same condition of cleanliness, repair and sightliness as at the date of the execution hereof, loss by fire and reasonable wear and tear excepted. Lessee shall make all necessary repairs and renewals upon Premises and replace broken globes, glass and fixtures with material of the same size and quality as that broken and shall insure all glass in windows and doors of the Premises at his own expense. If, however, the Premises shall not thus be kept in good repair and in a clean, sightly and healthy condition by Lessee, as aforesaid, Lessor may enter the same, himself or by his agents, servants or employes, without entering causing or constituting a termination of this lease or an interference with the possession of the Premises by Lessee, and Lessor may replace the same in the same condition of repair, sightliness, healthiness and cleanliness as existed at the date of execution hereof, and Lessee agrees to pay Lessor, in addition to the rent hereby reserved, the expenses of Lessor in thus replacing the Premises in that condition. Lessee shall not cause or permit any waste, misuse or neglect of the water, or of the water, gas or electric fixtures.

**ACCESS TO PREMISES**

7. Lessee will allow Lessor or any person authorized by Lessor free access to the Premises for the purpose of examining or exhibiting the same, or to make any repairs or alterations thereof which Lessor may see fit to make, and Lessee will allow Lessor to have placed upon the Premises at all times notices of "For Sale" and "For Rent", and Lessee will not interfere with the same.

**NON-LIABILITY OF LESSOR**

8. Except as provided by Illinois statute, Lessor shall not be liable to Lessee for any damage or injury to him or his property occasioned by the failure of Lessor to keep the Premises in repair, and shall not be liable for any injury done or occasioned by wind or by or from any defect of plumbing, electric wiring or of insulation thereof, gas pipes, water pipes or steam pipes, or from broken stairs, porches, railings or walks, or from the backing up of any sewer pipe or down-spout, or from the bursting, leaking or running of any tank, tub, washstand, water closet or waste pipe, drain, or any other pipe or tank in, upon or about the Premises or the

SHOULD LESSOR'S MORTGAGEE OR FINANCE COMPANY REQUIRE THAT LESSEE EXECUTES A
SUBORDINATION AGREEMENT AND ESTOPPEL CERTIFICATE, LESSEE HEREBY AGREES TO EXECUTE THESE
DOCUMENTS IN A TIMELY MANNER.

EXHIBIT
A

building of        they are a part nor from the escape of steam or hot water . . . . . any radiator, it being agreed that said ra... ...ors are under the control of Lessee, nor for any such damage... or injury occasioned by water, snow or ice being upon or coming through the roof, skylight, trap-door, stairs, walls or any other place upon or near the Premises or otherwise, nor for any such damage or injury done or occasioned by the falling of any fixture, plaster or stucco, nor for any damage or injury arising from any act, omission or negligence of co-tenants or of other persons, occupants of the same building or of adjoining or contiguous buildings or of owners of adjacent or contiguous property, or of Lessor's agents or Lessor himself, all claims for any such damage or injury being hereby expressly waived by Lessee.

**RESTRIC-TIONS (SIGNS, ALTER-ATIONS, FIXTURES)**

9.  Lessee shall not attach, affix or exhibit or permit to be attached, affixed or exhibited, except by Lessor or his agent, any articles of permanent character or any sign, attached or detached, with any writing or printing thereon, to any window, floor, ceiling, door or wall in any place in or about the Premises, or upon and shall not commit or suffer any waste in or about said premises; and shall make no changes or alterations in the Premises by the erection of partitions or the papering of walls, or otherwise, without the consent in writing of Lessor; and in case Lessee shall affix additional locks or bolts on doors or window, or shall place in the Premises lighting fixtures or any fixtures of any kind, without the consent of Lessor first had and obtained, such locks, bolts and fixtures shall remain for the benefit of Lessor, and without expense of removal or maintenance to Lessor. Lessor shall have the privilege of retaining the same if he desires. If he does not desire to retain the same, he may remove and store the same, and Lessee agrees to pay the expense of removal and storage thereof. The provisions of this paragraph shall not however apply to Lessee's trade fixtures, equipment and moveable furniture.

**HEAT**

10.  Where building is equipped for the purpose, Lessor shall furnish to Lessee a reasonable amount of heat, from October 1st to May 1st, whenever in Lessor's judgment necessary for comfortable use of the Premises, during customary business hours (excluding Sundays and holidays), but not earlier than 8 a.m. nor later than 11p.m. unless specifically stated herein. Lessor does not warrant that heating service will be free from interruptions caused by strike, accident or other cause beyond the reasonable control of Lessor, or by renewal or repair of the heating apparatus in the building. Any such interruption shall not be deemed an eviction or disturbance of Lessee's use and possession of Premises, nor render Lessor liable to Lessee in damages. All claims against Lessor for injury or damage arising from failure to furnish heat are hereby expressly waived by Lessee.

**FIRE AND CASUALTY**

11.  In case the Premises shall be rendered untenantable by fire, explosion or other casualty, Lessor may, at his option, terminate this lease or repair the Premises within sixty days. If Lessor does not repair the Premises within said time, or the building containing the Premises shall have been wholly destroyed, the term hereby created shall cease and determine.

**TERMINA-TION; HOLDING OVER**

12.  At the termination of the term of this lease, by lapse of time or otherwise, Lessee will yield up immediate possession of the Premises to Lessor, in good condition and repair, loss by fire and ordinary wear excepted, and will return the keys therefor to Lessor at the place of payment of rent. If Lessee retains possession of the Premises or any part thereof after the termination of the term by lapse of time or otherwise, then Lessor may at its option within thirty days after termination of the term serve written notice upon Lessee that such holding over constitutes either (a) renewal of this lease for one year, and from year to year thereafter, at double the rental (computed on an annual basis) specified in Section 1, or (b) creation of a month to month tenancy, upon the terms of this lease except at double the monthly rental, specified in Section 1, or (c) creation of a tenancy at sufferance, at a rental of . . . . $150.00 . . . . . . . . . . . dollars per day for the time Lessee remains in possession. If no such written notice is served then a tenancy at sufferance Lessor resulting from retention of possession by Lessee. The provisions of this paragraph shall not constitute a waiver by Lessor of any right of re-entry as hereinafter set forth; nor shall receipt of any rent or any other act in apparent affirmance of tenancy operate as a waiver of the right to terminate this lease for a breach of any of the covenants herein.

**LESSOR'S REMEDIES**

13.  If Lessee shall vacate or abandon the Premises or permit the same to remain vacant or unoccupied for a period of ten days, or in case of the non-payment of the rent reserved hereby, or any part thereof, or of the breach of any covenant in this lease contained, Lessee's right to the possession of the Premises thereupon shall terminate with or (to the extent permitted by law) without any notice or demand whatsoever, and the mere retention of possession thereafter by Lessee shall constitute a forcible detainer of the Premises; and if the Lessor so elects, but not otherwise, and with or without notice of such election or any notice or demand whatsoever, this lease shall thereupon terminate, and upon the termination of Lessee's right of possession, as aforesaid, whether this lease be terminated or not, Lessee agrees to surrender possession of the Premises immediately, without the receipt of any demand for rent, notice to quit or demand for possession of the Premises whatsoever, and hereby grants to Lessor full and free license to enter into and upon the Premises or any part thereof, to take possession thereof with or (to the extent permitted by law) without process of law, and to expel and to remove Lessee or any other person who may be occupying the Premises or any part thereof, and Lessor may use such force in and about expelling and removing Lessee and other persons as may reasonably be necessary, and Lessor may re-possess himself of the Premises as of his former estate, but such entry of the Premises shall not constitute a trespass or forcible entry or detainer, nor shall it cause a forfeiture of rents due by virtue thereof, nor a waiver of any covenant, agreement or promise in this lease contained, to be performed by Lessee. Lessee hereby waives all notice of any election made by Lessor hereunder, demand for rent, notice to quit, demand for possession, and any and all notices and demands whatsoever, of any and every nature, which may or shall be required by any statute of this state relating to forcible entry and detainer, or to landlord and tenant, or any other statute, or by the common law, during the term of this lease or any extension thereof. The acceptance of rent, whether in a single instance or repeatedly, after it falls due, or after knowledge of any breach hereof by Lessee, or the giving or making of any notice or demand, whether according to any statutory provision or not, or any act or series of acts except an express written waiver, shall not be construed as a waiver of Lessor's right to act without notice or demand or of any other right hereby given Lessor, or as an election not to proceed under the provisions of this lease.

**RIGHT TO RELET**

14.  If Lessee's right to the possession of the Premises shall be terminated in any way, the Premises, or any part thereof, may, but need not (except as provided by Illinois statute), be relet by Lessor, for the account and benefit of Lessee, for such rent and upon such terms and to such person or persons and for such period or periods as may seem fit to the Lessor, but Lessor shall not be required to accept or receive any tenant offered by Lessee, nor to do any act whatsoever or exercise any diligence whatsoever, in or about the procuring of another occupant or tenant to mitigate the damages of Lessee or otherwise. Lessee hereby waiving the use of any care or diligence by Lessor in the reletting thereof; and if a sufficient sum shall not be received from such reletting to satisfy the rent hereby reserved, after paying the expenses of reletting and collection, including commissions to agents, and including also expenses of redecorating, Lessee agrees to pay and satisfy all deficiency; but the acceptance of a tenant by Lessor, in place of Lessee, shall not operate as a cancellation hereof, nor to release Lessee from the performance of any covenant, promise or agreement herein contained. and performance by any substituted tenant by the payment of rent, or otherwise, shall constitute only satisfaction pro tanto of the obligations of Lessee arising hereunder.

**COSTS AND FEES**

15.  Lessee shall pay upon demand all Lessor's costs, charges and expenses, including fees of attorneys, agents and others retained by Lessor, incurred in enforcing any of the obligations of Lessee under this lease or in any litigation, negotiation or transaction in which Lessor shall, without Lessor's fault, become involved through or on account of this lease.

**CONFESSION OF JUDGMENT**

16. I hereby irrevocably constitute and appoint any attorney ~~any court of record in this State, to be his true and lawful attorney for him and in his name and stead, to enter his appearance in any suit or suits that may be brought in any court in this State at any time when any money is due hereunder for rent or otherwise, to waive the issuing of process and service thereof and trial by jury or otherwise, and to confess a judgment or judgments for such money so due and for costs of suit and for reasonable attorney's fees in favor of Lessor, and to release all errors that may occur or intervene in such proceedings, including the issuance of execution upon any such judgment, and to stipulate that no writ of error or appeal shall be prosecuted from such judgment or judgments, nor any bill in equity filed, nor any proceedings of any kind taken in law or equity to interfere in any way with the operation of such judgment or judgments or of execution issued thereon and to consent that execution may immediately issue thereon.~~

**LESSOR'S LIEN**

17. Lessor shall have a first lien upon the interest of Lessee under this lease, to secure the payment of all moneys due under this lease, which lien may be foreclosed in equity at any time when money is overdue under this lease; and the Lessor shall be entitled to name a receiver of said leasehold interest, to be appointed in any such foreclosure proceeding, who shall take possession of said premises and who may relet the same under the orders of the court appointing him.

**REMOVAL OF OTHER LIENS**

18. In event any lien upon Lessor's title results from any act or neglect of Lessee, and Lessee fails to remove said lien within ten days after Lessor's notice to do so, Lessor may remove the lien by paying the full amount thereof or otherwise and without any investigation or contest of the validity thereof, and Lessee shall pay Lessor upon request the amount paid out by Lessor in such behalf, including Lessor's costs, expenses and counsel fees.

**REMEDIES NOT EXCLUSIVE**

19. The obligation of Lessee to pay the rent reserved hereby during the balance of the term hereof, or during any extension hereof, shall not be deemed to be waived, released or terminated, ~~nor shall the right and power to confess judgment given in paragraph 16 hereof be deemed to be waived or terminated by the service of any five-day notice, either notice to collect, demand for possession, or notice that the tenancy hereby~~ created will be terminated on the date therein named, the institution of any action of forcible detainer or ejectment or any judgment for possession that may be rendered in such action, or any other act or acts resulting in the termination of Lessee's right to possession of the Premises. The Lessor may collect and receive any rent due from Lessee, and payment or receipt thereof shall not waive or affect any such notice, demand, suit or judgment, or in any manner whatsoever waive, affect, change, modify or alter any rights or remedies which Lessor may have by virtue hereof.

**NOTICES**

20. Notices may be served on either party, at the respective addresses given at the beginning of this lease, either (a) by delivering or causing to be delivered a written copy thereof, or (b) by sending a written copy thereof by United States certified or registered mail, postage prepaid, addressed to Lessor or Lessee at said respective addresses in which event the notice shall be deemed to have been served at the time the copy is mailed.

**MISCELLANEOUS**

21. (a) Provisions typed on this lease and all riders attached to this lease and signed by Lessor and Lessee are hereby made a part of this lease.

(b) Lessee shall keep and observe such reasonable rules and regulations now or hereafter required by Lessor, which may be necessary for the proper and orderly care of the building of which the Premises are a part.

(c) All covenants, premises, representations and agreements herein contained shall be binding upon, apply and inure to the benefit of Lessor and Lessee and their respective heirs, legal representatives, successors and assigns.

(d) The rights and remedies hereby created are cumulative and the use of one remedy shall not be taken to exclude or waive the right to the use of another.

(e) The words "Lessor" and "Lessee" wherever used in this lease shall be construed to mean Lessors or Lessees in all cases where there is more than one Lessor or Lessee, and to apply to individuals, male or female, or to firms or corporations, as the same may be described as Lessor or Lessee herein, and the necessary grammatical changes shall be assumed in each case as though fully expressed. ~~If there is more than one Lessee the warrant of attorney in paragraph 16 is given jointly and severally and shall authorize the entry of appearance of, and waiver of process and trial by jury by, and confession of judgment against any one or more of such Lessees, and shall authorize the performance of every other act in the name of and on behalf of any one or more of such Lessees.~~

**SEVERABILITY**

22. If any clause, phrase, provision or portion of this lease or the application thereof to any person or circumstance shall be invalid, or unenforceable under applicable law, such event shall not affect, impair or render invalid or unenforceable the remainder of this lease nor any other clause, phrase, provision or portion hereof, nor shall it affect the application of any clause, phrase, provision or portion hereof to other persons or circumstances.

**OPTION TO TERMINATE**

~~23. In the event that the Lessee, his successors, attorneys or assigns shall desire to regain the possession of the Premises herein described, for any reason, Lessee shall have the option of so doing upon giving the Lessee thirty days' notice of Lessor's election to exercise such option.~~

**CONFESSION OF JUDGMENT**

~~24. If default be made in the payment of rent, or any installment thereof, as herein provided, I do hereby irrevocably constitute any attorney of any Court of Record in this State, attorney for Lessee and in Lessee's name, from time to time, to enter the appearance of Lessee, to waive the issuance of process and service thereof, to waive trial by jury, and to confess judgment in favor of Lessor against Lessee for the amount of rent which may be then due hereunder, together with costs of suit and a reasonable sum for plaintiff's attorney's fees in or about the entry of such judgment, and to waive and release all errors and right of appeal from any such judgment, and to consent to an immediate execution thereon.~~

**PLURALS; SUCCESSORS**

~~25. The words "Lessor" and "Lessee" wherever used in this lease shall be construed to mean Lessors or Lessees in all cases where there is more than one Lessor or Lessee, and to apply to individuals, male or female, or to firms or corporations, as the same may be described as Lessor or Lessee herein, and the necessary grammatical changes shall be assumed in each case as though fully expressed. All covenants, premises, representations and agreements herein contained shall be binding upon, apply and inure to the benefit of Lessor and Lessee and their respective heirs, legal representatives, successors and assigns.~~

RIDER TO LEASE DATED

1993 XXXXXXXXXXXXXXXX

BETWEEN   Lars Nilsson

LESSOR AND  Marianne Gigiolio and

Marion Gajek        LESSEE (a partnership)

1.  Control of Rider:  Should any inconsistency appear between this Rider and the form portion of the Lease herein referred, this Rider shall control.

2.  Lessee shall pay a monthly rental of one _____ of ___ dollars per month and the monthly rental shall commence as of _____ _____ of term _____ , and shall be payable in advance on the first day of each month until the termination of this Lease.

3.  Inxadditionxxxxx the rent provided for in paragraph 2 above, xxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx *includes $3.00 per square foot of the Premises as Lessee's share of real estate taxes.

4.  Not withstanding any provision herein to the contrary, Lessee agrees to pay the Lessor additional rental in the amount of $100.00   if one or both of the following events occurs:

a)  Whenever a monthly rental payment or additional rental due under paragraph 4 herein is tendered and received later than the fifth (5th) day of the month; or

b)  Whenever a check is tendered for payment of rent is returned without payment by Lessee's bank, for whatever reason.

5.  A security deposit in the amount of  one  month's rent, xxxxxxx shall be paid to Lessor by Lessee at the time of the execution of this Lease.  This security deposit shall be held as security for the performance of all covenants and agreements of Lessee hereunder.  Lessor may at any time or times apply all or any portion thereof to the payment of any amounts due Lessor from the Lessee.  The security deposit is not to be construed as applicable against final rent payment or payments required under this Lease.  Upon termination of this Lease and full performance by Lessee of all of its obligations hereunder, so much of the security deposit as remains unapplied shall be returned to Lessee.  The security deposit shall not bear interest.

6.  The Lessee shall have a right to remodel the interior of the demised premises, at its own expense, as may be necessary to fit its business on the condition;  1) that such remodeling plans and specifications meet all requirements of the Village of Winnetka _____ Building Code for issuance of such permit xxxxxxxxxxxxxxxxxxxxxxx final be approved by the Lessor which approval shall not be unreasonably withheld, and 2) that all plans for such remodeling shall Lessor with a waiver of mechanics' lien for all work undertaken as part of the remodeling; and 4) that such remodeling work shall also be approved, if necessary, by Lessor's mortgagee so as not to give rise to a declaration of default.  Lessee may also, at its own expense, install such counters, fixtures, machinery and equipment upon or within the leased premises as Lessee may consider necessary to conduct its business.  At any time prior to the expiration or earlier termination of the Lease, Lessee may remove any or all such alterations, additions, or installations in such a manner as will not substantially injure the leased premises.  In the event Lessee shall elect to make such removal, Lessee shall restore the premises, or the portion or portions effected by such removal, to the same condition as existed prior to the making of such alteration, addition or installation, ordinary wear and tear, damage by fire or other unavoidable cause excepted.

All alterations, additions, or installations not so removed by Lessee shall become the property of Lessor without liability on Lessor's part to pay for the same.

7.  Lessee shall maintain insurance coverage in an amount sufficient to pay for the replacement of all plate glass installed in the demised premises.  In the event of breakage due to whatever cause.  In the event of breakage of plate glass, Lessee shall be responsible to protect the interior of the premises from whatever hazards arise as a result of the breakage.

8.  Lessee will repair and maintain at its cost the _____ air conditioning unit(s). xxxxxxxxxxxxxxxxxxxxxx install xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9.  Lessee agrees to obtain all licenses and permits, at its own expense, and so conduct its business on these premises that its activities fully conform to all codes and ordinances of the Village of Winnetka.

10.  Lessor's Remedies:

a)  All rights and remedies of Lessor herein enumerated shall be cumulative and none shall exclude any other right allowed by law.

b)  If any voluntary or involuntary petition or similar pleading under any section or sections of the Bankruptcy or Insolvency Act shall be filed by or against Lessee, or any voluntary or involuntary proceeding in any court or tribunal shall be instituted to declare Lessee insolvent or unable to pay Lessee's debts, or Lessee makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for Lessee, or for the major part of Lessee's property and, in the case of an involuntary petition or proceeding, the petition or proceeding is not dismissed within thirty (30) days, from the date it is filed, Lessor may elect, but is not required, with or without notice of such election and with or without entry or other action by Lessor, to forthwith terminate this Lease.  Notwithstanding any other provision of the Lease, upon such termination, Lessor shall forthwith be entitled to recover damages in an amount equal to the value of the rent specified in the form portion of this Lease for the residue of the term plus any other sums then due hereunder.

c)  If Lessee defaults in the payment of rent and such default continues for five (5) or more days after the same is due and payable, or if Lessee defaults in the prompt and full performance of any other provisions of this Lease and Lessee does not cure the default with thirty (30) days after written demand by Lessor that the default be cured (unless the default involves a hazardous condition which shall be cured forthwith upon Lessor's demand), or if the leasehold interest of Lessee is levied upon under execution or is attached by process of law or if Lessee abandons the premises then in any such event, Lessor may, if Lessor so elects, but not otherwise, with or without notice of such election and with or without any demand whatsoever, either forthwith terminate this Lease and Lessee's right to possession of the premises.

d)  Upon termination of this Lease, whether by lapse of time or otherwise, or upon any termination of the Lessee's right to possession without termination of the Lease, the Lessor shall surrender possession and vacate the premises immediately, and deliver possession thereof to the Lessor, and hereby grants to the Lessor full and free license to enter into and upon the premises in such event, with or without process of law, and to repossess Lessor of the premises as of Lessor's former estate, and to expel or remove Lessee or any others who may be occupying or within the premises and to remove any and all property therefrom, using such force as may be necessary, without being deemed in any manner guilty of trespass, eviction or forcible entry and without or conversion of property and without relinquishing the Lessor's rights to rent or any other right given to Lessor hereunder or by operation of law.

Lessee expressly waives the service of any demand for the payment of rent or for possession and the service of any notice of Lessor's election to terminate this Lease or to re-enter the premises, including any and every form of demand and notice prescribed by statute or at law for the simple breach of any covenant or provision of this Lease by Lessee shall, of itself, without the service of any notice or demand whatsoever, constitute a forcible detainer by Lessee of the premises within the meaning of the statutes of the State of Illinois. In such event, Lessor shall forthwith be entitled to recover damages in an amount equal to the value of the rent specified in the form portion of this Lease for the residue of the term plus any other sums then due hereunder and all such sums shall immediately become due and payable.

e) (i) If Lessee abandons the premises or if Lessor elects to terminate Lessee's right to possession only, without terminating the Lease pursuant to a right granted to Lessor hereunder, Lessor may, at Lessor's option, enter into the premises, remove tenant's signs and other evidence of tenancy, and take and hold possession thereof as in paragraph (d) of this section provided without such entry and possession terminating the Lease or releasing Lessee, in whole or in part, from Lessee's obligation to pay the rent hereunder for the full term. In any such case, Lessee shall pay forthwith to Lessor, if Lessor so elects, in lieu of making the regular payments of rent required hereunder, a sum equal to the entire amount of rent specified in the form portion of this Lease for the residue of the term plus any other sums then due hereunder.

(ii) Upon and after entry into possession without termination of the Lease, Lessor may but need not, relet the premises or any part thereof for the account of Lessee to any person, firm or corporation other than Lessee for such rent, for such time and upon such terms as Lessor, in Lessor's sole discretion, shall determine. Lessor shall not be required to accept any tenant offered by Lessee or to observe any instruction given by Lessee about such reletting. In any such case, Lessor may make repairs, alterations and additions in or to the premises and redecorate the same to the extent deemed by Lessor necessary or desirable. Lessee shall, upon demand, pay the cost thereof, together with Lessor's expenses of the reletting.

(iii) If Lessor has not elected to collect Lessor's damages as provided in paragraph e) (i) of this section, and if the consideration collected by Lessor upon any such reletting for Lessee's account is not sufficient to pay monthly the full amount of the monthly rental reserved in this Lease, together with, over the term of such new Lease, the costs of repair, alterations, additions, redecorating and Lessor's other costs and expense of regaining possession and reletting the premises, Lessee shall pay to Lessor the amount of such monthly deficiency upon demand.

f) No waiver of default of Lessee shall be implied to affect, and no express waiver shall affect, any default other than the default specified in such waiver and the date one shall not be implied to affect any default other than the default in payment of rent brought current by such tender of rent.

g) If Lessee at any time fails to make any payment or perform any other act on its part to be made or performed under this Lease, Lessor may, but shall not be obligated to, after thirty-day notice or demand and without waiving or releasing Lessee from any obligation under this Lease, make such payment or perform such other act to the extent Lessor may deem desirable and to pay expenses and employ legal counsel. All sums so paid by Lessor and all costs, charges and expenses incurred by Lessor in enforcing Lessee's obligations hereunder or incurred by Lessor in any litigation, negotiation or transaction in which Lessee causes Lessor, without Lessor's fault to be involved or concerned (including but not limited to, reasonable attorney's fees and costs) shall be payable upon demand, together with interest thereon at the rate of eight (8%) percent per annum, from the date such sum was paid or such charge, cost or expense was incurred and Lessor shall have the same rights and remedies for the non-payment thereof as in the case of default in the payment of rent hereunder.

11. Insurance:

a) Liability Insurance. Lessee shall procure from a company or companies satisfactory to Lessor and maintain during the term of this Lease, at its own cost and expense, a policy or policies of insurance in form satisfactory to Lessor, insuring Lessee, Lessor, the titleholder of the land or improvements and the agents, employees and/or beneficiaries, if any, against public liability, property damage, loss by fire, extended coverage and worker's compensation coverage, with respect to the leased premises and the business operated by Lessee, with such limits for bodily injury as to each person and as to each accident and for property damage as Lessor may from time to time require. Lessee shall at the commencement of this Lease carry public liability and property damage insurance in the minimal amounts of Three Hundred Thousand ($300,000.00) Dollars in respect of injury to any one person and Five Hundred Thousand ($500,000.00) Dollars in respect of any one accident, and Fifty Thousand ($50,000.00) property damage.

b) Increase in Fire Insurance Premium. Lessee agrees that it will not keep, use, sell or offer for sale in or upon the leased premises any article which may be prohibited by the standard form of fire insurance policy. Lessee agrees to pay any increase in premium for fire and extended coverage insurance that may be charged during the term of this Lease on the amount of such insurance which may be carried by Lessor on premises or buildings of which the leased premises are a part, resulting from the type of merchandise sold or equipment installed by Lessee in the leased premises, whether or not Lessor has consented to the same. In determining whether increased premiums are the result of Lessee's use of the leased premises, a schedule, issued by the organization making the insurance rate on the leased premises, showing the various components of such rate, shall be conclusive evidence of the several items and charges which make up the fire insurance rate on the premises.

c) Cancellation. Any insurance required to be procured and maintained by Lessee under the provisions of this Lease shall not be subject to cancellation or modification except after ten (10) days' prior written notice to Lessor, and each policy shall so provide all policies of insurance required to be furnished hereunder, together with receipts or other documents satisfactory to Lessor showing payment of premiums thereon shall be deposited with Lessor prior to the commencement of the term hereof and renewals thereof not less than thirty (30) days prior to the expiration of the term of such coverage; provided, however, that if Lessee shall maintain any insurance required hereunder under a blanket policy, Lessee shall have sufficiently complied with the terms hereof by furnishing Lessor a certificate or certificates in the premises for the same.

12. Lessee will allow Lessor or any person authorized by Lessor free access to the demised premises for the purpose of examining same or to make any repairs or alterations thereof which Lessor may deem fit to make to insure the safety to persons and prevent property damage to the building. Further, Lessee shall allow Lessor or any person authorized by Lessor free access to exhibit the premises and place "For Rent" signs on the premises if this Lease is terminated prematurely, or within ninety (90) days of the expiration of this Lease.

13. In the event Lessee hereunder shall become a corporation, duly authorized to do business in the State of Illinois said corporation shall join, execute and ratify the terms of this Lease while the individual Lessee's shall remain as jointly and severally liable or guarantors of the payment of rent and performance of the terms and conditions herein.

14. The Lessor and Lessee understand and agree that time is of the essence of all of the terms and provisions of this Lease Agreement. Further this Lease Agreement and Rider herein shall be binding on the heirs, executors, administrators and assigns of the respective parties.

IN WITNESS WHEREOF, the parties hereto set their hands and seals this 6 day of May, 19 65.

_____                    _____
Witness                                       LESSOR

                                              _____
                                              LESSEE

-2-

Also a three page rider and a two page preprinted rider included in this lease

Also "Riders # 3 and 4" Dated 7-26-93 *[signatures]*

WITNESS the hands and seals of the parties hereto, as of the Date of Lease stated above.

_____ (SEAL)     _____ (SEAL)

_____ (SEAL)     _____ (SEAL)

_____ (SEAL)     _____ (SEAL)
        (Lessor)                            (Lessee)

### ASSIGNMENT BY LESSOR

On this_____, 19_____, for value received, Lessor hereby transfers, assigns and sets over to _____ all right, title and interest in and to the above Lease and the rent thereby reserved, except rent due and payable prior to_____, 19_____.

_____ (SEAL)

_____ (SEAL)

### GUARANTEE

On this_____, 19_____, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned Guarantor hereby guarantees the payment of rent and performance by Lessee, Lessee's heirs, executors, administrators, successors or assigns of all covenants and agreements of the above lease.

_____ (SEAL)

_____ (SEAL)

NOTE: Use Form Number 12-1P for assignment by Lessee.

*Initial term* $\{$ 7-3-1 98
option
8-1-98
$\downarrow$
7-31 2003

RIDER NUMBER TWO
TO LEASE DATED ~~April~~ May 6, 1993 ON
CHESTNUT COURT PREMISES IN
WINNETKA, ILLINOIS,
BETWEEN LARS NILSSON, LESSOR AND
MARIANNE GIGIOLIO AND MARION GAJEK, LESSEE

1.   Should any conflict of inconsistency appear between this Rider No. Two and the standard form of Store Lease or Rider No. One thereto, this Rider No. Two shall control.

2.   The Premises to be leased by Lessor to Lessee under this Lease are deliniated on plat of the first floor of the building formerly occupied by the Indian Trail Restaurant at #1 Chestnut ~~Street~~, Winnetka, Illinois. The parties agree that a total of ____ square feet constitute the Premises. Common areas, exits and corridors used in common are also designated on the plat, Exhibit "A", attached hereto and made a part hereof.

3.   Lessee proposes to make the following alterations to the building and Premises at its expense, which expense shall be credited against the first rents due to Lessor upon receipt by Lessor of invoices showing the expenses so incurred by Lessee and proof of payment therefor:

    a.   A new entrance from Chestnut Court sidewalk into Premises, including new windows which are adjacent to the door as well as all finishing materials and labor expenses incurred in adding this new entrance.

    b.   Reopening the corridor to the existing bathrooms, including drywallings, and all materials and labor used in completing the construction on the hallways.

    c.   Installing new air-conditioning on the roof with all necessary electrical and mechanical work needed to make the system work effieciently and in a satisfactory manner including seperate thermostats and fan controls in the kitchen and other main rooms.

    d.   Re-routing the kitchen stairs into the kitchen area.

    e.   Walling in the kitchen area which is a part of the Premises.

    f.   Making the Premises handicapped accessable to bring it in compliance with the ADA Act.

    g.   Providing separate meters for water, gas and electric to be used in the Premises along with all labor necessary to install these seperate meters.

    h.   Replace main dinning room floor with ceramic tile.

Plans and specifications for the work shall be subject to prior written approval by Lessor, which approval shall not be unreasonably withheld. Lessor shall provide free and unobstructed access to Premises for Lessee's contractor and workmen from 8:00 A.M. until 5:00 P.M. daily except Sundays for the purpose of completing Lessee's improvements and alterations aforesaid.

4. The term of the Lease shall begin on August 1, 1983, or at such earlier date as Lessee is open for business. Rent shall be prorated on a daily basis if the term commences other than at the first of the month. The initial term shall end five years after the beginning of the first full calendar month of the Lease.

5. Lessor covenants at its expense to keep the foundations and roof of the premises and the structural soundness of the concrete floors and exterior walls thereof, in good order, repair and condition.

6. If Lessee shall timely and faithfully perform all of the terms, covenants and conditions of this lease during the original occupancy of all or substantially all of the demised Premises, Lessee shall have the right and option; exercisable by giving written notice thereof to Lessor at least six (6) months prior to the expiration of the original term of this lease or at the expiration of the First Additional Term, to extend the terms of the lease for an additional term of five (5) years ("First Additional Term"), upon all of the terms, covenants and conditions contained in this lease, ~~except that the annual rent~~ for that portion of the First Additional Term commencing August 1, 1993, shall be increased over the annual rent payable during the initial term (but in no event decreased) to the extent of the percentage of increase in the Consumer Price Index for All Urban Consumers, Chicago, Illinois and Northwestern Indiana--All Items-Series A (1967=100) prepared by the Bureau of Labor Statistics of the United States Department of Labor (the "Index") between the calendar month August, 1993 and the calendar month July, 1998. In the event that the Index shall no longer be published with a base year of 1967, the parties shall compute, by reference to data available from said Bureau of Labor Statistics, the actual percentage increase in such consumer prices during the period in question. If the Index shall cease to be published, the parties shall use, as the Index, the most ~~comparable index then published by the United States Government.~~ If Lessee exercises its option for the second additional term, the annual rent shall be increased by the same formula for the ~~period from August 1, 2003, to July 31, 2008.~~

IN WITNESS WHEREOF, the parties hereto set their hands and
seals this _____ day of _____, 19___

_____
Witness

_____
Witness

_____
Witness

Lessor: _____

Lessee: _____

Lessee: _____

RIDER NUMBER THREE
TO LEASE DATED MAY 6, 1993 ON
CHESTNUT COURT PREMISES IN
WINNETKA, ILLINOIS,
BETWEEN LARS NILSSON, LESSOR AND
MARIANNE GIGIOLOIO AND MARION GAJEK, LESSEE

1.  The Leased Space will now include the Old Indian Trail entrance from Chestnut Street (see attached drawing).  Lessee will get five months free rent for the additional space to compensate Lessee for all needed repairs and remodeling, such as Heat, Air Conditioning, Separate metering of gas, electric and water, decorating and alterations.

2.  Construction:

    a.  Upon completion of the alterations, and prior to final payment, Lessee shall furnish Lessor with 1. the Contractors sworn statement and completion affadavit, (2) full and final waivers of lien, (3) receipted bills covering all labor and materials expended and used, (4) other appropriate documents evidencing completion of the Alterations, and (5) as-built plans of the Alterations.

    b.  Lessee will request that Contractor hold Lessor, its beneficiaries and the respective agents and employees harmless from any and all liabilities of every kind and description, including reasonable attorney's fees, which may arise out of or be connected in any way with the Alterations or materials claimed to have been furnished to Lessee shall be discharged of record (or paid if notice be served) by Lessee within ten days after filing (or service) at the expense of Lessee.

3.  The additional monthly rent will be $925.00, which includes additional percentage of common areas.  In addition Lessee will pay monthly in additional real estate taxes of $197.25.  Rent payments and taxes to be subject to the same increases as the other space leased, and will start and end on the same dates thereof.

Lessor _____

Date  July 27th 1993

Lessee _____

Date  July 26, 1993

Rider Number Four to Lease
dated May 6, 1993 on Chestnut Court
premises in Winnetka, IL between Lars Nilsson,
Lessor and Marianne Gigiolioio and Marion
Gajek, Lessee

1. Lessee will have exclusive use to one of the commercial freezers
(the most Easterly one) located on the premises for the duration of
this lease; however, it must be wired to Lessee's electricity meter
at Lessee's expense.

2. The leased space will also include use of a reasonable part of the
basement for storage in areas to be determined by agreement of Lessee
and Lessor, as well as access to use of the existing basement washroom
facilities.

_7-27-93_

_____
Lessor/Date

_____
Lessee/Date

_____
Lessee/Date

RIDER NUMBER SIX TO LEASE
DATED MAY 6, 1993, ON CHESTNUT COURT PREMISES
IN WINNETKA, IL, BETWEEN LARS NILSSON, LESSOR
AND MARIANNE GIGIOLIOIO AND MARION GAJEK, LESSEE

1. The above lease now include 576 sq. ft. beneath the hoods and across to the first freezer at the east side of the kitchen, as outlined in the enclosed drawing, which is made a part of our lease.

2. The rent on the above space will be $768.00 per month, taxes will be $144.00 per month. Lessee will maintain a one month's security deposit. There will be a three month rent abatement period beginning June 1, 1994, so that Lessee can erect a wall demising his own premises, as agreed, and separate out all of the heating, electrical systems, etc.

3. In order to assure maximum security for each tenant, and the ability to lock their individual space, all deliveries and refuse removal will be done through the main entrance or each tenants' own side doors.

4. Lessor does not warrant that the hood's mechanical systems are functional. It is most likely that the tenant will have to put in new fans.

Date _____

LESSOR: _____

LESSEES: _____

Chestnut Street Partners
874 Green Bay Rd.,
Winnetka, Illinois 60093-1803
Phone: 847-446-5800 Fax: 847-446-7779

January 16, 2001

The law Offices of
Todd J. Stephens
Attn: Todd Stephens
Suites 205 & 207
833 Elm Street
Winnetka, Illinois 60093

Re: Options for the lease with M. Gigiolio, M. Gajek and LuBella.

Dear Todd,

I fail to see what the problem is. We have a perfectly good lease in place that expires 7-31-2003. The lease provides for a second option from August 1, 2003 to July 31, 2008.

Your clients should notify me in writing that they wish to extend the first option period to expire on July 31, 2006 instead of July 31, 2003. Obviously I will go along with it, but I need for them to put it in writing.

Very Truly Yours

Lars Nilsson

**EXHIBIT 2**

Civil Action Cover Sheet - Case Initiation                                          (Rev. 2/8/06) CCL 0570

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

LaBella Winnetka, Inc., an Illinois Corporation,

v.

Winnetka II, LLC, BJB Partners, LLC, et al.

No.

## CIVIL ACTION COVER SHEET - CASE INITITATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the
complaint in all civil actions. The information contained herein is
for administrative purposes only and cannot be introduced into
evidence. Please check the box in front of the appropriate case type
which best characterizes your action. ONLY ONE (1) CASE TYPE
MAY BE CHECKED WITH THIS COVER SHEET.

Jury Demand ☒ Yes ☐ No

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☐ 049 Product Liability
- ☐ 051 Construction Injuries
  (including Structural Work Act, Road
  Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
  *(Please Specify Below**)*
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
- ☐ 007 Confession of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

### COMMERCIAL LITIGATION
CASE TYPES:
- ☒ 002 Breach of Contract
- ☐ 070 Professional Malpractice
  (other than legal or medical)
- ☐ 071 Fraud
- ☒ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action
  *(Please Specify Below**)*
- ☐ 075 Other Commercial Litigation
  *(Please Specify Below**)*
- ☐ 076 Retaliatory Discharge

### OTHER ACTIONS
CASE TYPES:
- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

** _____

By: _____
        (Attorney)                          (Pro Se)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Firm ID 42297

## IN THE CIRCUIT COURT OF COOK COUNTY
### COUNTY DEPARTMENT, LAW DIVISION

LaBELLA WINNETKA, INC., an Illinois
Corporation,

        Plaintiff,

   vs.

WINNETKA II, LLC; BJB PARTNERS, LLC;
BJB PARTNERS LLC d/b/a BJB
COMMERCIAL DEVELOPMENT, BJB
NORTH SHORE, and OAK I EVANSTON LLC;
JOSEPH SLEZAK, individually; JAMES
PURCELL, individually; AVONDALE
ROOFING, INC., and GENERAL CASUALTY
COMPANY OF ILLINOIS,

        Defendants.

Case No.:

PLAINTIFF DEMANDS TRIAL
BY JURY

## COMPLAINT AT LAW

Plaintiff LaBella Winnetka, Inc., by and through its attorneys, Dykema Gossett PLLC, for its complaint against Winnetka II, LLC, BJB Partners, LLC, BJB Partners LLC d/b/a/ BJB Commercial Development, BJB North Shore, and Oak I Evanston LLC, Joseph Slezak, James Purcell, Avondale Roofing, Inc. and General Casualty Company of Illinois, states as follows:

## INTRODUCTION

## PARTIES

1.    Plaintiff LaBella Winnetka, Inc. (hereinafter "Plaintiff" or "LaBella") is an Illinois corporation with is principal place of business located in Winnetka, Cook County, Illinois. LaBella is in the business of operating a restaurant with authentic Italian cuisine and has been one of Chicagoland's finest Italian restaurants for the past fourteen years.

2.    Defendant Winnetka II, LLC ("Winnetka II") is an Illinois limited liability company with its principal place of business in Park Ridge, Cook County, Illinois.   On

information and belief, it is the owner of the building in which LaBella is located and is LaBella's Lessor.

3.     Defendant BJB Partners, LLC ("BJB"), on information and belief, is an Illinois limited liability company with its principal place of business in Park Ridge, Cook County, Illinois. It owns, directs and/or controls Winnetka II, the Lessor to LaBella, and it does business through entities known as BJB Commercial Development, BJB North Shore and Oak I Evanston LLC ("Oak I").

4.     Defendant Joseph Slezak ("Slezak") is an Illinois resident who is an owner, employee and/or agent of Winnetka II, the Lessor to LaBella, and an owner of BJB.

5.     Defendant James Purcell ("Purcell") is an Illinois resident who is an owner, employee and/or agent of Winnetka II, the Lessor to LaBella, and an owner of BJB.

6.     At all times material, Winnetka II, BJB, Slezak, and Purcell (collectively the "Lessor Defendants"), and, at material times, BJB Commercial Development, BJB North Shore and Oak I ,have transacted business with the Plaintiff in Cook County, Illinois.

7.     Defendant Avondale Roofing, Inc. ("Avondale") is a roofing contractor incorporated in Illinois with its principal place of business in Northbrook, Illinois and doing business in Cook County, Illinois.

8.     Defendant General Casualty Company of Illinois ("General Casualty") is an insurance company doing business in Cook County, Illinois. Its principal place of business in Illinois is in Freeport, Illinois, and at all relevant times, General Casualty was licensed by the State of Illinois to enter into insurance policies with insureds located in Cook County, Illinois.

## FACTUAL BACKGROUND

### THE LEASE

9.      On May 6, 1993, a Store Lease (the "Lease") agreement was entered into to lease certain property (the "Premises") at One Chestnut Court in Winnetka, Illinois 60093, and later 505 Chestnut Street, Winnetka Illinois, 60093.  A copy of the Lease is attached as Exhibit A. Thereafter, the Lease was extended from time to time, and it remains in effect to and including July 31, 2008.

10.      LaBella has always been and continues to be the lessee of the Premises pursuant to the Lease, and has paid rent to the applicable lessors for over fourteen years.

11.      After a several changes in ownership of the building in which LaBella is located, the Lessor became and was at all relevant times Winnetka II.

12.      Subsequent to the execution of the Lease, Rider 2 of the Lease was executed, which provides in material part as follows:

> "5.      Lessor covenants at its expense to keep the foundations and roof of the premises and the structural soundness of the concrete floors and exterior walls thereof, in good order, repair and condition."

13.      Rider 2 provides further that its terms control over the terms of the Store Lease.

14.      Since May 6, 1993, Plaintiff has at all times material continuously operated LaBella Winnetka, an Italian restaurant, at the Premises.  The Premises is for a particular section of a multi-use commercial building.  LaBella is, and at all times material, has been operated by Marianne and George Gigiolio.  Marianne Gigiolio is the sole shareholder of LaBella.

15.      LaBella has operated successfully throughout its fourteen years in the Premises, becoming a well-known and well-respected restaurant with a favorable reputation in the Winnetka community, attracting guests nationwide.  LaBella has made all rent payments, when

- 3 -

rent payments were in fact due, for the duration of the Lease and has complied with all the terms of the Lease.

## THE FIRE

16.     On or about February 28, 2007, the Lessor Defendants retained the services of Avondale to repair the roof above the Premises.

17.     The repair work was required by the Village of Winnetka and performed at the direction of a representative of the Village of Winnetka because of the defective condition of the roof.

18.     On information and belief, the Lessor Defendants had prior problems with the workmanship of Avondale before they *again* retained the services of Avondale to repair the roof above the Premises. The Lessor Defendants knew or should have known that repair of the roof involved dangerous activities including the use of torches and/or other dangerous tools and equipment, and that Avondale's activities in repairing the roof required care and supervision because this work involved risks to the soundness of the roof and walls of the structure which housed LaBella's restaurant.

19.     At all times material, the Lessor Defendants, on information and belief, knew or should have known that Avondale did not have the skill or ability to perform the repair of the roof above LaBella in a workmanlike manner and that Avondale would perform the work "on the cheap."

20.     On February 28, 2007, Avondale sent a single employee to repair the roof over the Premises. This employee negligently used a torch and/or other dangerous tools and equipment to perform repairs on the roof of the Premises without proper supervision. As a result of the Avondale employee's negligence, this employee set the roof over the Premises on fire.

- 4 -

21.    As a result of the fire, the roof covering the dining area of the LaBella restaurant was greatly damaged, and the interior of the Premises was also damaged, thereby depriving the Plaintiff of the use and quiet enjoyment of the Premises and forcing LaBella to close its Italian restaurant until such time as the roof could be restored, repaired and/or replaced. The Lessor Defendants knew at all times following the fire that LaBella's ability to repair its restaurant and reopen for business was completely dependent upon the roof being repaired and put in good order by the Lessor Defendants.

22.    At all times material, it was the obligation of the Lessor Defendants to repair and restore the roof and put it in good order and condition in compliance with the Lease and Rider 2 of the Lease and consistent with the requirements of the Village of Winnetka. Until and unless the roof was restored as required by the Village of Winnetka, LaBella was prohibited from repairing its restaurant so it could reopen to the public, and it was deprived of the quiet enjoyment of the Premises.

## **FAILURE TO REPAIR ROOF**

23.    Thereafter, the Lessor Defendants took no action to repair and replace the roof above the Premises and they refused and failed to put the roof in good order so the Plaintiff could reopen its restaurant in the Premises.

24.    Rather, the Lessor Defendants asserted that the fire, caused by their own negligence and the negligence of Avondale, served as the basis for cancellation of the Lease.

25.    As a result of the negligent conduct of Avondale and the Lessor Defendants in setting the roof on fire, and the willful and intentional conduct of the Lessor Defendants in failing to repair the roof timely and in a commercially reasonable manner as required by the Lease, and their unlawful assertion that the fire served as a basis for terminating the Lease,

Plaintiff has been deprived of the use and quiet enjoyment of the Premises, has been forced to close its restaurant, and has suffered substantial damages.

## COUNT I – NEGLIGENCE

### AVONDALE

26.     Plaintiff re-alleges paragraphs 1 through 25 of the Introduction as paragraph 26 of this Count I.

27.     At all times material, Avondale owed a duty of care to the Plaintiff to repair the roof in a safe and reasonable manner and not to do so in a dangerous and careless manner.

28.     In the repair of the roof, Avondale failed to act reasonably and with care when it sent a single employee to perform repairs on the roof above the Premises and allowed this employee to use a torch and/or other dangerous tools and equipment on the roof above the Premises without supervision and without the issuance of any permits to perform repairs to the roof.

29.     As a result of Avondale's failure to act reasonably and with care, its employee carelessly and negligently set the roof on fire through the improper use of a torch and/or other dangerous tools and equipment. The fire caused damage to the roof and the structure housing the LaBella restaurant, and the roof is not and has not been in good order and condition as a result of the fire caused by Avondale's negligence.

30.     Avondale's negligence in setting the roof on fire breached the duty of care owed to the Plaintiff by Avondale.

31.     As a result of Avondale's negligence in setting the roof above the Premises on fire, the Plaintiff has been unable to operate its restaurant, has suffered damage to its property, has suffered lost income from the operation of its business, and suffered a significant diminution in the value of its business.

Wherefore, the Plaintiff prays for entry of judgment in its favor against Avondale for an amount greater than $30,000, for its costs, and for such further relief as this Court deems appropriate.

## COUNT II - NEGLIGENCE

## WINNETKA II, BJB, SLEZAK, AND PURCELL

32.    Plaintiff re-alleges paragraphs 1 through 25 of the Introduction as paragraph 32 of this Count II.

33.    At all times material, the Lessor Defendants, as landlord of the Premises, owed a duty of care to the Plaintiff, their lessee, to undertake work on the roof over the LaBella restaurant in a safe and reasonable manner, including but not limited to selection of a roofing contractor to perform dangerous roof repair work in a reasonable and careful manner.

34.    Prior to February 28, 2007, on information and belief, the Lessor Defendants experienced problems with the workmanship of Avondale. The Lessor Defendants knew that repair of the roof involved dangerous work, including the use of torches and/or other dangerous tools and equipment. They also knew or should have known from their prior dealings with Avondale that the repair work was not likely to be done reasonably, carefully or in a workmanlike manner.

35.    On February 28, 2007, in an attempt to fix the roof as inexpensively as possible, and without taking into consideration the precautions, skills and supervision required to repair the roof in a safe and reasonable manner, the Lessor Defendants contracted with Avondale in such a manner as to have but one employee from Avondale work on site to repair the roof over the Premises.

36.    In retaining a company with whom it had prior problems regarding workmanship and allowing a single employee, under its control and authority, to attempt to repair the roof over

- 7 -

the Premises through the dangerous and unsupervised use of a torch and/or other dangerous tools and equipment, the Lessor Defendants were careless and negligent.

37.    The Lessor Defendants' careless and negligent selection of Avondale to perform work on the roof which they knew or should have known was dangerous, and their delegation of this dangerous work to Avondale without proper supervision and direction, breached the duty of care owed to the Plaintiff by the Lessor Defendants.

38.    As a result of the Lessor Defendants' negligent hiring of Avondale to repair the roof over the Premises and their negligent delegation of this work to Avondale without proper supervision which resulted in Avondale negligently causing a fire on the roof over the Premises, the Plaintiff has been unable to operate its restaurant, has been deprived of the quiet enjoyment of the Premises, has suffered damage to its property, has suffered lost income from the operation of its business, and has suffered a significant diminution in the value of its business.

Wherefore, the Plaintiff prays for entry of judgment in its favor against all Lessor Defendants for an amount greater than $30,000, for its costs, and for such further relief as this Court deems appropriate.

## COUNT III - BREACH OF LEASE - FAILURE TO REPAIR THE ROOF
### WINNETKA II, BJB, SLEZAK, AND PURCELL

39.    Plaintiff re-alleges paragraphs 1-25 of the Introduction as paragraph 39 of this Count III.

40.    At all material times the Lease and Rider 2 of the Lease provided, in material part, that the Lessor Defendants were required at all times and at their expense to keep the roof above the Premises in good order, repair and condition.

41.    Following the fire on the roof over the Premises which occurred on February 28, 2007, the Lessor Defendants knew that LaBella could not operate its restaurant business and

- 8 -

could not reopen unless and until the roof was repaired promptly and in good order as required by the Village of Winnetka. They also knew that they were required by the terms of the Lease to restore, repair and/or replace the roof at their expense.

42.    Thereafter, in direct violation and breach of the Lease and Rider 2 of the Lease, the Lessor Defendants failed and refused to repair the roof timely and thereby prevented the Plaintiff from reopening and operating the LaBella restaurant business in the Premises.

43.    As a direct result of the Lessor Defendants' breach of the Lease, by its intentional failure to repair the roof promptly and in good order, Plaintiff has (i) been deprived of the quiet enjoyment of the Premises, (ii) been unable to reopen its restaurant, (iii) suffered the loss of its personal property, (iv) lost profits from operation of the restaurant, and (v) suffered a significant diminution in the value of its business.

Wherefore, the Plaintiff prays for entry of judgment in its favor against all Lessor Defendants for an amount greater than $30,000, for its costs, and for such further relief as this Court deems appropriate, including punitive damages for the Lessor Defendants' intentional, willful and malicious conduct in failing and refusing to repair the roof, thereby preventing LaBella from reopening its restaurant.

## COUNT IV - BREACH OF LEASE - WRONGFUL TERMINATION
### WINNETKA II, BJB, SLEZAK, AND PURCELL

44.    Plaintiff re-alleges paragraphs 1 through 25 of the Introduction, and paragraphs 39 through 43 of Count III as paragraph 44 of this Count IV.

45.    At all material times the Lease and Rider 2 of the Lease provided, in material part, that the Lessor Defendants were to keep the roof above the Premises in good order, repair and condition at their expense.

46.    On May 16, 2007, Defendant Slezak, on behalf of the Lessor Defendants, hand-delivered a letter to counsel for LaBella that purported to terminate the Lease pursuant to Section 11 of the Lease which provides as follows:

> "11.    In case the Premises shall be rendered untenantable by fire, explosion or other casualty, Lessor may, at his option, terminate this lease or repair the Premises within sixty days. If the Lessor does not repair the Premises within said time, or the building containing the Premises shall have been wholly destroyed, the term hereby created shall cease and determine."

47.    On June 8, 2007, Defendant Slezak sent LaBella another letter purporting to terminate the Lease which stated in part:

> "the above Premises were rendered uninhabitable on or about February 28, 2007. Although there have been discussions they have not eventuated in restoration of the Premises. Paragraph #11 of the Lease states, *"In case the Premises shall be rendered untenantable by fire, explosion, or other casualty, Lessor may, at his option, terminate this lease or repair the Premises within sixty days. If Lessor does not repair the Premises within said time or the building containing the Premises shall have been wholly destroyed, the term hereby created shall cease and determine."* Pursuant thereto your lease has been terminated."

48.    The Lessor Defendants' purported termination of the Lease pursuant to paragraph 11 is invalid and is in breach of the Lease because:

A.    The Lessor Defendants, through their own negligence, caused the fire which they are relying on to terminate the Lease, and such conduct on their part cannot be used to deprive the Plaintiff of the quiet enjoyment of the leased Premises;

B.    Rider 2 of the Lease requires the Lessor Defendants, without qualification, to keep the roof over the Premises in good order, repair and condition, and the Lessor Defendants cannot use the fire

- 10 -

to negate the covenant to repair the roof and/or as the basis for termination of the Lease; and

C.    Rider 2 of the Lease requires the Lessor Defendants to keep the roof over the Premises in good condition and repair, and the LaBella restaurant itself remained tenantable and would have reopened within 60 days, provided the Lessor Defendants repaired the roof as required by Rider 2 of the Lease.

49.    At no time material to this action were the demised Premises rendered untenantable.

50.    As a result of the Lessor Defendants' breach of the Lease, the Plaintiff has been unable to reopen its restaurant, has suffered the loss of its personal property, has lost the quiet enjoyment of the Premises, has lost profits from operation of the restaurant, and has suffered a significant diminution in the value of its business.

Wherefore, the Plaintiff prays for entry of judgment for an amount greater than $30,000; for its costs; for a final and binding declaration that Section 11 of the Lease does not apply to terminate the Lease because the Premises was not rendered untenable so as to make Section 11 of the Lease applicable; and for such further relief as this Court deems appropriate, including punitive damages for their intentional, willful and malicious conduct in attempting to terminate the Lease and attempting to force LaBella to move.

## COUNT V – FRAUD

### WINNETKA II, BJB, SLEZAK, AND PURCELL

51.    Plaintiff re-alleges paragraphs 1 through 25 of the Introduction, and paragraphs 39 through 43 of Count III, and paragraphs 44 through 50 of Count IV as paragraph 51 of this Count V.

52.    At all times, the Lease provided in material part that the Lessor Defendants were to maintain and repair the roof above the Premises at their expense pursuant to Rider 2 of the Lease.

53.    Between February 28, 2007 and May 16, 2007, at numerous times, the Lessor Defendants made material representations to LaBella that they would repair the roof timely, and were making efforts towards fulfilling this obligation as promptly as possible.    Those representations were false; they were known to be false when made and they were made to induce Plaintiff into not acting immediately to seek appropriate judicial relief.

54.    LaBella relied on these representations and took no action to compel the Lessor Defendants to repair the roof during this period of time, at all times relying upon the Lessor Defendants' representations that the roof over the Premises would be repaired timely and in a manner which would allow LaBella to initiate and complete repairs to the interior of the restaurant so that LaBella could reopen to the public promptly.

55.    At no time did the Lessor Defendants intend to take prompt action to repair the roof above the Premises, and they knew and/or believed at all times that their representations to LaBella were not true.

56.    On May 16, 2007, a representative for the Lessor Defendants, Slezak, hand-delivered counsel for LaBella a letter attempting to terminate the Lease. The letter states, in part, that:

> "pursuant to Section 11 of the Lease Agreement dated May 6, 1993 as amended, that agreement is terminated."

57.    The May 16, 2007 letter was in furtherance of the Lessor Defendants' intent, scheme and artifice to defraud LaBella by delaying the repairs to the roof of the Premises until such time as the Lessor Defendants could unlawfully assert that the Lease was terminated,

- 12 -

thereby freeing up the Lessor Defendants to rent the Premises to another tenant of the building and a newly-planned tenant.

58.    The Lessor Defendants knew at all times that LaBella would rely on their untrue representations that they would repair the roof in a timely and prompt manner, and they made these untrue representations publicly and to various representatives of the Village of Winnetka and other interested parties who were seeking to repair the fire damage, all the while knowing that LaBella would rely on them to its detriment so the Lessor Defendants could attempt to terminate the lease and lease the Premises to other tenants.

59.    LaBella did in fact rely on the Lessor Defendants' untrue representation that they would repair the roof in a timely manner, and LaBella did so to its economic detriment.

60.    Additionally, the Lessor Defendants knew when they sent this letter to LaBella that the claim of termination was not true because Section 11 of the Lease did not operate to terminate the lease agreement for the following reasons:

(a)    Section 11 of Lease could not apply to terminate the Lease, as the Premises themselves have not been rendered untenantable so as to apply Section 11, as the delay in reopening LaBella would not exist but for the actions and delay of the Lessor Defendants.

(b)    The Lessor Defendants' obligation to keep the roof in repair under Paragraph 5 of Rider 2 to the Lease supersedes Section 11 of the Lease.

61.    LaBella's reliance on the Lessor Defendant's misrepresentations was reasonable and justifiable under the circumstances.

62.    As a result of the Lessor Defendants' false representations that they would repair the roof in a timely, workmanlike manner, LaBella has been forced to seek another location for its restaurant, has lost income and its reputation, and will have to invest substantial time and financial resources before it can reopen and begin to operate a new LaBella Winnetka restaurant

- 13 -

in the manner consistent with its highly successful operation of its Italian restaurant prior to the fire on the roof above the Premises.

63.    The actions of the Lessor Defendants were malicious, intentional and willful.

Wherefore, the Plaintiff prays for entry of judgment for an amount greater than $30,000, for its costs, and for such further relief as this Court deems appropriate, including punitive damages for the Lessor Defendants' intentional, willful and malicious conduct.

## COUNT VI - PIERCE THE CORPORATE VEIL OF WINNETKA II

64.    Plaintiff re-alleges paragraphs 1 through 25 of the Introduction as paragraph 64 of this Count VI.

65.    On information and belief, Winnetka II is, and at all relevant times, has been inadequately capitalized and used as part of a series of sham entities designed to prevent access to the personal assets of the real parties in interest.

66.    Winnetka II's undercapitalization and failure to operate as a bona fide corporate entity has resulted in ongoing lack of repair and maintenance of the roof over the Premises in a commercially reasonable timeframe and workmanlike manner.

67.    On information and belief, Slezak and Purcell, as employees and owners of BJB and Winnetka II, and BJB and its related entities doing business as BJB Commercial Development, BJB North Shore and Oak I, have acted on behalf of Winnetka II in their dealings with LaBella as set out in Counts II through V of this Complaint. As a result of their commingling of interests, ownership, and authority with Winnetka II, Slezak, Purcell, and BJB and its related entities must be treated as one and the same with Winnetka II.

68.    There is such unity of interest, actions and ownership between Winnetka II and Slezak, Purcell, and BJB and its related entities known as Oak I, BJB Commercial Development

- 14 -

and BJB North Shore, that the separate entity known as Winnetka II does not really exist, and this unity of interest and ownership continues.

69.    Adherence to the fiction of a separate existence of Winnetka II, which has insufficient assets to satisfy a judgment, thereby allowing Slezak, Purcell and BJB and its related entities to escape personal liability would promote injustice, sanction fraud or other inequitable circumstances, including the unlawful use of the limited liability company form of ownership to evade personal responsibility.

70.    As a result, Slezak, Purcell, BJB and its related entities doing business as Oak I, BJB Commercial Development and BJB North Shore, are each personally liable for the liability asserted by LaBella against Winnetka II in this Complaint.

WHEREFORE, Plaintiff LaBella respectfully prays that any judgment entered against Winnetka II shall also be entered against Slezak, Purcell, and BJB and its related entities consisting of Oak I, BJB Commercial Development and BJB North Shore, and for such other and further relief as may be just and proper, including reasonable attorneys' fees, costs, and the imposition of punitive damages for the failure to operate Winnetka II as a lawful, fully capitalized entity as well as the intentional willful, malicious and knowingly wrongful conduct in depriving LaBella of the opportunity to reopen its Italian restaurant, of which these defendants were repeatedly advised was the entire livelihood of its owners.

## COUNT VII - BREACH OF INSURANCE POLICY

### GENERAL CASUALTY

71.    Plaintiff realleges paragraphs 1 through 25 of the Introduction as paragraph 71 of this Count VII.

72.    On or about September 13, 2006, LaBella entered into an insurance policy with General Casualty for comprehensive insurance coverage for the Premises, policy number CCI

- 15 -

046511 (the "Policy"). The Policy covered the period from September 13, 2006 to September 13, 2007. A copy of the Policy is attached as Exhibit B.

73.    On or about February 28, 2007, an employee of Avondale negligently started a fire while working on the roof above LaBella's restaurant and Premises. The fire caused serious damage to the roof over LaBella and also caused damage to the interior of the restaurant, both fire damage and smoke and water damage. As a result of the fire damage, LaBella was unable to continue its restaurant operations and was forced to close its doors at that time.

74.    As a result of the fire on the roof above the Premises and in awaiting the Lessor Defendants to complete the restoration, repair and/or replacement the roof over LaBella's restaurant, LaBella has not been able to reopen its doors and continue its operations, its business has been suspended, and it has lost business income for the period from the date of the fire on February 28, 2007 to the present.

75.    Under the terms of the Policy, General Casualty is required to pay LaBella for, but not limited to, the following:

> Actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during "the period of restoration". The "suspension" must be caused by direct physical loss or damage to property at the described premises. Exhibit B, Policy.

76.    The Plaintiff has lost business income as a result of the fire and continues to suffer loss of business income until such time as the repair and replacement of the roof over the Premises is completed, which is required before the Plaintiff can resume its operations and reopen the LaBella restaurant.

77.    LaBella has coverage under its Policy with General Casualty for Loss of Business Income and other losses, and General Casualty has improperly denied coverage to LaBella,

including full and complete coverage for lost business income and other losses caused by the suspension of its restaurant operations as a result of the fire of the roof over the Premises.

78.     Additionally, Plaintiff states, on information and belief, that General Casualty and its agents or assigns, have met separately with the Lessor Defendants and others, including various insurance carriers and adjusters, to conspire with them to deny LaBella monies to which it was lawfully entitled under the Policy, to cause construction activity to restore the Plaintiff's demised Premises to cease, and to force LaBella to execute a complete release of all claims against General Casualty as a condition precedent to receiving any further money owed under Policy.

79.     Plaintiff has fully complied with the terms of the Policy and through no fault of its own, has been damaged by General Casualty's willful refusal to honor the terms of the Policy relating to coverage for Loss of Business Income and other losses sustained by LaBella as a result of the fire and events thereafter.

80.     General Casualty has vexatiously and unreasonably failed to comply with the terms of the Policy, and by reason of this conduct, General Casualty has breached the covenant of good faith and fair dealing implied in the insurance contract.

81.     As a result of General Casualty's breach of the Policy, its vexatious and unreasonable failure to comply with the Policy, and its breach of the covenant of good faith and fair dealing, Plaintiff has been deprived of the full and complete insurance proceeds to which it is entitled under the Policy.

82.     In addition, LaBella is entitled to reasonable attorneys' fees pursuant to Section 155 of the Illinois Insurance Code, 215 ILCS 5/155, based on General Casualty's unreasonable and vexatious delay in complying with the terms of the insurance Policy.

83.    Additionally, as a consequence of General Casualty's tortious, intentional, willful and conspiratorial conduct, LaBella is entitled to an award of punitive damages.

Wherefore, the Plaintiff prays for entry of judgment for an amount greater than $30,000, for its attorneys' fees and costs, and for such further relief as this Court deems appropriate.

Dated:

Respectfully submitted,

By: _____

DYKEMA GOSSETT PLLC
10 South Wacker Drive
Suite 2300
Chicago, IL 60606
Phone: (312) 876-1700
Fax: (312) 876-1155
Firm ID #42297

CHICAGO\2387975.4
JD\LTH

- 18 -

# EXHIBIT 3

Winnetka Village Code

## Title 2

## ADMINISTRATION AND PERSONNEL

**Chapters:**

| | |
|---|---|
| 2.04 | VILLAGE COUNCIL |
| 2.08 | VILLAGE PRESIDENT |
| 2.12 | VILLAGE MANAGER |
| 2.16 | VILLAGE CLERK |
| 2.20 | VILLAGE TREASURER |
| 2.24 | VILLAGE COLLECTOR |
| 2.28 | VILLAGE ATTORNEY |
| 2.32 | VILLAGE PROSECUTOR |
| 2.36 | BUDGET OFFICER |
| 2.40 | ETHICS |
| 2.44 | COMMUNITY DEVELOPMENT DEPARTMENT |
| 2.48 | FINANCE DEPARTMENT |
| 2.52 | FIRE DEPARTMENT |
| 2.56 | HEALTH DEPARTMENT |
| 2.60 | POLICE DEPARTMENT |
| 2.64 | DEPARTMENT OF PUBLIC WORKS |
| 2.68 | WATER AND ELECTRIC DEPARTMENT |

Winnetka Village Code

## Chapter 2.04

## VILLAGE COUNCIL

**Sections:**

2.04.010    **Village Council.**
2.04.020    **Meetings.**
2.04.030    **Committees.**
2.04.040    **Passage of ordinances.**
2.04.050    **Council rules.**

**Section 2.04.010    Village Council.**

A.  Membership; Election; Term. The Village Council shall consist of the Village President and six Trustees. The terms of office of the Village President and the Trustees shall be two years and until their successors are elected and have qualified. The Village President and three Trustees shall be elected at the consolidated election held in each odd-numbered year, as provided in the Illinois Election Code. The other three Trustees shall be elected at the general primary election held in each even-numbered year, as provided in the Illinois Election Code.

B.  Powers and Duties. The Village Council shall be the legislative body of the Village and shall have such powers and duties as provided in the Charter, statutes, this code, and other ordinances of the Village.

C.  Oath of Office; Compensation. The Village President and Trustees shall take the oath of office prescribed by statute before entering upon the duties of their respective offices. The Village President and Trustees shall serve without compensation. (Ord. MC-183-97 § 12, 1997: prior code § 2.01)

**Section 2.04.020    Meetings.**

A.  Time and Day of Meetings. The Council shall hold its regular meetings on the first and third Tuesday of each month at seven-thirty p.m., or as otherwise set forth in the annual meetings notice posted pursuant to the Illinois Open Meetings Act. In the event the regular meeting date falls on a legal holiday, or cannot be held on the date regularly scheduled for any other reason, including a general election, the meeting shall be held on such other day as the Council may designate; provided, that notice of such designation shall comply with the notice requirements of the Illinois Open Meetings Act.

B.  Place of Meetings. Except in the case of an emergency, or as hereinafter provided, all meetings of the Council shall be held at the Village Hall. If the physical facilities of the Village Hall shall appear to the Council to be inadequate to accommodate the number of persons desiring to be present at any meeting, the Council may, in its discretion, upon resolution adopted at such meeting after the convening of such meeting, move the meeting to some other hall or place within the Village having adequate capacity, and continue the meeting at such other place. If the location of a Council meeting is changed, the Village Clerk shall post at the Village Hall, or other place from which the meeting has been moved, a notice of the location at which the meeting is being or will be held.

C.  Special Meetings. The President, or any two of the Trustees, may call special meetings of the Council. The Clerk shall notify all members of the Council of such meeting at least forty-eight (48) hours

Winnetka Village Code

before the special meeting is held, by delivering to each member of the Council, either personally or by leaving a copy at the member's residence, a written notice stating the time and place of the meeting.

D.  Open Meetings. All meetings of the Village Council shall be conducted in accordance with the Illinois Open Meetings Act. (Ord. MC-183-97 § 13, 1997: prior code § 2.02)

E.  Attendance. It is the policy of the Village of Winnetka that the members of the Council attend meetings of the Council in person, notwithstanding any statutes of the State of Illinois permitting remote attendance by some means other than physical presence at the location of the meeting.
(MC-8-2007, Amended, 06/05/2007, Subsection E added; MC-7-2007, Amended, 05/15/2007; MC-1-2001, Amended, 01/16/2001)

### Section 2.04.030    Committees.
The members of Council committees shall be appointed by the Village President with the consent of the Trustees and shall submit reports at such times and in such manner as may be directed by the Village President. All meetings of Council committees shall be conducted in accordance with the Illinois Open Meetings Act. It is the policy of the Village of Winnetka that the members of all Council committees and subcommittees shall attend meetings of their respective bodies in person, notwithstanding any statutes of the State of Illinois permitting remote attendance by some means other than physical presence at the location of the meeting.  No Council committee or subcommittee shall be authorized to establish rules permitting any of their members to attend meetings by any means other than by their physical presence.
(MC-8-2007, Amended, 06/05/2007)

### Section 2.04.040    Passage of ordinances.
A.  Introduction. All proposed ordinances shall first be read and presented to the Council and a motion shall be made to introduce the ordinance.

B.  Initial Posting. Upon introduction of any ordinance, the Village Clerk shall make a copy of the proposed ordinance available for inspection in his or her office and shall post a copy of the proposed ordinance in three of the most public places in the Village, which are designated as the following:  (1) the Village bulletin board on the first floor of Winnetka Village Hall; (2) inside the Winnetka Public Library at 768 Oak Street; and (3) in or adjacent to the Post Office parking lots located on the west side of Chestnut Street, between Elm Street and Oak Street,  The proposed ordinance shall be so posted not less than five days prior to the next regular meeting of the Council.

C.  Passage, Approval and Posting. A proposed ordinance, after it has been introduced and posted as provided in this section, may be called up for passage at any subsequent meeting of the Council, when the statutory vote necessary for passage shall be taken. After the ordinance has been approved and signed by the Village President and countersigned by the Village Clerk, the Village Clerk shall post a copy of such ordinance in each of the three places designated in subsection B of this section not later than five days after passage.

D.  Waiver of Introduction and Initial Posting. The Council may waive or suspend the procedures set forth in subsections A and B of this section when the members of the Council then present have unanimously determined, by motion, that an emergency exists or that cause has been presented to establish that the procedures do not in that instance serve the best interests of the Village. (Ord. MC-183-97 § 16, 1997: prior code § 2.05; Ord. MC-09-2004 § 2, 2004)

Page 3 of Title 2

Winnetka Village Code

**Section 2.04.050        Council rules.**

A.  Order of Business. The order of business to be observed at all meetings of the Council shall be as determined by the Council from time to time.

B.  Quorum. A majority of the members of the Council shall constitute a quorum.

C.  Majority Rule. Except when a greater vote is required by statute, Charter or this code, the action of the Council shall be controlled by a majority vote of the members present. The President shall vote in case of a tie vote of the Trustees present and may vote in such other instances as may be authorized by statute.

D.  Voting. Every Trustee who is present when a question is stated from the chair shall vote on such question unless excused by the Council.

E.  Reconsideration of Vote. No vote of the Council may be reconsidered or the action of the Council rescinded at a special meeting unless at least as many Trustees are present as were present when such vote or action was taken.

F.  Resolutions. Any resolution or amendment of such resolution requiring a roll call vote shall be reduced to writing before being presented for consideration. Any other resolution or amendment of such resolution shall, upon the request of any member of the Council, be reduced to writing before being presented for consideration.

G.  Rules of Order. The Village President shall decide all questions of order, and shall be guided in such decisions by parliamentary law, as prescribed by Roberts' Rules of Order, as revised. (Ord. MC-183-97 § 19, 1997: prior code § 2.06)

Winnetka Village Code

## Chapter 2.12

## VILLAGE MANAGER

**Sections:**

2.12.010      Office Created; Appointment; Terms and Conditions of Appointment.
2.12.020      Absence of Village Manager.
2.12.030      Bond.
2.12.040      Compensation.
2.12.050      Powers and Duties.

**Section 2.12.010      Office Created; Appointment; Terms and Conditions of Appointment.**

A. Office Created.  There is hereby created the office of Village Manager, who shall be the chief administrative officer of the Village, and shall be responsible to the Council for the management and operation of all departments of the Village, unless the management and operation of any departments are expressly delegated elsewhere by statute or ordinance.

B. Appointment.  The Village Manager shall be appointed by the President by and with the approval of the Trustees, and may be removed by the affirmative vote of a majority of the Council.

C. Terms and conditions of appointment.  The Manager need not be a resident of the Village when appointed, but shall become a resident of the Village within one hundred twenty (120) days after being appointed.  The conditions of the Manager's appointment may be set forth in an agreement.
(MC-6-2006, Amended, 08/15/2006)

**Section 2.12.020      Absence of Village Manager.**

A. Acting Village Manager.
   1. Designation by Village Manager.  In the event that the Village Manager is to be absent from the Village for thirty calendar days or less, he shall appoint a qualified administrative officer of the Village to serve as acting Village Manager; provided that the Village Manager shall notify the Village Council of such designation before it shall become effective.
   2. Designation by Village Council.  The Village Council shall retain the discretion and authority to designate a qualified administrative officer of the Village to serve as acting Village Manager in the case of the disability of the Village Manager, or if the Village Manager is to be absent from the Village for more than thirty days.  The Village Council shall notify the Village Manager and all administrative officers of the Village of such designation.
B. Powers and Duties of Acting Manager.  The acting Village Manager shall perform all the duties and exercise all the powers of the Village Manager.
(MC-6-2006, Added, 08/15/2006)

**Section 2.12.030      Bond.**

Before entering upon the duties of the office of Village Manager, the Village Manager shall execute and file with the Village Treasurer a bond with security to be approved by the Council. The bond shall be payable to the Village in the penal sum directed by resolution of the Council, and shall be conditioned upon the faithful performance of the duties of the office of Village Manager, according to law and the ordinances of the Village. The premiums of such bond shall be paid by the Village.
(MC-6-2006, Amended, 08/15/2006)

Winnetka Village Code

**Section 2.12.040          Compensation.**
The compensation of the Village Manager shall be determined by the Council.
(MC-6-2006, Amended, 08/15/2006)

**Section 2.12.050          Powers and Duties.**
The Village Manager shall have the powers and duties set forth in this chapter, and such other powers and duties as may be prescribed by statute or by ordinance or resolution of the Council. The powers and duties of the Manager shall include the following:

A.   Appointment of Directors of Departments. To appoint and remove from office all directors of departments whose appointment is not otherwise provided for, and, subject to the approval of the Council, to fix the salaries and wages of all such department directors, except as otherwise provided by ordinance. At the next meeting of the Council following the removal of any department director, the Village Manager shall submit a statement to the Council advising that the removal has been made and stating the reasons for the removal.

B.   Administration of Departments and Employees. To exercise control over all departments and divisions of Village departments, including the employment, discharge and compensation of all administrative officers and employees, except that the employment and discharge of sworn members of the Police and Fire Departments shall be in the manner provided by the rules of the Board of Fire and Police Commissioners, pursuant to Chapter 3.16 of this code and applicable statutes.

C.   Issuance and Administration of Licenses and Permits. To issue and administer all licenses and permits except those issued directly by the Council and those under the exclusive authority of other officers of the Village as provided in this code.

D.   Accounting; Purchasing. To supervise and be responsible for the financial activities of the Village and for the purchase of all necessary materials and services required for the operation of the Village government, subject to the limitations imposed by the annual budget and any revisions to such budget. The Village Manager shall develop a purchasing policy consistent with the requirements of applicable state law and Chapter 4.12 of this code.

E.   Approval of Warrants. To review and approve all warrants in payment of claims against the Village prior to submitting them to the Council for approval. All warrants submitted to the Council shall be accompanied by a voucher bearing the signature of the Village Manager, which signature shall constitute the Manager's certification that the claims are legally due and payable and have been properly authorized.

F.   Reports. To present to the Council, from time to time, reports regarding the work of each Village department, and any other matters requested by the Council.

G.   Monthly Financial Reports. To prepare and present to the Council each month a statement showing the financial condition of the Village as of the end of the preceding month, including a statement of current assets and liabilities and a summarized statement of income and expenditures, detailed as to funds and departments.

H.   Proposed Budget. To appoint the Budget Officer and to present to the Council for its consideration on or before the first regular meeting in February of each year, the proposed budget prepared by the Budget Officer for the following fiscal year.

I.   Council Meetings; Attendance; Participation. To attend all meetings of the Council, to attend meetings of committees of the Council when requested by the Council, and to provide additional reports and information to the Council as required by the Council. The Village Manager shall be entitled to take part in all discussions at any meeting of the Council, but shall not have the right to vote.

J.   Recommendations to Council. To recommend to the Council for adoption or approval such measures as the Manager may deem necessary or expedient.

K.   Other Duties. To perform such other duties as may be prescribed by statute or by ordinance or resolution of the Council. (Ord. MC-228-99 § 1 (part), 1999: prior code § 3.02)
(MC-6-2006, Amended, 08/15/2006)

Page 7 of Title 2

Winnetka Village Code

## Chapter 5.09

## LIQUOR CONTROL REGULATIONS

Sections:

| | |
|---|---|
| 5.09.010 | Definitions. |
| 5.09.020 | President designated Local Liquor Control Commissioner. |
| 5.09.030 | Commissioner's duties. |
| 5.09.040 | Commissioner's powers. |
| 5.09.050 | Liquor Advisory Board. |
| 5.09.060 | Unlicensed sale prohibited--Sale in violation of restrictions prohibited. |
| 5.09.070 | Application for license. |
| 5.09.080 | Ineligibility for license. |
| 5.09.090 | Termination date. |
| 5.09.100 | Classification of Licenses |
| 5.09.110 | License fees |
| 5.09.120 | Payment and disposition of fees |
| 5.09.130 | Numbers Of Licenses |
| 5.09.140 | List of licenses--Notification of certain officers of revocation, etc. |
| 5.09.150 | License is personal privilege. |
| 5.09.160 | License Renewals. |
| 5.09.170 | Change in personnel. |
| 5.09.180 | Restrictions on location of retail establishments. |
| 5.09.190 | Civil rights in licensed premises. |
| 5.09.200 | Sales restricted to authorized premises--Change of location--Alteration of premises. |
| 5.09.205 | Service of alcoholic beverages without service of full meals. |
| 5.09.210 | Give-away prohibited. |
| 5.09.220 | Peddling prohibited. |
| 5.09.230 | Sanitary requirements. |
| 5.09.240 | Health of employees. |
| 5.09.250 | Hours of business. |
| 5.09.255 | Sealing and Removal of Partially Consumed Bottles of Wine |
| 5.09.260 | Sales to minors and intoxicated persons--Responsibility of parents and owners or occupants of premises. |
| 5.09.270 | Purchase or acceptance of gifts of liquor by underage persons; Identification cards. |
| 5.09.275 | Display of license and certain notices. |
| 5.09.280 | Revocation and suspension of license. |
| 5.09.290 | Complaints. |
| 5.09.300 | Violations and penalties. |
| 5.09.310 | Repealed by MC-14-2003 |

Section 5.09.010        Definitions.

Unless the context otherwise requires, words and phrases in this chapter shall be construed in accordance with the definitions set forth in this section.

"Alcohol" means the product of distillation of any fermented liquid whether rectified or diluted, whatever may be the origin of such fermented liquid, including synthetic ethyl alcohol, but not including denatured alcohol or wood alcohol.

Winnetka Village Code

" Alcoholic beverage" means any beverage that contains alcoholic liquor and that is not sold in its original package. As used in this chapter, the term " alcoholic beverage" shall include individual bottles of wine and individual bottles or cans of beer that are sold for consumption on the premises where sold.

"Alcoholic liquor" means any alcohol, spirits, wine, or beer or any substance, patented or not, containing alcohol, spirits, wine or beer, capable of being consumed as a beverage by a human being. The provisions of this chapter shall not apply to alcohol used in the manufacture of denatured alcohol produced in accordance with acts of the United States Congress and regulations promulgated under such acts, or to any substance containing not more than one-half of one percent of alcohol by volume.

"Beer" means a beverage obtained by the alcoholic fermentation of an infusion or concoction of barley, or other grain, malt, ale, stout, lager beer, porter and the like.

"Full-service grocery store" means a retail establishment primarily for the sale of food, generally including fresh fruits and vegetables, fresh meats and a variety of packaged products. Such establishment shall consist of at least five thousand (5,000) square feet and shall not normally have retail business hours after 10:00 p.m. in the evening.

" Licensee" means any person who has been issued a license under this chapter.

"Limited food products store" means a retail establishment for the sale only of fresh foods, frozen or pre-packaged foods, and food-related products, including packaged meals either prepared on the premises or prepared for sale solely on the premises. Such establishment shall not normally have retail business hours after 7:00 p.m. or before 8:30 a.m.

"Original package" means any bottle, flask, jug, can, cask, barrel, keg, hogshead, or other receptacle or container whatsoever, used, corked or capped, sealed and labeled by the manufacturer of alcoholic liquor, to contain and to convey any alcoholic liquor.

"Restaurant" means any public place kept, used, maintained, advertised and held out to the public as a place where complete meals are served, and where complete meals are actually and regularly served, such space being provided with adequate and sanitary kitchen and dining room equipment and having employed in such space a sufficient number and kind of employees to prepare, cook and serve suitable food for its patrons, where a host or hostess is present to seat patrons, where patrons order from individual pre-printed menus, where orders are taken from and food is served to patrons while they are seated at tables, where complete meals are served using nondisposable dishes, glassware and utensils, and at which the service of alcoholic beverages is incidental and complementary to such meal service.

"Sale" means any transfer, exchange or barter in any manner, or by any means whatsoever, including the transfer of alcoholic liquors by and through the transfer or negotiation of warehouse receipts or certificates, for a consideration and includes and means all sales made by any person, with the principal, proprietor, agent, servant or employee.

"Sale at retail," "sell at retail" or "retail sale" means sales for use or consumption and not for resale in any form.

"Sale of package liquor" means the sale of alcoholic liquor in the original package for use or consumption off the premises where sold.

"Specialty Restaurant" means any public place kept, used, maintained, advertised and held out to the public as a place where complete meals are served, and where complete meals are actually and regularly served, such space being provided with adequate and sanitary kitchen and dining room equipment and having employed in such space a sufficient number and kind of employees to prepare, cook and serve suitable food for its patrons, where a host or hostess is present to seat patrons, where all patrons are served the same prix fixe, multi-course meal at a scheduled seating, where admission to the scheduled seating is by reservation only, where food is served to patrons while they are seated at tables or at a counter, where the meals are served using nondisposable dishes, glassware and utensils, and at which the service of alcoholic beverages is incidental and complementary to such meal service.

"Spirits" means any beverage which contains alcohol obtained by distillation, mixed with water or other substances in solution, and includes brandy, rum, whiskey, gin, or other spirituous liquors, and such liquors when rectified, blended or otherwise mixed with alcohol or other substances.

Winnetka Village Code

(Prior code § 35.07)(MC-4-2001, Amended, 06/05/2001, Amends Subsection J; MC-9-2002, Added, 09/17/2002; MC-6-2003, Amended, 05/20/2003; MC-10-2003, Amended, 06/03/03, Adds Subsection L; MC-2-2006, Amended 04/11/2006, amends Subsection K.)

### Section 5.09.080    Ineligibility for license.

A. No license shall be issued under this Chapter to or for any of the following persons or establishments:

1. A person who is not a resident of the Village;

2. A person who is not of good character and reputation in the community in which he or she resides;

3. A person who is not a citizen of the United States;

4. A person who has been convicted of a felony under any federal or state law unless the Local Liquor Control Commissioner determines, after investigation, that such person has been sufficiently rehabilitated to warrant the public trust;

5. A person who has been convicted of being the keeper, or is keeping, a house of ill fame;

6. A person who has been convicted of pandering or other crime or misdemeanor opposed to decency and morality;

7. A person whose license under this chapter has been revoked for cause;

8. A person who at the time of application for renewal of any license issued under this chapter would not be eligible for such license upon a first application;

9. A partnership, if any general partner, or any limited partner of such partnership owning more than five percent of the aggregate limited partner interest in such partnership, would not be eligible to receive a license under this chapter for any reason other than citizenship or residence within the Village;

10. A corporation, if any officer, manager or director of such corporation, or any stockholder owning directly or beneficially in the aggregate more than five percent of the stock of such corporation, would not be eligible to receive a license under this chapter for any reason other than citizenship or residence within the Village;

11. A corporation, unless it is incorporated in Illinois or unless it is a foreign corporation which is qualified under the Business Corporation Act, 805 ILCS 5/1.01, et seq., to transact business in Illinois;

12. A person whose place of business is conducted by a manager or agent unless the manager or agent possesses the same qualifications required by the licensee under this chapter;

13. A person who has been convicted of a violation of any federal or state law concerning the manufacture, possession or sale of alcoholic liquor, or has forfeited bond to appear in court to answer charges for any such violation;

14. A person who does not beneficially own the premises for which a license is sought or does not have a lease on such premises for the full period for which the license is to be issued;

15. Any elected public official, including any member of the Village Council, or any employee of the Village; provided, however, that nothing contained in this section shall be construed to prevent such official or employee from making application for the issuance or renewal of a Class C license under this chapter as an officer, director or board member of an organization qualified for such license if the official or employee derives no direct or indirect pecuniary benefit from the organization;

16. A person who is not a beneficial owner of the business to be operated by the licensee;

17. A person who has been convicted of a gambling offense under Chapter 38 of the Illinois Revised Statutes;

18. A person to whom a Federal Wagering Stamp has been issued by the federal government for the current tax period;

19. A partnership to which a Federal Wagering Stamp has been issued by the federal government for the current tax period, or if any of the partners have been issued a Federal Gaming Device Stamp or Federal Wagering Stamp by the federal government for the current tax period;

20. A corporation, if any officer, manager or director of such corporation, or any stockholder

Winnetka Village Code

owning directly or beneficially in the aggregate more than twenty (20) percent of the stock of such corporation, has been issued a Federal Wagering Stamp for the current tax period;

21. Any premises for which the Federal Wagering Stamp has been issued by the federal government for the current tax period. (Prior code § 35.08)

22. Any limited food establishment, such as, but not limited to, fast food restaurants and drive-in restaurants as defined in the Winnetka Zoning Ordinance, luncheonettes, lounges, diners, drive-ins, or self-service or carry-out establishments.

23. A person who has any delinquent accounts with the Village, as provided in Section 1.04.140 of this Code, including without limitation unpaid taxes.

(MC-4-2007, Amended, 04/17/07; MC-9-2002, Added, 09/17/2002; MC-2-2006, amended ¶15, Subsection A, 04/11/06)


## Section 5.09.090    Termination date.

A. Every Class A, Class A-1, television rider, packaged meal rider, Class B, Class D, Class D-1, Class E, Class E-1 and Class P license issued under the provisions of this chapter shall terminate on the last day of March next following its issuance. (MC-10-2003, Amended, 06/03/03, Adds Class P)

B. Every Class C license issued under the provisions of this chapter shall terminate on the date specified in the license.

C. Every sidewalk restaurant rider shall terminate on the last day of November in the year the license is issued.

(Prior code § 35.09) (MC-4-2001, Amended, 06/05/2001, Subsection C added) (MC-10-2003, Amended, 06/03/2003; MC-6-2003, Amended, 05/20/2003; MC-9-2002, Added, 09/17/2002)


## Section 5.09.100    Classification of Licenses

A. Class A Licenses. Class A licenses authorize the retail sale and service of alcoholic beverages by restaurants, but only when such sales and service are incidental and complementary to the sale and service of complete meals for consumption only on the premises where sold, which incidental and complementary sales and service may include the occasional service of alcoholic beverages alone or with less than a full meal, subject to the provisions of Section 5.09.205 of this Chapter.

B. Class A-1 Licenses. Class A-1 licenses authorize the retail sale and service of alcoholic beverages by restaurants, but only when such sales and service are incidental and complementary to the sale and service of complete meals served in multiple courses for consumption only on the premises where sold, which incidental and complementary sales and service may include the service of food or liquor at a counter, bar or waiting area, subject to the conditions set forth in this subsection. Subject to the provisions of Section 5.09.205 of this Chapter, such incidental and complementary sales and service of alcoholic beverages may include the occasional sale and service of alcoholic beverages alone or with less than a full meal.

1. Except as provided in section 5.09.205 of this Chapter, the counter, bar or waiting area shall be restricted to patrons who have been seated by the restaurant's host or hostess.

2. (Repealed.)

3. (Repealed.)

4. (Repealed.)

5. The percentage of the total space available to patrons that is allocated to any lounge or waiting area in which a bar, counter or shelf or any substitute for such bar, counter or shelf will be located, shall not exceed ten (10) percent of the total space of the premises accessible to patrons.

Page 11 of Title 5

Winnetka Village Code

## Chapter 8.12

## FOOD SERVICE SANITATION

**Sections:**

| | |
|---|---|
| 8.12.010 | Title |
| 8.12.020 | General Provisions |
| 8.12.030 | Adoption of Food Service Sanitation Code |
| 8.12.040 | Adoption of Retail Food Store Sanitation Code |
| 8.12.050 | Definitions |
| 8.12.060 | License Required |
| 8.12.070 | Issuance of License |
| 8.12.080 | Issuance of New License on Change of Ownership |
| 8.12.090 | Suspension of License |
| 8.12.100 | Revocation of License |
| 8.12.110 | Service of Notice |
| 8.12.120 | Hearings |
| 8.12.130 | Application After Revocation |
| 8.12.140 | Village Sanitarian's Right of Access to Premises and Records |
| 8.12.150 | Report of Inspection |
| 8.12.160 | Correction of Violations |
| 8.12.170 | Examination and Condemnation of Food and Equipment |
| 8.12.180 | Submission of Plans; Inspection |
| 8.12.190 | Procedure When Infection Is Suspected |
| 8.12.200 | Pest Control |
| 8.12.210 | Grease Disposal |
| 8.12.220 | Sale of Food from Sources Outside Jurisdiction of the Village |
| 8.12.230 | Temporary Food Service Permit Required |
| 8.12.240 | Penalties |

**Section 8.12.010        Title**
This chapter shall be known, cited and referred to as the Winnetka Food Sanitation Code.
(MC-1-2004, Amended, 01/20/2004)

**Section 8.12.020        General Provisions**
    A.  Scope. This chapter, including the provisions of the Illinois Food Service Code, 1998 Edition, and the Illinois Retail Food Store Sanitation Code, 1992 Edition, as adopted by reference in this chapter, establish the minimum requirements for the manufacture, processing, preparation, handling, labeling, storage and dispensing of all items of food and drink sold for human consumption in the Village.

    B.  Intent.  This chapter is intended to ensure the public health, safety and welfare insofar as they are affected by the manufacture, processing, preparation, handling, labeling, storage and dispensing of all items of food and drink sold for human consumption in the Village.

    C.  Authority of Village Sanitarian. The Village Sanitarian is hereby authorized to enforce the provisions of this chapter, which shall include such powers as: the power to issue such rules and regulations as the Village Sanitarian may deem necessary to implement the provisions of this chapter; the

Winnetka Village Code

power to issue, renew, suspend and revoke licenses issued pursuant to this chapter; the power to conduct inspections of all food service establishments and retail food stores in the Village; the power to issue citations for violations of this chapter or any rules promulgated pursuant to this chapter; and the power to specify corrective actions a food service establishment or retail food store must take to fully comply with this chapter.
(MC-1-2004, Amended, 01/20/2004)

**Section 8.12.030    Adoption of Food Service Sanitation Code**
The Illinois Food Service Sanitation Code, 1998 Edition, promulgated by the Illinois Department of Public Health in Title 77 of the Illinois Administrative Code, Part 750, as amended, is adopted by reference pursuant to Article 1, Division 3of the Illinois Municipal Code, 65 ILCS 5/1-3-1 through 5/1-3-6, and the Municipal Adoption of Codes and Records Act, 50 ILCS 220/1 through 220/7, except as modified by the amendments set forth in this chapter.
(MC-1-2004, Amended, 01/20/2004)

**Section 8.12.040    Adoption of Retail Food Store Sanitation Code**
The Illinois Retail Food Store Sanitation Code, 1992 Edition, promulgated by the Illinois Department of Public Health in Title 77 of the Illinois Administrative Code, Part 760, as amended, is adopted by reference pursuant to Article 1, Division 3 the Illinois Municipal Code, 65 ILCS 5/1-3-1 through 5/1-3-6, and the Municipal Adoption of Codes and Records Act, 50 ILCS 220/1 through 220/7, except as modified by the amendments set forth in this chapter.
(MC-1-2004, Amended, 01/20/2004)

**Section 8.12.050    Definitions**
As used in this chapter, the following terms, phrases and words and their derivations, shall have the meanings given in this section, unless the context or use clearly indicates another or different meaning is intended.

  A.  Adulterated:  The condition of any food:
    1.  if it bears or contains any poisonous or deleterious substance in a quantity which may render it injurious to health;
    2.  if it bears or contains any added poisonous or deleterious substance for which no safe tolerance has been established by regulation or is in excess of such tolerances if one has been established;
    3.  if it consists in whole or part of any filthy, putrid, or decomposed substance or if it is otherwise unfit for human consumption;
    4.  if it has been processed, prepared, packed, or held under unsanitary conditions whereby it may have been contaminated with filth or whereby it may have been rendered injurious to health;
    5.  if it is in whole or in part the product of a diseased animal which has died otherwise than by slaughter;
    6.  if its containers are composed in whole or in part by any poisonous or deleterious substance which may render the contents injurious to health.

  B.  Critical Violation:  Any violation of the Illinois Food Service Sanitation Code or the Illinois Retail Food Store Sanitation Code that the Illinois Department of Public Health has determined to be of a nature that is known to cause or be a condition that has a high probability of causing a food borne illness outbreak and that has been marked with an asterisk and given a weight as 4 or 5 points on the standard inspection form.

Winnetka Village Code

C.  Food Service Establishment:  Any place where food is prepared and intended for, though not limited to, individual portion service, and includes the site at which individual portions are provided.  The term includes any such place regardless of whether consumption is on or off the premises and regardless of whether there is a charge for the food.  The term also includes delicatessen type operations that prepare foods intended for individual portion service.  The term does not include lodging facilities serving only a continental breakfast (limited to only coffee, tea, juice and commercially prepared baked goods), private homes or a closed family function where food is prepared or served for individual family consumption, retail food stores or food vending machines.

D.  License:  The document issued by the Village of Winnetka which authorizes a person to operate a food service establishment or retail food store.

E.  Regulatory Authority:  The Village of Winnetka or its duly authorized Village Sanitarian or his/her licensed designee.  Wherever the term " regulatory authority" appears in the Illinois Food Service Sanitation Code, it shall also be deemed to refer to the Village of Winnetka or its duly authorized Village Sanitarian or his/her licensed designee.

F.  Retail Food Store:  Any establishment or section of an establishment where food and food products are offered to the consumer and intended for, though not limited to, off-premises consumption.  The term includes delicatessens that offer food in bulk quantities only.  The term does not include establishments that handle only prepackaged spirits; roadside markets that offer only fresh fruits and vegetables for sale; food service establishments or food and beverage vending machines.

G.  Temporary Food Service Establishment:  Any food service establishment that operates for a temporary period of time, not to exceed fourteen  (14) days, in connection with a fair, carnival, public exhibition, or other similar transitory gatherings.

H.  Village Sanitarian:  An employee of the Village who is a State of Illinois Licensed Environmental Health Practitioner and who is authorized by the Village to enforce this chapter.  The term also includes the Village Sanitarian' s licensed designee.
(MC-1-2004, Amended, 01/20/2004)


**Section 8.12.060        License Required**
No person shall operate a food service establishment or retail food store without a valid license to operate issued by the Village Sanitarian.  A valid license shall be posted in every food service establishment and retail food store so as to be visible to patrons.
(MC-1-2004, Amended, 01/20/2004)


**Section 8.12.070        Issuance of License**
A.  Any person desiring to operate a food service establishment or retail food store shall make written application on forms provided by the Village.  Such application shall include the name and address of each applicant, the location of the proposed establishment, the proposed scope of the operation and the signature of the applicant(s).

B.  No license to operate shall be issued until the facility has been inspected and found to comply with all applicable Village ordinances, rules and regulations.

Winnetka Village Code

**Title 15**

**BUILDINGS AND CONSTRUCTION**

**Chapters:**

| | |
|---|---|
| 15.04 | **GENERAL PROVISIONS** |
| 15.08 | **MODEL CODES ADOPTED BY REFERENCE** |
| 15.12 | **Repealed by MC-3-2005** |
| 15.16 | **FIRE PREVENTION AND LIFE SAFETY CODES** |
| 15.20 | **Repealed by MC-3-2005** |
| 15.24 | **SEWER CODE** |
| 15.28 | **TREE PRESERVATION CODE** |
| 15.32 | **CONSTRUCTION PERMITS** |
| 15.36 | **CERTIFICATES OF OCCUPANCY** |
| 15.40 | **CERTIFICATES OF APPROPRIATENESS OF DESIGN** |
| 15.44 | **SUPPLEMENTARY STANDARDS AND REQUIREMENTS** |
| 15.48 | **UNSAFE STRUCTURES AND EQUIPMENT** |
| 15.52 | **DEMOLITION PERMITS** |
| 15.56 | **PRIVATE SWIMMING POOLS AND TRAMPOLINES** |
| 15.60 | **SIGNS*** |
| 15.64 | **LANDMARK PRESERVATION** |
| 15.68 | **FLOOD HAZARD PROTECTION REGULATIONS** |
| 15.72 | **APPEALS** |

Winnetka Village Code

## Chapter 15.04

## GENERAL PROVISIONS

**Sections:**

| | |
|---|---|
| 15.04.010 | **Winnetka Building Code.** |
| 15.04.020 | **Scope.** |
| 15.04.030 | **Intent.** |
| 15.04.040 | **Rules of construction.** |
| 15.04.050 | **Definitions.** |
| 15.04.060 | **Compliance with regulations.** |
| 15.04.070 | **Right to enter premises.** |
| 15.04.080 | **Enforcement procedures for violations.** |
| 15.04.090 | **Notice of Violation.** |
| 15.04.100 | **Stop Work Orders.** |
| 15.04.110 | **Penalties; Fines.** |

**Section 15.04.010        Winnetka Building Code.**

This Title 15 of the Winnetka Village Code shall be known, cited and referred to as the Winnetka Building Code. (Prior code § 23.01)
(MC-3-2005, Amended, 06/21/2005)

**Section 15.04.020        Scope.**

This title establishes the minimum requirements for construction activities in the Village, and for all other matters affecting or relating to buildings, structures and site work, including but not limited to electrical equipment, engineering, fire prevention and building safety, plumbing, drainage and sanitation systems, heating, ventilation and air conditioning systems, and compliance with the tree preservation, occupancy and zoning requirements as provided in this code. (Prior code § 23.02)
(MC-3-2005, Amended, 06/21/2005)

**Section 15.04.030        Intent.**

This title is intended to ensure public safety, health and welfare insofar as they are affected by the design, construction, alteration, addition, repair, removal, demolition, location, occupancy and maintenance of all buildings, structures and property within the Village. (Prior code § 23.03)(MC-3-2005, Amended, 06/21/2005)

**Section 15.04.040        Rules of construction.**

A.  In the event any provision of this title is in conflict with any provision of any model code adopted and incorporated by reference in this Building Code, or with applicable statutes, the provision imposing the stricter regulation, as determined by the Director, shall prevail unless otherwise provided by law.

B.  Words used in the singular shall include the plural and words used in the plural shall include the singular. (Prior code § 23.04)(MC-3-2005, Amended, 06/21/2005)

Winnetka Village Code

**Section 15.04.050      Definitions.**

A.  Terms Defined in Other Ordinances and Codes. Terms used in this title Building Code, but not otherwise defined, shall have the meanings ascribed to them in the Zoning Ordinance, this code or the codes adopted by reference in Sections 15.08.010, 15.12.010 and 15.20.010.

B.  Definitions. For purposes of this title, certain words are defined, as follows:

"Building Officer" means any officer or employee of the Village responsible for administering or enforcing any provision of this title or any provision of this code that is administered pursuant to this title. The term "Building Officer" includes: the Director of Public Works; the Fire Chief; the Director of Community Development; the Health Officer; the Plan Examiner; and the building, electrical, code enforcement, engineering, fire prevention, forestry, mechanical, plumbing, water and electric, and zoning inspectors. The term "Building Officer" also includes such other professional service providers as may be engaged by the Village and such other person as may be assigned or directed by the Director or the Village Manager to perform any of the functions of a Building Officer.

"Construction activity" means any activity or activities related to the construction, alteration, addition, repair, removal, demolition, occupancy or maintenance of a structure or building, or any part, including but not limited to site work, excavation, underpinning, raising, lowering, remodeling, renovation, rehabilitation, or site restoration. Unless otherwise specified, "construction activity" includes ordinary repairs. In addition, "Construction activity" includes the following: (1) any activity or activities involving the alteration of the elevation or grade of any property for any purpose, including but not limited to, grading for stormwater drainage, landscaping and the placement of berms; (2) all plumbing work;  (3) all electrical work; (4) the delivery, servicing or removal of construction equipment and supplies, including but not limited to, brick, lumber, construction trailers and portable toilets; and (5) the exterior use of any machinery or equipment in the cleaning, servicing or maintenance of a construction site or any temporary facilities or temporary structures on a construction site.

"Construction documents" means documents, drawings and calculations that are certified under the professional seal of the appropriate Illinois registered design or engineering professional and are submitted with applications for permits required by this title, in order to describe the scope of the work proposed in the application and to establish that the work complies with this code. "Construction documents" and technical submissions include, but are not limited to: property, tree and topographic surveys; proposed site plan; floor plans; framing plans; exterior elevations; building and wall sections; mechanical, plumbing, and electrical and fire sprinkler and protection systems, specifications, diagrams and details; reflected ceiling plan; structural calculations; building size and lot coverage calculations; and such other documents as the Director may determine are necessary to establish that the work proposed complies with this code and any rules and regulations issued pursuant to this code.

Construction Documents, Approved. "Approved construction documents" means the construction documents and technical submittals, which describe the work authorized by the permit and which have been stamped "Approved/Approved as Noted" by each required Building Officer.

"Department" means the Community Development Department established in Section 2.44.010 of this code.

"Director" means the Director of Community Development established in Section 2.44.010 of this code.

Page 3 of Title 15

Winnetka Village Code

"Electrical equipment" means materials, fittings, devices, appliances, fixtures, apparatus and the like used as part of or in connection with any electrical installation, including fire alarm systems and the source connection of security alarm systems. For purposes of this title, ordinary household appliances that are not required to be permanently connected to a power source, and apparatus, conductors and other equipment installed for or by a public utility, including a common carrier, for the purpose of providing public utility service, if such utility is under the jurisdiction of a state or federal regulatory agency or the Village, shall not be considered electrical equipment.

"Electrical inspector" means a person who is certified as an electrical inspector and who is employed by the Village to serve as the Building Officer who is responsible, under the supervision of the Director, for the review of applications for permits and construction documents relating to electrical work, and for conducting inspections necessary to insure that all electrical work is performed and completed in full compliance with the provisions of this code.

"Electrical work" means all work involving the installation, repair or alteration of electrical equipment or electrical systems.

"External architectural features" means the architectural style and general arrangement of the exterior of a building or structure and the style, nature and arrangement of associated site improvements, such as landscaping, screening materials, lighting and site circulation patterns, as are designed to open to view from a courtyard open to the public or a public street, place or way. "External architectural features" include: the kind and characteristics of windows, doors, lighting components and other appurtenant features; the color of the exterior of a building or structure, or associated site improvements; and the size and species of all planting materials.

"Minor Construction Activity" means construction activity that is performed by a property owner without the services of a contractor and that does not require a permit from the Village of Winnetka.

"Ordinary repairs" means work on or repairs made to any part of an existing structure for the purpose of the structure's maintenance, provided, the work or repair does not affect or involve any structural element or any of the following: (1) the cutting away of any wall, partition or portion of wall; (2) changing the use or occupancy classification of the structure; (3) the fire hazard of the structure; (4) the reshingling or recovering of any roof; (5) electrical work; (6) plumbing work; (7) the installation or alteration of any means of egress or of any mechanical systems, including but not limited to heating, cooling and ventilation.

"Owner" means the person who holds legal or equitable title to a parcel of property. For purposes of this title, except as otherwise provided, the term "owner" includes all licensed or registered professionals or contractors authorized by the owner to act on the owner's behalf in applying for permits or performing construction activities pursuant to the provisions of this title.

"Permit work" means the work that is authorized by any permit issued pursuant to this title, including work described and detailed on the approved construction documents.

"Plumbing inspector" means a person licensed as a plumber by the state of Illinois, who is employed by the Village to serve as the Building Officer who is responsible, under the supervision of the Director, for the review of applications for permits and construction documents relating to plumbing work and for conducting all inspections necessary to insure that plumbing work is performed and completed in full compliance with this code.

"Plumbing work" means all work involving the installation, repair or alteration of any plumbing fixture, including but not limited to any standpipe, water supply, sewer, drain, drain leader, gas, soil, water, vent or similar fixture, and any piping related to such fixture.

Winnetka Village Code

"Primary structure" means the structure in which the principal use of a parcel of property is conducted.

(Ord. MC-193-97 § 2, 1997; Ord. MC-192-97 §§ 9--11, 1997: prior code § 23.05)(MC-15-2003, Amended, 10/07/2003, Definitions of construction activity and ordinary repairs amended; MC-10-2002, Amended, 11/19/2002)(MC-3-2005, Amended, 06/21/2005, Construction Documents, Approved ; MC-15-2003, Amended, 10/07/2003, Definitions of construction activity and ordinary repairs amended; MC-10-2002, Amended, 11/19/2002)

**Section 15.04.060        Compliance with regulations.**

It is a violation of this code for any person to engage in any construction activities in violation of any provisions of this code, this title or any applicable rules and regulations adopted pursuant to this code, or to change the use or occupancy of any building, structure or portion of such building or structure, unless the building, structure or portion is in full compliance with the provisions of this code and is approved for such use or occupancy. (Prior code § 23.06)(MC-3-2005, Amended, 06/21/2005)

**Section 15.04.070        Right to enter premises.**

Building Officers are empowered, during reasonable hours, to lawfully enter upon any premises or into any structure or addition for which a permit has been issued but which has not received a final certificate of use or occupancy or when necessary to do so in the performance of any duty imposed upon them by this code. If entry is refused or not obtained, a Building Officer is authorized to pursue remedies as provided by law or this code. (Prior code § 23.07)

**Section 15.04.080        Enforcement procedures for violations.**

A. Authority of Building Officers. Any Building Officer is authorized to exercise the police power of the Village in such manner and to such extent as the Building Officer determines the character of the violation and the interests of public health, safety and welfare may demand in order to secure compliance with the provisions of this title.

B. Types of Enforcement Actions. Enforcement actions shall include, but not be limited to, the issuance of a stop work order, permit revocation, prosecution for violations, the bringing of a civil action to recover any penalty or fine, or the institution of the appropriate action at law or in equity to restrain, correct or abate such violation or to require the removal of the unlawful use or act.

C. Initiating Enforcement Procedures.  Enforcement proceedings shall be initiated as provided in this subsection, by the issuance of notice of violation or stop work order, or by the initiation of a civil action.

1. Issuance of Notice of Violation or Stop Work Order.  A notice of violation or stop work order shall be issued to the property owner or to any person who is in charge of the work site or otherwise responsible for the work.  All notices of violation and stop work orders shall be issued as provided in sections 15.04.090 and 15.04.100 of this code.

2. Civil Action to Recover Fines or Penalties.  The Village Attorney or, at the direction of the Village Manager, the Village Prosecutor, may file a civil action to recover any fine or other penalty  against any such person; provided, however, that the filing of such civil action shall preclude incarceration or imprisonment.

Winnetka Village Code

D.  Nuisance Violations.    If any violation of this chapter also constitutes a public nuisance under chapter 9.16 of this Code, the Village may seek any or all of the remedies provided in said chapter 9.16 for such nuisance, and such remedies shall be in addition to the remedies provided in this chapter.

(Ord. MC-13-2004 § 4, 2004, subsection D amended)

E.  Wilful Violation. Any person who is found by a court of competent jurisdiction to have wilfully violated any of the provisions of this title, or of any other provision of this code in the course of performing any work that is subject to the provisions of this title, shall, in addition to any other penalty imposed pursuant to this code, be ineligible for a period of five years from the date of the violation to apply for a permit, to be issued a permit, or to perform any work in connection with or relevant to a permit issued or applied for, pursuant to the provisions of this title. For purposes of this section, a violation shall be deemed wilful if work continues in violation of a stop work order, if the violations cited in an oral or written notice of violation  are not promptly corrected or if more than two notices of violation are issued for the same work site within any thirty (30) day period.

(MC-3-2005, Amended, 06/21/2005; MC-13-2004, Amended, 12/07/2004)

**Section 15.04.090        Notice of Violation.**

A.  Oral Notice.  If the notice of violation is given orally, it shall be followed by a written notice, as provided in the following subsection C.

B.  Written Notice.  The written notice of violation shall specify the violation and direct the discontinuance of the illegal action or condition and the abatement of the violation. The issuance of a written stop work order shall constitute the giving of written notice of a violation.  If steps are immediately taken to discontinue the illegal action or condition and to correct the violation so as to comply with the provisions of this code, then the violation shall not be deemed a wilful violation of this code and shall not be subject to any penalty provided in this code.

C.  Exceptions to Notice Requirement.   Prior written notice of a violation shall not be required for the initiation of enforcement actions under this section if the violation creates any emergency or unsafe condition, if the violation is the resumption of an activity that was the subject of a written notice of violation issued within the previous thirty (30) days, or if the Building Officer determines that the violation is part of a pattern of behavior at the site which discloses a disregard for the requirements of this code.

(MC-3-2005, Added, 06/21/2005)

**Section 15.04.100        Stop Work Orders.**

A.  Stop Work Orders. In case work is being done in violation of, or contrary to, the provisions of the code, or if in the opinion of the Director, Director of Public Works or Fire Chief, any work is being performed in an unsafe or dangerous manner, the Director, Director of Public Works, Fire Chief, Village Manager, or other person designated in writing by the Village Manager, is authorized to order such work to be stopped immediately.

B.  Form of Stop Work Order.  A stop work order may be issued orally or in writing.  An oral stop work order to the owner or to the person doing the work shall be followed by a written stop work order signed by the Director by the close of the next business day.

C.  Effect and Duration of Stop Work Order.  On receipt of an oral or written stop work order, all construction activities shall cease immediately, and it shall be unlawful to continue or

Winnetka Village Code

resume any construction activities on the property, except such work as may be necessary to prevent damage to persons or property, until the Director has determined that all conditions set forth in the stop work order have been met and all required fees have been paid. In addition, all stop work orders shall be subject to the terms and conditions of the stop work order policy set forth in subsection D of this section.

   D.   Stop Work Order Policy

      1.   1st Stop Work Order.   All work must cease until the violation has been cured and the applicable stop work order fee in the amount set by resolution of the Village Council has been paid in full. For stop work orders issued for construction activity outside of the hours permitted under section 15.32.140 of this code, the Director of Community Development, in the reasonable exercise of his discretion, may permit work to resume during permitted times, provided the stop work order fee is paid within seven (7) days of the violation.

      2.   2nd Stop Work Order.   Upon the issuance of a second stop work order at the site of construction activity, a two (2) business days stop work order shall be issued. Work may resume at the permitted hour on the third business day if the violation has been cured and the applicable stop work order fee in the amount set by resolution of the Village Council has been paid in full.

      3.   3rd Stop Work Order.   Upon the issuance of a third stop work order at the site of construction activity, a three (3) business-day stop work order shall be issued, and citations to appear in the Circuit Court of Cook County shall be issued to the general contractor or owner/developer and to any offending sub-contractors. Work may resume at the permitted hour on the fourth business day if the violation has been cured and the applicable stop work order fee in the amount set by resolution of the Village Council has been paid in full.

      4.   4th Stop Work Order.   In addition to the revocation of permits as provided in the following paragraph 5, upon the issuance of a fourth Stop Work Order for any site, citations will be issued to appear in the Circuit Court of Cook County.

      5.   Permit Revocation. All permits will be revoked and fees and deposits forfeited upon the occurrence of either of the following:

         a.   if three (3) Stop Work Orders have been issued at the site in any 30 day period;
   or

         b.   if a total of four (4) Stop Work Orders have been issued at any one site in the course of the project.

(MC-3-2005, Added, 06/21/2005)


**Section 15.04.110       Penalties; Fines**.

   A.   Fines for Violations.   Except as provided in subsection B of this section, any person who violates any provision of this title shall be subject to a fine of not less than one hundred dollars ($100.00) nor more than seven hundred fifty dollars ($750.00) for each violation, plus the cost of prosecution.

   B.   Pre-Court Payment. Except as provided in this paragraph, any person charged with any violation of this title may pay directly to the Village, at the Village Hall, the minimum fine applicable to each offense charged, as established in subsection A of this section, subject to the following conditions:

      1.   No pre-court such payment shall be made less than five days before the date of a court hearing set for such violation.

Winnetka Village Code

2.   A receipt shall be issued for any pre-court payment.

3.   Any violation for which the fine or penalty is paid in full by pre-court payment as provided in this subsection B shall not be subject to further prosecution.

4.   No pre-court payments will be accepted less than five days before the scheduled court hearing date.

5.   If more than two violations are issued for the same work site in any thirty (30) day period, only the first two such violations may be subject to a pre-court payment pursuant to this paragraph.

C.   Separate Offenses. Each act of violation and each day upon which a violation occurs shall constitute a separate offense. (Ord. MC-192-97 § 12, 1997; prior code § 23.08)(MC-3-2005, Added, 06/21/2005)

Winnetka Village Code

## Chapter 15.08

## MODEL CODES ADOPTED BY REFERENCE

**Sections:**

15.08.010        Adoption of Model Codes by Reference.
15.08.020        Amendments to the International Building Code, 2003 Edition.
15.08.030        Amendments to the International Residential Code for One- and Two-Family
                 Dwellings, 2003 Edition
15.08.040        Amendments to the International Mechanical Code, 2003 Edition.
15.08.050        Amendments to the International Fuel Gas Code
15.08.060        Amendments to the State of Illinois Plumbing Code, 2004 Edition
15.08.070        Amendments to the National Electric Code, 2002 Edition

**Section 15.08.010        Adoption of Model Codes by Reference.**

The model codes described in the following subsections A through G are each adopted by reference pursuant to the home rule authority of the Village of Winnetka under Article VII, Section 6 of the State of Illinois Constitution of 1970, and further pursuant to applicable provisions of the Illinois Municipal Code and the Municipal Adoption of Codes and Records Act, 50 ILCS 220/1 through 220/7, except as modified by the exclusions, amendments and additional provisions set forth in this chapter.

    A.  International Building Code, 2003 Edition.

    B.  International Residential Code for One- and Two-Family Dwellings, 2003 Edition.

    C.  International Mechanical Code, 2003 Edition.

    D.  International Fuel Gas Code, 2003 Edition.

    E.  State of Illinois Plumbing Code, 2004 Edition, as promulgated by the Illinois Department of Public Health and published in Title 77 of the Illinois Administrative Code, Chapter I, Subchapter R, Part 890,

    F.  National Electrical Code, 2002 Edition.

    G.  International Fire Code, 2003 Edition.  (See Chapter 15.16)
(MC-3-2005, Amended, 06/21/2005; MC-13-2004, Amended, 12/07/2004)

**Section 15.08.020        Amendments to the International Building Code, 2003 Edition.**

    A.  **Exclusions.** The following provisions of the International Building Code, 2003 Edition, are excluded from adoption by the Village.  Where a range of sections is listed, the exclusion includes all sections and subsections within the specified range.

       1.  **101.4.5 Property maintenance.**

       2.  **105.1.1 Annual permit.**

       3.  **105.1.2 Annual permit records.**

       4.  **105.5        Expiration.**  (Superseded by Section 15.32.190 of the Village Code.)

Winnetka Village Code

 5.  **105.7**      **Placement of permit.**  (Superseded by Section 15.32.180 of the Village Code.)

 6.  **105.8**      **Surety Bond Requirement.**  (Superseded by Section 15.32.060 of the Village Code.)

 7.  **106.2**      **Site plan.**  (Superseded by section 15.32.050 of the Village Code.)

 8.  **106.3.1 Approval of construction documents.**  (Superseded by Sections 15.32.090 and 15.32.100 of the Village Code.)

 9.  **108.2**      **Schedule of permit fees.**  (Superseded by Section 15.32.020 of the Village Code.)

 10.  **108.4**      **Work commencing before permit issuance.**  (Superseded by Section 15.32.010 of the Village Code.)

 11.  **108.6**      **Refunds.**  (Superseded by Section 15.32.030 of the Village Code.)

 12.  **109.3.10**    **Final inspection.** (Superseded by Section 15.32.160 of the Village Code.)

 13.  **110.3**      **Temporary occupancy.**  (Superseded by Section 15.36.010 of the Village Code.)

 14.  **907.2.1 through 907.2.9**    **Use groups.**

 15.  **1805.4.5**    **Timber footings.**

 16.  **1805.4.6**    **Wood foundations.**

 B.  **Amendments.**  The following provisions of the International Building Code, 2003 Edition, are amended for adoption by the Village:

 1.  **101.1**      **Title.**  These regulations shall be part of the Building Code of the Village of Winnetka.  As used in the International Building Code, 2003 Edition, as adopted and amended by the Village, "this code" shall mean the Building Code of the Village of Winnetka.  As used in the ordinances and codes published by the Village, the term "this code" shall mean the Winnetka Village Code, and the Building Code the Village of Winnetka shall be called the "Building Code."

 2.  **101.4.1 Electrical:**  The provisions of the National Electrical Code, 2002 Edition, as adopted by reference as provided in this chapter Section 15.08, shall apply to the installation of electrical systems, including alterations, repairs, replacement, equipment, appliances, fixtures, fittings and appurtenances thereto.

 3.  **101.4.4 Plumbing.**  The provisions of the State of Illinois Plumbing Code, 2004 Edition, as adopted by reference as provided in this chapter Section 15.08, shall apply to the installation, alteration, repair and replacement of plumbing systems, including equipment, appliances, fixtures, fittings and appurtenances, and where connected to a water or sewage system and all aspects of a medical gas system.  The provisions of the State of Illinois Plumbing Code 2004 Edition, as adopted by reference as provided in this chapter Section 15.08, shall apply to private sewage disposal systems.

 4.  **102.6**      **Existing structures.**  The legal occupancy of any structure existing on the date of adoption of this building code shall be permitted to continue without change, except as is specifically provided in this code, including this building code and the International Fire Code as adopted by the Village, and except as is deemed necessary by the building official for the general safety and welfare of the occupants and the public.

 5.  **103.1**      **Creation of enforcement agency.**  The Department of Community Development is created pursuant to Chapter 2.44 of the Village Code hereby established as the

Winnetka Village Code

enforcement agency for this building code, and the Director of Community Development shall be known as the building official.

6. **103.2    Appointment.** The building official shall be appointed by the Village Manager.

7. **103.3    Deputies.** Subject to the approval of the Village Manager, the building official shall have the authority to appoint a deputy building official, the related technical officers, inspectors, plan examiners and other employees. Such employees shall have powers as delegated by the building official.

8. **104.10    Modifications.** Wherever there are practical difficulties involved in carrying out the provisions of this building code, the building official shall have the authority to grant modifications for individual cases, upon application of the owner or owner' s representative, provided the building official shall first find that special individual reasons makes the strict letter of this building code impractical and that the modification is in compliance with the intent and purpose of this building code and that such modification does not lessen health, accessibility, life and fire safety, or structural requirements. The details of actions granting modifications shall be recorded and entered in the files of the Department of Community Development.

9. **105.2    Work exempt from permit.** Permits shall not be required for the following work. Exemptions from the permit requirements of this Building Code shall not be deemed to grant authorization for any work to be done in any manner in violation of the provisions of the Village Code or any other laws or ordinances of the Village.

a.   Painting, papering, tiling, carpeting, cabinets, counter tops and similar finish work.

b.   Construction or installation of temporary motion picture, television and theater stage sets and scenery. Notwithstanding the foregoing, a film production permit shall be required as provided in Chapter 5.20 of the Village Code.

c.   Prefabricated swimming pools accessory to a detached one and two family residential dwellings, as applicable in Section 101.2, which are less than 24 inches (610 mm) deep, do not exceed 5,000 gallons (18 925 L) and are installed entirely above ground.

10. **106.1.1.1   Fire protection system shop drawings.** Shop drawings for the fire protection system(s) shall be submitted to indicate conformance with this building code, all other applicable provisions of the Village Code and the construction documents, and shall be approved prior to the start of system installation. Shop drawings shall contain all information as required by the referenced installation standards in Chapter 9 of the International Building Code, 2003 Edition,.

11. **106.3.2 Previous approvals.** This code shall not require changes in the construction documents, the construction or the designated occupancy of a structure for which a lawful permit has heretofore been issued or otherwise lawfully authorized, and for which construction has been pursued in good faith within six months after the effective date of this code and has not been abandoned.

12. **107.3    Temporary power supply.** The building official is authorized to give permission to temporarily supply and use power in part of an electric installation before such installation has been fully completed and the final certificate of completion has been issued. The part covered by the temporary certificate shall comply with the requirements specified for temporary lighting, heat or power in the National Electrical Code 2002 Edition, and in Section 13.08,210 and Section 15.32.140(D)(3) of the Village Code.

13. **112.1    General.** The Building Review Committee created by Section 3.36.010 of the Village Code shall hear and decide appeals of orders, decisions or determinations made by the building official relative to the application and interpretation of this building code. Appeals shall be subject to the provisions of Chapter 15.72 of the Village Code.

Winnetka Village Code

14. **114.2.1 Stop work order policy.** The issuance of stop work orders shall be subject to the enforcements provisions set forth in Chapter 15.04 of the Village Code.)

15. **406.1.4 Separation.** The sills of all door openings between private garages and adjacent interior spaces shall be raised not less than six (6) inches above the garage floor.

16. **903.4.2 Alarms.** Approved audible devices shall be connected to every automatic sprinkler system. Such sprinkler water-flow alarm devices shall be activated by water flow equivalent to the flow of a single sprinkler of the smallest orifice size installed in the system. Alarm devices shall be provided on the exterior of the building in an approved location. Where a fire alarm system is installed, actuation of the automatic sprinkler system shall actuate the building fire alarm system. An outside audio/visual device shall be provided and shall be located above the fire department connection.

17. **903.4.2.1    Alarm-indicating devices.** All sprinklered buildings shall be provided with audio/visual alarm-indicating devices. The alarm-indicating devices shall be of a sufficient number and power to be seen and heard in all areas of every building.

18. **903.4.2.2    Test Valves.** Fire sprinkler system inspector test valves shall be accessible at all times and shall located no more than 6 feet above the finished floor. On multiple riser systems, each test valve shall be marked to identify which riser and area it tests.

19. **903.4.3 Floor control valves.** Approved supervised indicating control valves shall be provided at the point of connection to the riser on each floor in high-rise buildings. In multiple story buildings, floor control valves with water flow and tamper switches shall be provided for each floor.

20. **903.6    Safety Factor.** Provide a minimum 10% safety factor in the fire protection system hydraulic calculation. The system demand shall be 10% minimum below the seasonal low water flow test supply.

21. **903.7    Hydraulic nameplate.** By each hydraulically calculated area, on each drawing, provide a copy of the hydraulic nameplate.

22. **903.8    NFPA standards.** The appendixes of all NFPA standards are to be considered as part of each standard and are considered a "shall" requirement and not "should" information.

23. **903.9    Fire alarm systems.** All fire alarm systems shall be of the addressable type and shall be installed per NFPA 72, 1999.

24. **903.10    Quick response sprinklers.** All offices, assembly, and residential buildings and areas shall be provided with residential and/or quick response sprinklers.

25. **905.3.1 Building height.** Class III standpipe systems shall be installed throughout buildings where the floor level of the highest story is located more than 30 feet (9144 mm) above the lowest level of fire department vehicle access, or where the floor level of the lowest story is located more than 30 feet (9144 mm) below the highest level of fire department vehicle access. Notwithstanding the foregoing, standpipes shall be required in all buildings that are more than two stories high and/or more than two stories below grade.

26. **903.3.5 Water supplies.** Water supplies for automatic sprinkler systems shall comply with this section and the standards referenced in Section 903.3.1. The potable water supply shall be protected against backflow in accordance with the requirements of this section and the State of Illinois Plumbing Code, 2004 Edition. Hydrant water flow data used for the design of any sprinkler system shall be witnessed by the Fire Department and shall be no more than six (6) months old.

27. **907.2    Where required.** An approved manual fire alarm system shall be provided in all use groups, except as specified in Section 907.2.6 of this code, and except for single family

Winnetka Village Code

detached dwellings. All fire alarm control panels and annunciators shall be installed in locations approved by the Fire Department. All fire alarm panels and annunciator shall be keyed.

28. **1101.2    Design.** Buildings and facilities shall be designed and constructed to be accessible in accordance with this building code, the State of Illinois Accessibility Code, 1997 Edition, and ICC A117.1.

29. **2302.1.2.1  Fire Protection.** Where prefabricated wood I-joists are used for floor and ceiling assemblies in finished or unfinished spaces or areas in one- or two-family dwellings, these assemblies shall be separated from adjacent spaces or areas by fire-resistant material capable to resist a fire exposure equivalent to one-hour or more in accordance with fire test procedures as set forth in ASTM E119, as well as in accordance with UL or FM classification standards. Such separation shall not be required for structures that are fully equipped with an automatic sprinkler system designed and installed in accordance with NFPA 13.

30. **2603.2.1    Third Party Approval.** No foam plastic insulation shall be unless it has been approved by a nationally recognized independent testing agency, such as Underwriters Laboratories or Factory Mutual.

31. **3306.9.1    Barriers.** Prior to commencing any work under a permit that includes the authorization of demolition, excavation, construction of a new structure and/or construction of an addition to an existing structure, the applicant shall erect a fence to enclose the site in a location and manner approved by the building official. The fence shall be no less than six (6) feet in height and shall be located at least 18 inches off any public sidewalk. The fence shall be permanently secured in the ground, and shall remain in place until the building official approves its removal. When there are no construction personnel at the site, any gate or opening in the fence shall be closed and secured with a lock.

(MC-03-2005, Added, 06/21/2005)


**Section 15.08.030    Amendments to the International Residential Code for One- and Two-Family Dwellings, 2003 Edition**

A. **Exclusions.** The following provisions of the International Residential Code for One- and Two-Family Dwellings, 2003 Edition, are excluded from adoption by the Village. Where a range of sections is listed, the exclusion includes all sections and subsections within the specified range.

1. **105.5    Expiration.** (Superseded by Section 15.32.190 of this code.)

2. **105.7    Placement of permit.** (Superseded by Section 15.32.180 of the Village Code.)

3. **106.2    Site plan.** (Superseded by section 15.32.050 of the Village Code.)

4. **106.3.1 Approval of construction documents.** (Superseded by Sections 15.32.090 and 15.32.100 of the Village Code.)

5. **108.2    Schedule of permit fees.** (Superseded by Section 15.32.020 of the Village Code.)

6. **108.6    Surety Bond Requirement.** (Superseded by Section 15.32.060 of the Village Code.)

7. **108.4    Work commencing before permit issuance.** (Superseded by Section 15.32.010 of the Village Code.)

8. **108.6    Refunds.** (Superseded by Section 15.32.030 of the Village Code.)

Winnetka Village Code

9. **109.3.10**    **Final inspection.** (Superseded by Section 15.32.160.)

10. **110.4**    **Temporary occupancy.**  (Superseded by Section 15.36.010 of the Village Code.)

11. **310.4**    **Bars, grill, covers and screens.**

12. **402.1**    **Wood foundations.**

13. **404.2**    **Wood foundation walls.**

14. **1003.12Mantel and trim.**  Woodwork or other combustible materials shall not be placed within 6 inches on either side of a fireplace opening or 12 inches above a fireplace opening.  No combustible mantel shall be installed less than 21 inches from the top of the fireplace opening.

15. **Part VII — Plumbing.**    Chapters 26 through 32

16. **Part VIII — Electrical.**    Chapters 33 through 42.


B.  **Amendments.**  The following provisions of the International Residential Code for One- and Two- Family Dwellings, 2003 Edition, are amended for adoption by the Village:

1. **101.1**    **Title.**  These provisions shall be known as the Residential Code for One- and Two-Family Dwellings of the Village of Winnetka.  As used in the International Residential Code for One- and Two- Family Dwellings, 2003 Edition, as adopted and amended by the Village, "this code" shall mean the Residential Code for One- and Two-Family Dwellings of the Village of Winnetka.  As used in the ordinances and codes published by the Village, the term "this code" shall mean the Winnetka Village Code, and the Residential Code for One- and Two-Family Dwellings of the Village of Winnetka shall be called the "Dwelling Code."

2. **101.2**    **Scope.**  The provisions of this Dwelling Code shall apply to the construction, alteration, movement, enlargement, replacement, repair, equipment, use and occupancy, location, removal and demolition of detached one- and two-family dwellings and attached single-family dwellings (townhouses) that are not more than three stories in height and that have a separate means of egress and their accessory structures.

3. **102.7**    **Existing structures.**  The legal occupancy of any structure existing on the date of adoption of this Dwelling Code shall be permitted to continue without change, except as is specifically provided in this code,  including this Dwelling Code and the International Fire Code as adopted by the Village, and except as is deemed necessary by the building official for the general safety and welfare of the occupants and the public.

4. **103.1**    **Creation of enforcement agency.**  The Department of Community Development is created pursuant to Chapter 2.44 of the Village Code is hereby established as the enforcement agency for this code and the Director of Community Development shall be known as the building official.

5. **103.2**    **Appointment.**  The building official shall be appointed by the Village Manager.

6. **103.3**    **Deputies.**  Subject to the approval of the Village Manager, the building official shall have the authority to appoint a deputy building official, the related technical officers, inspectors, plan examiners and other employees. Such employees shall have powers as delegated by the building official.

7. **105.2**    **Work exempt from permit.**  Permits shall not be required for the following work.  Exemptions from the permit requirements of this Dwelling Code shall not be deemed to grant

Page 14 of Title 15

Winnetka Village Code

authorization for any work to be done in any manner in violation of the provisions of this code or any other laws or ordinances of the Village.

    a. Buildings:

        i) Painting, papering, tiling, carpeting, cabinets, counter tops and similar finish work.

        ii) Construction or installation of temporary motion picture, television and theater stage sets and scenery. Notwithstanding the foregoing, a film production permit shall be required as provided in Chapter 5.20 of the Village Code.

        iii) Prefabricated swimming pools accessory to a detached one and two family residential dwellings, as applicable in Section 101.2, which are less than 24 inches (610 mm) deep, do not exceed 5,000 gallons (18 925 L) and are installed entirely above ground.

    b. Electrical:

        i) Minor repair work, including the replacement of lamps or the connection of approved portable electrical equipment to approved permanently installed receptacles.

    c. Gas:

        i) Portable heating, cooking or clothes drying appliances.

        ii) Replacement of any minor part that does not alter approval of equipment or make such equipment unsafe.

        iii) Portable fuel cell appliances that are not connected to a fixed piping system and are not interconnected to a power grid.

    c. Mechanical:

        i) Portable heating appliance.

        ii) Portable ventilation appliances.

        iii) Portable cooling unit.

        iv) Replacement of any minor part that does not alter approval of equipment or make such equipment unsafe.

        v) Portable evaporative cooler.

        vi) Self-contained refrigeration systems containing 10 pounds (4.54 kg) or less of refrigerant or that are actuated by motors of 1 horsepower (746 W) or less.

        vi) Portable fuel cell appliances that are not connected to a fixed piping system and are not interconnected to a power grid.

    d. Plumbing:

        i) The stopping of leaks in drains, water, soil, waste or vent pipe; provided, however, that if any concealed trap, drainpipe, water, soil, waste or vent pipe becomes defective and it becomes necessary to remove and replace the same with new material, such work shall be considered as new work and a permit shall be obtained and inspection made as provided in this code.

        ii) The clearing of stoppages or the repairing of leaks in pipes, valves or fixtures, and the removal and reinstallation of water closets, provided such repairs do not involve or require the replacement or rearrangement of valves, pipes or fixtures.

Page 15 of Title 15

Winnetka Village Code

8. **112.1    General.** The Building Review Committee created by Section 3.36.010 of the Village Code shall hear and decide appeals of orders, decisions or determinations made by the building official relative to the application and interpretation of this building code. Appeals shall be subject to the provisions of Chapter 15.72 of the Village Code.

9. **114.1    Notice to owner; stop work orders.** The issuance of stop work orders shall be subject to the enforcements provisions set forth in Chapter 15.04 of the Village Code.)

10. **115.1    Prefabricated Construction.** A certificate of approval by an approved agency shall be furnished with every prefabricated assembly, except where all elements of the assembly are readily accessible to inspection at the site. No element of any prefabricated assembly shall be concealed prior to inspection and approval by the building official. All elements of any prefabricated assembly shall be readily accessible for inspection at the permit site. Prefabricated assemblies shall be inspected at the building site by the building official as required by this code.

11. **310.4.1 Bars, grills, covers and screens on window wells.** All window wells, whether to be used as emergency escape or rescue openings or not, shall be fitted with bars, grills, covers, screens, railings or similar devices.

12. **309.2    Separation required.** The garage shall be separated from the residence and its attic area by not less than 1/2-inch (12.7 mm) gypsum board applied to the garage side. Garages beneath habitable rooms shall be separated from all habitable rooms above by not less than 5/8-inch (15.9 mm) Type X gypsum board or equivalent. Where the separation is a floor-ceiling assembly, the structure supporting the separation shall also be protected by not less than 1/2-inch (12.7 mm) gypsum board or equivalent. The sills of all door openings between private garages and adjacent interior spaces shall be raised not less than six (6) inches above the garage floor.

13. **314.3    Specific approval.** Plastic foam not meeting the requirements of Sections R314.1 and R314.2 may be specifically approved on the basis of one of the following approved tests: ASTM E 84, FM 4880, UL 1040, NFPA 286, ASTM E 152, or UL 1715, or fire tests related to actual end-use configurations. The specific approval may be based on the end use, quantity, location and similar considerations where such tests would not be applicable or practical. Any foam plastic insulation must be approved by an independent testing agency, either Underwriters Laboratories or Factory Mutual.

14. **403.1    General.** All exterior walls shall be supported on continuous solid or fully grouted masonry or concrete footings, wood foundations, or other approved structural systems which shall be of sufficient design to accommodate all loads according to Section R301 and to transmit the resulting loads to the soil within the limitations as determined from the character of the soil. Footings shall be supported on undisturbed natural soils or engineered fill. All footings shall have a minimum of two (2) Number Five (5) reinforcement bars that shall be placed at the perimeter of all concrete monolithic slabs with integral footings

15. **404.1.1 Masonry foundation walls.** Concrete masonry and clay masonry foundation walls shall be constructed as set forth in Tables R404.1.1(1), R404.1.1(2), R404.1.1(3) and R404.1.1(4) and shall also comply with the provisions of this section and the applicable provisions of Sections R606, R607 and R608. In Seismic Design Categories D1 and D2, concrete masonry and clay masonry foundation walls shall comply with Section R404.1.4, but with not less than two (2) Number Five (5) reinforcement bars placed at the top and bottom of any concrete trench, belle, grade beam or formed foundation wall. Rubble stone masonry foundation walls shall be constructed in accordance with Sections R404.1.8 and R606.2.2. Rubble stone masonry walls shall not be used in Seismic Design Categories D1 and D2.

16. **2501.2    Application.** In addition to the general administration requirements of Chapter 1 of the Dwelling Code, the administrative provisions of this chapter 2501 of the Dwelling

Page 16 of Title 15

Winnetka Village Code

Code shall also apply to the plumbing requirements of the State of Illinois Plumbing Code, 2004 Edition.

17. **2501.3     Authority.**  These rules are promulgated pursuant to authority granted by Section 35 of the Illinois Plumbing License Act (225 ILCS 320/35).

18. **2501.4 Applicability.**  These rules govern the design and installation of new plumbing or plumbing systems and the alteration of existing plumbing systems.  They apply to all new construction and any remodeling or renovation that alters renovates or replaces existing plumbing or plumbing systems.  These rules do not apply to existing buildings unless the plumbing or plumbing system is being altered, the building use is being changed or the existing plumbing creates a health or safety hazard.

a.  If an existing building is changed from one use to another or from one classification to another, as provided in Appendix A, Table, (Illinois State Plumbing Code 2004 Edition) it shall be treated as a new building and shall comply with the requirements of this Part for its new use or occupancy.

b.  Regardless of the age of the building, where a health or safety hazard exists because of an existing plumbing installation or lack thereof, the owner or his agent shall install additional plumbing or make such corrections as may be necessary to abate the hazard or violation of this part.

19. **Part VIII — Electrical.**  The provisions of the National Electrical Code, 2002 Edition, as adopted by reference as provided in this chapter Section 15.08, shall apply to the installation of electrical systems, including alterations, repairs, replacement, equipment, appliances, fixtures, fittings and appurtenances thereto.
(MC-3-2005, Added, 06/21/2005)

**Section 15.08.040     Amendments to the International Mechanical Code, 2003 Edition.**

A. **Exclusions.**  The following provisions of the 2003 International Mechanical Code are excluded from adoption by the Village.  Where a range of sections is listed, the exclusion includes all sections and subsections within the specified range.

1. **104.4          Inspections.** (Superseded by Section 15.32.160 of the Village Code.)

2. **106.4.3 Expiration.** (Superseded by Section 15.32.190 of the Village Code.)

3. **106.5.1 Work commencing before permit issuance.** (Superseded by Section 15.32.010 of the Village Code.)

4. **106.5.2 Fee schedule.** (Superseded by Section 15.32.020 of the Village Code.)

5. **106.5.3 Fee refunds.** (Superseded by Section 15.32.030 of the Village Code.)

B. **Amendments.**  The following provisions of the 2003 International Mechanical Code are amended for adoption by the Village:

1. **101.1          Title.**  These provisions shall be known as the Mechanical Code of the Village of Winnetka. As used in the International Mechanical Code, 2003 Edition, as adopted and amended by the Village, "this code" shall mean the Mechanical Code of the Village of Winnetka. As used in the ordinances and codes published by the Village, the term "this code" shall mean the Winnetka Village Code, and the Mechanical Code of the Village of Winnetka shall be called the "Mechanical Code."

Page 17 of Title 15

Winnetka Village Code

2. **103.1        General.** The Department of Community Development is created pursuant to Chapter 2.44 of the Village Code is hereby established as the enforcement agency for this code, and the Director of Community Development shall be known as the building official.

3. **103.2        Appointment.** The building official shall be appointed by the Village Manager.

4. **108.5        Stop work orders.** The issuance of stop work orders shall be subject to the enforcements provisions set forth in Chapter 15.04 of the Village Code.)

5. **109.2        Membership of board.** The Building Review Committee created by Section 3.36.010 of the Village Code shall hear and decide appeals of orders, decisions or determinations made by the building official relative to the application and interpretation of this building code. Appeals shall be subject to the provisions of Chapter 15.72 of the Village Code.

6. **301.8        Plumbing connections.** Potable water supply and building drainage system connections to equipment and appliances regulated by this code shall be in accordance with the State of Illinois Plumbing Code 2004 Edition.

7. **Chapter 15 Referenced Standards.**

   a.   SIPC-2004, State of Illinois Plumbing Code 2004 Edition.

   b.   NEC-2002, National Electrical Code 2002 Edition

(MC-3-2005, Added, 06/21/2005)

**Section 15.08.050        Amendments to the International Fuel Gas Code**

A. **Exclusions.** The following provisions of the International Fuel Gas Code, 2003 Edition, are excluded from adoption by the Village. Where a range of sections is listed, the exclusion includes all sections and subsections within the specified range.

1. **106.4.3 Expiration.** (Superseded by Section 15.32.190 of the Village Code.)

2. **106.5.2 Fee schedule.** (Superseded by Section 15.32.020 of the Village Code.)

3. **106.5.3 Fee refunds.** (Superseded by Section 15.32.030 of the Village Code.)

4. **403.6        Plastic pipe, tubing and fittings.**

5. **403.11        Plastic pipe, joints and fittings.**

B. Amendments. The following provisions of the International Fuel Gas Code, 2003 Edition, are amended for adoption by the Village:

1. **101.1        Title.** These provisions shall be known as the Fuel Gas Code of the Village of Winnetka. As used in the International Fuel Gas Code, 2003 Edition, as adopted and amended by the Village, "this code" shall mean the Fuel Gas Code of the Village of Winnetka. As used in the ordinances and codes published by the Village, the term "this code" shall mean the Winnetka Village Code, and the Fuel Gas Code of the Village of Winnetka shall be called the "Fuel Gas Code."

2. **103.1        General.** The Department of Community Development is created pursuant to Chapter 2.44 of the Village Code is hereby established as the enforcement agency for this code, and the Director of Community Development shall be known as the building official.

3. **103.2        Appointment.** The building official shall be appointed by the Village Manager.

Page 18 of Title 15

Winnetka Village Code

4. **103.3    Deputies.** Subject to the approval of the Village Manager, the building official shall have the authority to appoint a deputy building official, the related technical officers, inspectors, plan examiners and other employees. Such employees shall have powers as delegated by the building official.

5. **108.5    Stop work orders.** The issuance of stop work orders shall be subject to the enforcements provisions set forth in Chapter 15.04 of the Village Code.)

6. **109.2    Membership of board.** The Building Review Committee created by Section 3.36.010 of the Village Code shall hear and decide appeals of orders, decisions or determinations made by the building official relative to the application and interpretation of this building code. Appeals shall be subject to the provisions of Chapter 15.72 of the Village Code

7. **624.1.1 Installation requirements.** The requirements for water heaters relative to sizing, relief valves, drain pans and scald protection shall be in accordance with the State of Illinois Plumbing Code 2004 Edition.

8. **Chapter 7    Referenced Standards.**

    a.    SIPC-2004, State of Illinois Plumbing Code 2004 Edition – Section 624.1.1

    b.    NEC-2002, National Electrical Code 2002 Edition

(MC-3-2005, Added, 06/21/2005)

**Section 15.08.060    Amendments to the State of Illinois Plumbing Code, 2004 Edition**

A. Exclusions. The following provisions of the State of Illinois Plumbing Code, 2004 Edition, are excluded from adoption by the Village. Where a range of sections is listed, the exclusion includes all sections and subsections within the specified range.

1. **Table A, "Approved Materials for Building Sewers"** is amended by deleting the following Items 2, 5, 8 and 9:

    2)   Asbestos Cement Pipe.

    5)   Concrete Pipe

    8)   Vitrified Clay Pipe

    9)   Solder

2. **Table A, "Approved Materials for Water Service Pipe"** is amended by deleting the following Items 1 and 4:

    1)   ABS Pipe

    4)   CPVC Pipe

3. **Table A, "Approved Materials for Water Distribution Pipe"** is amended by deleting the following Items 2, 7 and 8:

    2)   CPVC Pipe

    7)   Poly Butylene Pipe

    8)   PVC Pipe

B. **Amendments.** The following provisions of the State of Illinois Plumbing Code, 2004 Edition, are amended for adoption by the Village:

Page 19 of Title 15

Winnetka Village Code

1. **Section 890.110, General Regulations** is amended by adding the following subsection (c):

**890.110 (c) General Regulations.**  Plumbing and drainage systems in all buildings, public and private, shall be installed in accordance with the provisions of this ordinance by a licensed plumber in accordance with the provisions of the State of Illinois Plumbing License Law.  If a plumbing contractor is found to be using unlicensed plumbers, the contractor's plumbing permit will be revoked

2. **Section 890.120    Definitions** is amended by adding the following definition :

"Plumbing Code."  The Illinois State Plumbing Code, 2004 Edition, as adopted and amended by the Village, shall be known as the Plumbing Code of the Village of Winnetka.  As used in the Illinois State Plumbing Code, 2004 Edition, as adopted and amended by the Village, the terms "Part" or "this code" shall mean the Plumbing Code of the Village of Winnetka.  As used in the ordinances and codes published by the Village, the term "this code" shall mean the Winnetka Village Code, and the Plumbing Code of the Village of Winnetka shall be called the "Plumbing Code."

C. **Additions.**    The State of Illinois Plumbing Code, 2004, is further amended for adoption by the Village by adding the following provisions:

1. Potable Water.  Type L copper piping shall be used for potable water.

2. Couplings.  Heavy duty 4 band couplings must be used with no hub soil pipe.

3. Plumbing Walls.  Plumbing walls where stacks are located must be built of 2 x 6 framing at a minimum.

4. Primer.  Purple primer must be used on all PVC piping.

5. Testing.  Gas tests are required if any existing gas lines have been moved.

6. Water Service.  For all new construction, including additions and substantial remodeling a minimum 1 inch copper water service is required.

7. Existing Conditions.  All nonconforming plumbing installations or materials discovered or revealed during remodeling, renovation, or other alteration projects, shall be corrected in accordance with this code.

8. Inspections.  Inspections shall be subject to the provisions of Section 15.20.050 of this chapter.

9. Below grade construction.  Construction with basements, or with floors, rooms or occupancy areas below grade, shall comply with the provisions of section 15.20.060 of this chapter.

10. Inspections.

a. Inspections Required.  All plumbing work shall be done by licensed plumbers or sewer contractors and shall be subject to the inspection and approval of the Director, or the plumbing inspector under the supervision of the Director.  The plumbing contractor shall be on site when the rough plumbing inspection is conducted.

b. Testing by Plumbing Inspector. All plumbing work shall be tested by the plumbing inspector, in accordance with this code, while all pipes are uncovered in every part.  A water test shall be applied to the drainage system in its entirety, or in sections, as completed.  A water pressure test for plumbing work shall be applied by closing the lower end of the vertical pipes and filling the pipes to the highest opening above the roof with water.  Special provision shall be made to include all joints and connections to the finished line or face of floors or side walls, so that all vents or revents, including lead work, may be tested with the main stacks. The house drain inside any building shall be

Winnetka Village Code

tested by closing up the drain at the point where it leaves the building, using the clean out wye provided for, and filling the pipes inside the building with water to a height of a least two feet above the highest point of the drainage system.

c. Water Supply for Testing. Licensed plumbers will be allowed to leave the water turned into pipes for forty-eight (48) hours after completing any work for the purpose of testing the same, at the end of which time they shall immediately cut off the supply, unless otherwise instructed by the Director of the Water and Electric Department. Plumbers are prohibited from turning water on from any service pipe for any other purpose, except on the order or permission from the Water and Electric Department.

d. Additional Inspections. All plumbing work shall be subject to such further inspections and tests as shall be required by the rules and regulations of the Water and Electric Department of the Village. (Prior code § 23.49)

11. Overhead sewers and other protective measures below ground level. All buildings constructed after December 31, 1970 with basements, floors, rooms or occupancy areas below grade and served by a public or private sewer system shall have overhead plumbing with ejector pumps. (Prior code § 23.50)
(MC-3-2005, Added, 06/21/2005)

**Section 15.08.070        Amendments to the National Electric Code, 2002 Edition**

A. **Exclusions.**   The following provisions of the National Electric Code, 2002 Edition, are excluded from adoption by the Village.  Where a range of sections is listed, the exclusion includes all sections and subsections within the specified range.

1. **80.2    Definitions.**     The definition of Chief Electrical Inspector is deleted.

2. **80.15    Electrical Board.**   Delete subsections (A) (B) (C) (D) (E) (F) and (H).

3. **80.19(D)    Annual Permits.**

4. **80.19(F)(3) Inspections.**

5. **80.19(F)(4) Approvals.**

6. **230. II      Overhead Service-drop conductors.**

7. **320 Armored Cable: Type AC.**  Delete entire Article.

8. **322 Flat Cable Assemblies: Type FC.**  Delete entire Article.

9. **324 Flat Conductor Cable: Type FCC.**  Delete entire Article.

10. **334 Nonmetallic-sheathed Cable: Types NM, NMC and NMS.**  Delete entire Article.

11. **338 Service-Entrance Cable: Types SE and USE.**  Delete entire Article.

12. **340 Underground Feeder and Branch-Circuit Cable: Type UF.**  Delete entire Article.

13. **360 Flexible Metallic Tubing: Type FMT.**  Delete entire Article.

14. **362 Electrical Nonmetallic Tubing: Type ENT.**  Delete entire Article.

15. **394 Concealed Knob and Tube Wiring.**  Delete entire Article.

16. **396 Messenger Supported Wiring.**  Delete entire Article.

17. **547 Agricultural Buildings.**  Delete entire Article.

Page 21 of Title 15

Winnetka Village Code

18. **551 Recreational Vehicles and Recreational Vehicle Parks.** Delete entire Article.

19. **552 Park Trailers.** Delete entire Article.

20. **553 Floating Buildings.** Delete entire Article.

B.  **Amendments.**  The following provisions of the National Electric Code, 2002 Edition, are amended for adoption by the Village:

1.  **80.0        Title.**  These provisions shall be known as the Electric Code of the Village of Winnetka.  As used in the National Electric Code, 2002 Edition, as adopted and amended by the Village, "this code" shall mean the Electric Code of the Village of Winnetka.  As used in the ordinances and codes published by the Village, the term "this code" shall mean the Winnetka Village Code, and the Electric Code of the Village of Winnetka shall be called the "Electric Code."

2.  **80.15        Electrical Board, subsection (G) Appeals,** is amended to provide:

**(G) Appeals -** Review of Decisions.  Any person, firm, or corporation may register an appeal with the Building Review Committee for a review of any decision of the Electrical Inspector, provided that such appeal is made in writing within fifteen (15) days after such person, firm, or corporation shall have been notified.  Upon receipt of such appeal, the Building Review Committee shall, if requested by the person making the appeal, hold a public hearing and proceed to determine whether the action of the Electrical Inspector complies with this law and, within fifteen (15) days after receipt of the appeal or after holding the hearing, shall make a decision in accordance with its findings.

2.  **80.27(B)(3) Experience.**  Be well versed in the National Electric Code 2002 Edition and the amendments hereto.

3.  **80.27(D)        Revocation and Suspension.**  The Director of Community Development or the Village Manager shall have the authority to revoke or suspend an inspector' s authority to conduct inspections.

4.  **110.14 (A)        Terminals.**  Connection of conductors to terminal parts shall insure a thoroughly good connection without damaging the conductors and shall be made by means of pressure connectors (including set screw type), solder lugs, or splices to flexible leads.  Connection by means of wirebinding screws or studs and nuts that have upturned lugs or the equivalent shall be permitted for 10 AWG or smaller conductors.

Terminals for more than one conductor, and terminals used to connect aluminum, shall be so identified.

No more than one (1) conductor shall be connected and/or installed to a single screw terminal on an electrical device,

5.  **200.10        Use and Identification of Grounded Conductors, Outlets, Switches and Receptacles.**  All garage outlets shall be located not less than forty-two (42) inches above the finished floor.

Switches and receptacles in bathrooms shall be located in a minimum of thirty (30) inches from the inside edge of a tub or shower measured horizontally at the floor line.  Lighting fixtures above, or within two feet of the inside of the tub edge, must have GFCI protection.

Grounded conductors shall be at least the same size as the ungrounded conductors of the same circuit.

6.  **210.8        Ground-Fault Circuit Interrupter Protection of Personnel – Pumps.**  Sump pumps and ejector pumps shall be on a dedicated 20 amp circuit with a single head receptacle (not GFCI protected).

Winnetka Village Code

7.  Section 210.50(G)  Basements and Garages.  For a one-family dwelling, at least one receptacle outlet, in addition to any provided for laundry equipment, shall be installed in each basement and in each attached garage, and in each detached garage with electric power.  See 210.8 (A) and (A) (5).  Where a portion of the basement is finished into one or more habitable rooms, each separate unfinished portion shall have a receptacle outlet installed in accordance with the section.

A minimum of one (1) switched lighting fixture shall be installed in the immediate area of the top stair tread of all staircases leading to basement areas.  A minimum of one (1) switched lighting fixture shall be installed in the area of the lower most stair tread of all staircases that lead to the basement areas.

8.  220.2(B)(11)   Branch-Circuit, Feeder and Service Calculations, Computations.  Other Outlets.  Other outlets not covered in 220.3(B) (1) through (10) shall be computed based on 180 volt-amperes.

In dwelling occupancies dishwashers and disposals shall have separate disconnecting means under the sink cabinet.

A separate circuit shall be provided for all heating and air conditioning units.

Receptacle outlets adjacent to kitchen sinks may be located a maximum of three feet from the edge of the sink bowl.

9.  230.1 (A)  Services, Scope – Overhead or Exposed Wiring.  No overhead or exposed wiring on the exterior of buildings shall be installed except for main service conduits and wiring runs of four feet or less to freestanding cooling units and connections to underground wiring.  In all such cases, rigid metal conduit shall be used, except that, where flexible connections are required, liquid tight or flexible metal conduit with a green equipment ground wire may be used.

10. 230. VI Service Equipment – Disconnecting Means.  All new single family detached swellings shall have a minimum 200 amp single phase service with the main disconnect located at the meter.

11. 230.70 (A)    Location.   The service disconnecting means shall be installed in accordance with 230.70 (A) (1), (2) and (3).  The location of outside meters for single family dwellings must be determined prior to installation by the Water and Electric Department.

Meter pedestals must be installed so that the center of the meter is located between 48 to 66 inches as measured from the adjacent finished grade.

12. 300.1(D)   Underground Wiring.  All underground wiring in buildings, including wiring in sub-grade floors, shall be installed in rigid metal conduit.  Rigid nonmetallic conduit may be used underground outside of buildings.

All interior wiring not required to be flexible and all basement wiring shall be installed in intermediate metal or rigid metal conduit or electrical metallic tubing.

13. 310.14    Aluminum Conductor Material.  No aluminum or copper-clad aluminum wire shall be used, except as approved for service to an electrical meter.

14. 408.31    Busbars.  Copper bus shall be used in switchboard, panel boards and meter socket enclosures containing more than four sockets.

15. 410.8(D)(5) Luminaries (Fixtures) in Clothes Closets.  In dwelling units, all closets twenty-three (23) inches deep and all utility rooms and pantries, shall be illuminated.

16. 680.3  Swimming Pools, Fountains and Similar Installations, Other Articles.  Except as modified by this article, wiring and equipment in or adjacent to pools and fountains shall comply with other applicable provisions of this Code, including those provisions identified in Table 680.3.  All

Winnetka Village Code

controls, pumps or lights for a swimming pool, sauna, hot tub or hydro massage bathtubs shall not be used without GFCI protection. All underwater lights shall be twelve (12) volts.

C. **Additions.**     The National Electric Code, 2002 Edition, is further amended for adoption by the Village by adding the following provisions:

1. **Nonconforming Installations.**  All nonconforming electrical installations or maters discovered or revealed during remodeling, renovation, or other alteration projects, shall be corrected in accordance with this code.

2. **Removal of Abandoned Materials.**  All abandoned wiring, conductors, conduit systems, raceways, junction boxes, electrical devices, electrical materials and/or equipment, etc, shall be completely removed prior to a final electrical inspection.

3. **Circuit Wiring.**  Circuits wired with AWG #14 wire, shall be limited to eight (8) outlets or receptacles for general lighting connected to a single circuit.  Circuits wired with AWG #12 wire, shall be limited to ten (10) outlets or receptacles for general lighting connected to a single circuit.

4. **Wire Size.**  Minimum wire size requirements for any installation other than residential shall be AWG #12.  Devices and receptacles shall be twenty (20) amp rated.

5. **Conductor Installation.**  Conductors shall not be installed in any raceway, until wall finishes are applied or mechanical work has been completed with the consent of the electrical inspector.

6. **Minimum Box Size.**  Minimum size boxes for general lighting outlets shall be 1-1/2 inches deep and 3-3/4 inches in diameter.  Minimum size boxes for switch and receptacles shall be 1-1/2 inches deep and 4 inches square.

7. **Box Installations.**  Back to back box installations shall not be permitted in any case.

8. **Light Switches.**  Stairways, hallways, passageways, corridors, garages, rooms or other areas with more than one (1) entry shall have a sighting outlet switched from all exits and entries.

9. **Materials and Equipment.**  New materials and/or equipment must be used on all installations.

10. **Final Inspections.**  For final inspection purposes, all light fixtures shall have at least one (1) bulb or lamp in each fixture.

11. **Remodeling.**  Existing buildings or structures that are scheduled for remodeling and/or additions, or have been vacated and made available to new tenants, shall prior to occupancy, be required to remove existing electrical equipment and materials that will not be used, or are determined not to conform to the currently adopted code requirements of the Village of Winnetka. Existing wiring, materials and equipment shall be in good condition, without actual or potential hazards or in an unsafe condition.  Hazardous or unsafe conditions include, but are not limited to the following: open boxes, unstable raceways, frayed wiring, dried out/flaking insulation on conductors, improper connections, burned or defective contacts, overloaded circuits, insufficient number of circuit breakers/fuses, defective main breaker/bus bar, non-listed or labeled fixtures or devices or other similar unsafe conditions, shall be replaced, removed or repaired as provided for by the provisions of the code.  Unusable electrical systems and devices in good condition, which will provide safe electric service, may remain in place.

12. **Low Voltage Wiring – Residential.**  Low voltage wiring for control, signaling, or communication systems shall be encased in a raceway throughout.

13. **Smoke Detectors.**  In addition to other village requirements pertaining to smoke detectors, the following is required:

Winnetka Village Code

a.  A dedicated circuit shall be provided, which are to be permanently wired into a dwelling units electric service;

b.  A "lockout" shall be installed on the systems circuit protection device to maintain power to the equipment;

c.  A separate raceway shall be provided for the system' s circuit and detector' s control wiring, thereby eliminating the interference of circuit conductors and raceways, which may be installed for other equipment or outlets.

d.  Attics and/or closets, which contain mechanical equipment, i.e. heating, ventilating, or cooling, shall contain an approved smoke detector.

e.  An automatic fan shutdown device shall be installed in ceiling house fan and attic fans. This shall interconnect the smoke detector system and de-energize the power to the fan thereby discontinuing the induced air-flow from one room to another.

14. **Installation of Electric Services.**  The Water and Electric Department shall install underground services for all new and modified electrical services.  The cost of these services will be determined by the department and must be prior to installation.  No overhead electrical services shall be installed.  Meter pedestals must be installed so that the center of the meter measures 48 inched as measured from the adjacent finished grade.  Electrical services shall be installed to the most proximate point of the primary structure.  All other electrical work shall be performed by a licensed electrician.

15. **Inspections.**  All electrical work shall be subject to the inspection and approval of the Director of Community Development, or the electrical inspector under the supervision of the Director.

(MC-3-2005, Added, 06/21/2005)

Winnetka Village Code

# Chapter 15.32

## CONSTRUCTION PERMITS

**Sections:**

| | |
|---|---|
| 15.32.010 | **Permits required** |
| 15.32.020 | **Permit fees and costs** |
| 15.32.030 | **Refunds of deposits** |
| 15.32.040 | **Forfeiture of fees, deposits and permit bonds** |
| 15.32.050 | **Applications for permit** |
| 15.32.060 | **Permit bond required** |
| 15.32.070 | **Review of permit application--Requests for additional information.** |
| 15.32.080 | **Criteria for permit approval.** |
| 15.32.090 | **Approval and issuance of permit.** |
| 15.32.100 | **Approved construction documents.** |
| 15.32.110 | **Partial permit.** |
| 15.32.120 | **Limitations of permit work.** |
| 15.32.130 | **Changes to permit work and construction documents.** |
| 15.32.140 | **Construction Hours** |
| 15.32.150 | **Site management.** |
| 15.32.160 | **Inspections.** |
| 15.32.170 | **Foundation inspections--Spot survey.** |
| 15.32.180 | **Posting of permit.** |
| 15.32.190 | **Expiration, revival and extension of permits.** |
| 15.32.200 | **Repealed by MC-13-2004** |

**Section 15.32.010      Permits required**

No person shall proceed with any construction activity, other than ordinary repairs, on any property in the Village unless the owner first obtains a permit from the Director as provided in this chapter. Any person who engages in any construction activity that requires a permit before said permit has been issued, shall be subject to such additional fees and penalties as may be set from time to time by resolution of the Village Council.  (Prior code § 23.09)
(MC-3-2005, Amended, 06/21/2005)

**Section 15.32.020      Permit fees and costs**

A.  Fees Set by Village Council. The Village Council shall establish all fees, costs, deposits and bonding requirements pertaining to the review and processing of all applications for any construction activity, including but not limited to building permits, permits for electrical work, plumbing work, HVAC or mechanical work, permits for awnings, fences, impermeable surfaces, driveways and work affecting any public right-of-way; all inspections, development agreements and other actions involved in the administration and enforcement of the provisions of this code; all applications requesting any other action by the Village, or any board, commission or committee of the Village, related to construction activities and the compliance of such activities with this code. The nature and amount of all such fees, costs, deposits and bonds shall be set from time to time by resolution of the Village Council.

B.  Formulas for Building Permit Fees.

Winnetka Village Code

1.  Building permit fees for the construction of new structures or additions to existing structures, shall be based on the new construction's gross floor area, as that term is defined in Section 17.04.030 of this code. For purposes of determining building permit fees, no zoning allowances, exceptions or bonuses for gross floor area shall be deducted and the gross floor area of all basement or below grade spaces shall be included.

2.  Building permit fees for the construction of new structures or additions to existing structures, which do not contribute to gross floor area, as defined in Section 17.04.030 of this code may be based on the horizontal square footage of the structure or addition, as measured from its outer perimeter.

3.  Building permit fees for alterations to existing structures, for the construction or alteration of any wireless telecommunications service facility, as defined in Title 17 of this code, and for any other construction activity not specified in a resolution of the Council, shall be based on the estimated total cost of the proposed work. The Director shall require a certificate of the estimated cost from the project's Illinois registered design or engineering professional. If, pursuant to Section 15.32.050(F) of this code, the Director waives the requirement that construction documents bear the signature of the appropriate Illinois design or engineering professional, the owner shall submit an affidavit stating the total estimated cost of the proposed work. The Director may adjust the certified estimate if the Director determines, based on a reliable estimating resource, that the certificate of affidavit does not appropriately reflect local costs of the work proposed.

C.  Reinspection Fees. A reinspection fee shall be charged for each duplicate inspection or reinspection of permit work necessary to confirm code compliance, or for additional site visits or inspections by any building officer.

D.  Responsibility of Owner. The owner shall be responsible for the payment of all fees, costs and deposits charged pursuant to this code, in such amounts as may be set by resolution of the Village Council. The owner shall be responsible for the payment of all fees and costs associated with the performance of any services provided by any independent professional, when such services are required by this code, the Director or the Village Council. (Ord. MC-195-97 § 19, 1997; prior code § 23.10)

### Section 15.32.030    Refunds of deposits

Any balance remaining on any deposit shall be returned only to the person who made such deposit, after deducting all applicable Village costs. The amount of the balance shall be determined only upon final approval of the permit work by all required and necessary Village departments. (Prior code § 23.11)

### Section 15.32.040    Forfeiture of fees, deposits and permit bonds

All fees and deposits shall be forfeited in the event of any of the following: (A) work is performed which is not within the scope of the permit work; (B) the permit has lapsed pursuant to Section 15.32.190; (C) certificate of occupancy requirements of Chapter 15.36 have been violated; or (D) the work performed otherwise violates this code. Permit bonds are subject to forfeiture in the same instances upon approval of the Council. (Prior code § 23.12)

Winnetka Village Code

**Section 15.32.050    Applications for permit**

A.  Permit Application Requirements. No permit application shall be accepted for review unless it is complete. Except as provided in this chapter, any application for a permit required by this chapter shall be made on forms provided by the Director. The application shall be signed by the owner, and shall include a statement, signed by the person holding legal or equitable title to the property that the proposed work is authorized and that the registered professional or contractor submitting the application is authorized to do so. The application shall contain an agreement to be signed by the owner, which shall state that, if the permit sought is approved, the permit work will be completed in accordance with this code, and within the scope of work described in the application and the approved construction documents. The application shall also include an application for a certificate of occupancy, and the name, address, phone and fax numbers, and, if applicable, the registration or license numbers of the architect, general contractor and intended subcontractors. The permit application shall be accompanied by construction documents, fees, deposits, contractor permit bonds and all other documentation required by this section. In addition, the applicant shall provide all such other information and documentation as may be required by the application forms provided by the Director.

B.  Implied Consent. Application for a permit shall constitute the owner's consent to all inspections of the permit work that may be required pursuant to this code, and to the right of all building officers to enter onto the premises during reasonable hours to conduct such inspections.

C.  Application for Permit for Electrical Work. All electrical work shall be performed by, and all applications for permits for any electrical work shall be made by, an electrical contractor licensed to perform electrical work in any municipality in the states of Illinois, Wisconsin or Indiana, using forms provided by the Director. A copy of the electrical contractor's license and permit bond shall be placed on file with the Director before any such permit application shall be accepted by the Village.

D.  Application for Permits for Plumbing Work. All plumbing work shall be performed by, and all applications for permits for plumbing work shall be made by, an Illinois licensed plumber, using forms provided by the Director. A copy of the plumber's license and permit bond shall be placed on file with the Director before any such permit application shall be accepted by the Village.

E.  Survey. All applications for permits, except those pertaining to interior alterations, shall be accompanied by a plat of survey as certified by a land surveyor registered in the state. The survey shall be drawn to scale, showing the actual dimensions and area of the lot to be built upon, the location, size and dimension of existing or proposed buildings, other structures or additions, the location, size and dimensions of other existing or proposed impermeable surfaces, and such other information as may be required by the Director to review the work proposed and to provide for enforcement and administration of this code.

F.  Construction Documents.

1.  General requirements. All applications for a permit shall be accompanied by no less than two sets of construction documents, which shall include the site plan described in the following subsection G, as well as a proposed construction schedule, the estimated total cost of the work proposed in the format required, and such other technical data or information as may be required by the Director or other building officer.

2.  Signature and seal required.  No permit application shall be accepted for approval consideration unless the construction documents bear the signature and seal of the appropriate design professional, registered in the state.

3.  One- and two-family dwellings.  Construction documents for one- and two-family dwellings shall be prepared by an Illinois registered design professional, except that the Director

Page 53 of Title 15

Winnetka Village Code

may waive such requirement if the Director determines that the proposed work is either for a minor accessory structure or for minor alterations not involving structural changes, and that the construction documents are sufficiently detailed to establish code compliance and meet all other requirements of this section.

    G.  Site plan.

       1.  The construction documents shall include a site plan that is drawn to scale and that is in accordance with an accurate boundary line survey.  The site plan shall show, to scale:

         a.  the size and location of new construction and existing structures on the site;

         b.  distances from lot lines;

         c.  the established grades;

         d.  proposed finished grades;

         e.  proposed top of foundation;

         f.  proposed first floor elevations; and

         g.  flood hazard areas, floodways, and design flood elevations.

       2..  In the case of demolition, the site plan shall show construction to be demolished and the location and size of existing structures and construction that are to remain on the site or plot.

       3.  The building official is authorized to waive or modify the requirement for a site plan when the application for permit is for alteration or repair or when otherwise warranted;

    H.  Zoning Calculation Requirements. Any application for a new structure or additions shall be accompanied by completed zoning calculations on forms provided by the Director. The building size and lot coverage submittal shall bear the signature and seal of an appropriate Illinois registered design professional.

    I.  Permits in Flood Hazard Areas. Application for a building permit for a structure in a flood hazard area, as defined in Chapter 15.68 of this code, shall also satisfy the requirements set forth in Sections 15.68.050 through 15.68.090 of that chapter.

    J.  Applications for Land Grading Permits. Any application for a land grading permit shall be accompanied by a topographical survey of the property for which the permit is sought, which shall depict existing land elevations on the property and the areas immediately adjacent to the property. The application shall also provide such other information as the Village Engineer may deem necessary in order to determine the nature and extent of the grade alteration and its impact on natural stormwater drainage patterns and rates of flow.

    K.  Permits for Wireless Telecommunications Services Facilities. All applications for a building permit for wireless telecommunications services facilities, as defined in Title 17 of this code, shall also satisfy the requirements of Section 17.48.010(A) of that title. (Ord. MC-195-97 § 20, 1997; Ord, MC-193-97 § 3, 1997: prior code § 23.13)
(MC-3-2005, Amended, 06/21/2005)


**Section 15.32.060     Permit bond required**
Unless otherwise provided by law, no permit shall be issued to a general contractor, plumbing contractor, electrical contractor or any other contractor identified on the application for building permit for any construction work until the contractor files a License and Permit Bond in the amount of Twenty Thousand Dollars ($20,000) with the Department of Community Development.   In the

Winnetka Village Code

event the work performed under the permit is not completed or fails to meet Code requirements of this Chapter and all other applicable ordinances of the Village of Winnetka, the Village shall have the right to make a claim against the bond and, if necessary, the Bond will be forfeited. (Prior code § 23.14)

(MC-3-2005, Amended, 06/21/2005)

**Section 15.32.070     Review of permit application—Requests for additional information.**

Permit application materials shall be examined by the Director or other building officers to determine if the application and construction documents meet the requirements of this code. The Director of other building officers may request such additional information or clarification as they determine is necessary to complete their review of the permit application. If the owner fails to respond to permit plan review requests or comments for a period of three consecutive months, during which no Village Board approvals are requested, all of the permit application documents shall be returned to the owner. The cost of returning such documents shall be deducted from the permit deposits. (Prior code § 23.15)

**Section 15.32.080     Criteria for permit approval.**

A. Conformity With Code Required. If the Director or any of the required building officers determine that the work proposed in the application does not conform with the requirements of this code, the Director shall not approve the requested permit and shall provide plan review comments to the owner. If the Director and all required building officers determine that the proposed work conforms with the requirements of this code, the Director shall approve the permit.

B. Trees, Shrubbery and Plants. No building permit for new structures, additions or structural changes or repairs to existing structures shall be issued unless the owner has complied with the provisions of Section 15.28.010 of this code and fees are paid relating to tree enhancement and preservation.

C. Zoning Conformity Required. No building permit for new structures or additions shall be issued unless the owner has complied with the provisions of the Title 17 of this code relating to zoning regulations. Any property upon which the construction of any new primary structure is to occur, shall be a single lot of record.

D. Occupation of Public Rights-of-Way. No person shall deposit or store upon any street, parkway or sidewalk, any materials, tools, apparatus or structure designed or intended to be used in any construction activity, unless a street occupation permit is first obtained from the Director.

E. Work Affecting Public Way and Property; Excavation of Public Rights-of-Way. No permit authorizing any construction activity in, on or above any part of any public right-of-way or other public property shall be issued unless the applicant has first complied with the applicable requirements of Title 12 of this code. No permit authorizing any construction activity that involves the excavation or disturbance of any public right-of-way, including any street, pavement, parkway, sidewalk or crosswalk, or any part, shall be issued unless the applicant has first complied with the applicable requirements of Title 12 of this code, including obtaining all required permits.

F. Flood Hazard Areas. No building permit for new structures or additions shall be issued for property within a flood hazard area, as defined in Chapter 15.68 of this code, unless the applicant has first complied with all applicable provisions of that chapter.

Winnetka Village Code

G. Drainage of Surface Water. To diminish or remove any adverse impact of surface water drainage and run-off on an adjacent property, no new building, other structure or addition shall be constructed which will result in the surface water run-off, during and following construction of any such improvement, at a rate greater than the water run-off immediately prior to such construction and no building permit shall be issued unless and until adequate provision is made by connecting to available storm sewers or by other means (in the form of drainage swales, detention areas or such other form of water control mechanism as shall be approved by the Director of Public Works) to so limit such water run-off and provide for the proper control and drainage of surface water.

H. Use of Water. The use of water from Village mains for construction activity shall be governed by such regulations as shall be issued by the Water and Electric Department.

I. Landmarks. No permit shall be issued for any construction activity affecting an external architectural feature of a building or structure that has been designated a landmark pursuant to Chapter 15.64 of this code unless the Winnetka Landmark Preservation Commission has completed its review of an application for certificate of appropriateness for such work in the manner set forth in Chapter 15.64.

J. Certificate of Appropriateness of Design. No building permit shall be issued for any work affecting an external architectural feature, site improvement or other work for which a certificate of appropriateness of design is required pursuant to Chapter 15.40, unless the Design Review Board has first issued such certificate.

K. Development Agreement. The Director shall not issue any permit for new multifamily or commercial primary structures unless the owner executes a development agreement with the Village. The development agreement shall include, without limitation, provisions regarding the following: (1) conditions to be met before building permits are approved; (2) development of the property; (3) independent plan review and inspectional services; (4) public and site improvements; (5) construction traffic and staging area(s); (6) performance sureties; (7) fees and agreements; (8) liability and indemnity of the Village; and (9) plats and easements.

L. Land Grading. No permit shall be issued for any land grading that will permanently alter the existing land elevation or grade of a parcel of property unless and until the Village Engineer has determined, upon a review of the permit application, that the proposed grading will not cause surface water runoff to be diverted onto or detained on abutting or nearby property, will not significantly alter existing drainage patterns, and will not increase or concentrate stormwater runoff onto abutting or nearby property. (Ord. MC-193-97 §§ 3, 4, 1997; Ord. MC-192-97 § 13, 1997; prior code § 23.16)
(MC-8-2001, Amended, 08/21/2001)

**Section 15.32.090    Approval and issuance of permit.**

A. Issuance; Payment of Fees. Upon approval of a permit application, the permit shall be issued by the Director to the owner only if all required fees and costs then due from or owed by the owner or any contractor have been paid. No permit shall be in force or effect until it has been issued pursuant to this section.

B. Approval Stamps.  When the building official issues a permit, the building official shall indicate approval of construction documents in writing or by stamp, as "Approved/Approved as Noted." Stamps or written notes of approval shall be shown on at least two sets of the approved

Page 56 of Title 15

Winnetka Village Code

construction documents for all aspects of the permit work subject to specific code compliance, depending on the scope of the work, including, but not limited to, building, engineering, fire prevention, forestry, HVAC, mechanical, health and sanitation, electrical and plumbing codes, and the Zoning Ordinance. (Prior code § 23.17)

C.  Delay for Public Convenience and Safety.  The Director of Public Works may order that the issuance of a permit be delayed if the proposed schedule for the construction activity will interfere with previously scheduled works in the public rights-of-way in the immediate vicinity of the subject property, or if the Director of Public Works determines that delay is necessary to prevent undue congestion and noise impacts in the neighborhoods when the traffic or noise from the proposed demolition combined with traffic or noise from previously scheduled public works projects in the immediate neighborhood.

D.  Administrative Delay.  The Director may delay the issuance of a permit for a new primary structure for up to sixty (60) days if one or more building or demolition permits for primary structures have been approved for properties, for which work is continuing, on either side of the right-of-way block face and/or alley along which the property is located, or if the Director determines that a delay is necessary to prevent undue congestion and noise impacts in the neighborhood.
(Amended MC-10-2002, 11/19/02)
(MC-3-2005, Amended, 06/21/2005; MC-10-2002, Amended, 11/19/2002)


**Section 15.32.100      Approved construction documents.**
One set of approved construction documents shall be returned to the applicant and shall be kept at the site of the work, open to inspection by the building official or a duly authorized representative at all reasonable times while the work is in progress. One set of approved construction documents shall be retained by the building official.  (Prior code § 23.18)
(MC-3-2005, Amended, 06/21/2005)


**Section 15.32.110      Partial permit.**
A.  Extraordinary Circumstances Required.  Upon determining that extraordinary circumstances exist, the Director may authorize construction activities to commence and proceed for a limited time and for a designated scope of work, prior to the complete issuance of all permits required by this code for the proposed work. The applicant for a partial permit shall furnish the Director with sufficient construction documents to enable the Director to determine that both the work to be commenced and the work proposed to be done subsequently are of a lawful nature. Partial permits shall be issued at the applicant's own risk and without assurance that all permits required by this code for the entire construction activity will be granted.

B.  Revocation of Partial Permit. The Director shall revoke a partial permit, whether or not construction has begun, if it appears that the information provided by the owner is incorrect or inaccurate, if it appears that not all of the permits required by this code will be issued, if the general contractor or any subcontractor being used is disqualified under Section 15.04.080(E), if such a disqualified contractor has been substituted for one named in the application, or if the work violates, cancels or sets aside any provisions of this code. (Prior code § 23.19)

Winnetka Village Code

**Section 15.32.120        Limitations of permit work.**

Any permit shall be a license to proceed with the permit work and shall not be construed as authority to violate, cancel or set aside any provision of this code or any other applicable law. (Prior code § 23.20)

**Section 15.32.130        Changes to permit work and construction documents.**

A.  Changes to permit work.  Except as provided in this section, it is unlawful to alter or in any way modify the approved construction documents or to deviate from the permit work.

B.  Revised construction documents.  If, during the progress of the permit work, changes that deviate from the work permitted under the approved construction documents become necessary or ar otherwise considered, the owner shall submit to the Director a certified description of the changes and complete revised construction documents which clearly show all revisions.  Changes to plans can only be made by the design professional who prepared and affixed his/her professional seal to the construction documents.  No work shall proceed under the revised construction documents until the amendments to the original permit(s) and approved construction document(s) have been approved by the Director or other building officers in accordance with this code. (Prior code § 23.21) (MC-3-2005, Amended, 06/21/2005)

**Section 15.32.140        Construction Hours**

A.  General Limitation on Construction Hours.  In addition to the provisions of this code relating to nuisances, and without limiting any other provision of this code, it is unlawful for any person to permit or engage in any construction activity, or to operate or permit the operation of power equipment such as any pile driver, power shovel, pneumatic hammer or derrick, or to operate or permit the operation of any motor vehicles in relation to any such activities at any location in the Village:  (1) on Sundays and holidays; (2) before 9:00 a.m. and after 6:00 p.m. on any Saturday; or (3) before 7:00 a.m. and after 7:00 p.m. on all other days, except as provided in this section.

B.  Additional Limitations in Single Family Residential Zoning Districts.   In addition to the limitations established by subsection A of this section, the demolition of buildings, the hauling of building or demolition materials, and the digging of excavations for building foundations and structures requiring similar excavations, is prohibited on all properties located in single family residential zoning districts on Saturdays, Sundays and holidays.

C.  Electric Generators. Except for public works projects being performed on or in any public right-of-way by or on behalf of the Village or another governmental entity, the use of portable electric generators in construction activity at any time is prohibited.

D.  Exceptions.

1.  Minor construction activity shall be permitted on Sundays and holidays between the hours of 9:00 a.m. and 5:00 p.m.

2.  Construction activity of all kinds shall be permitted on Sundays in any building located in a commercial or multi-family zoning district.

3.  The Director or the Director's designee may issue a written permit temporarily allowing either work during an otherwise prohibited time or the use of a portable electric generator if the Director or the Director's designee finds that an emergency exists or that such work is necessary to correct or prevent an unsafe condition, or if the Village Manager determines that such work is

Page 58 of Title 15

Winnetka Village Code

necessary to preserve or protect the public health, safety or welfare; provided that, any such temporary permit shall be granted only for a specified scope of work and for the period of time that the emergency or other circumstance giving rise to the need for such permit continues.

4.  The Director or Director's designee may issue a written permit allowing the use of a portable electric generator during permitted working hours for no more than five days if the Director or Director's designee finds that the construction activity requires the temporary disconnection of service from the Village's electric distribution system.

E.  Penalties. In addition to any other penalties provided in this code, a violation of this section shall constitute a sufficient basis for the revocation of any permit issued under the provisions of this code. (Ord. MC-223-99 § 3, 1999: prior code § 23.22)

F.  Definition.  As used in this Section, the term " holiday" shall mean any or all of the following days:  New Years Day (January 1), Memorial Day, the Fourth of July, Labor Day, Thanksgiving Day and Christmas Day (December 25). (MC-4-2004, Amended, 04/06/2004; MC-15-2003, Amended, 10/07/2003, Subparagraph A; MC-10-2002, Amended, 11/19/2002) (MC-4-2004, Amended, 04/06/2004; MC-15-2003, Amended, 10/07/2003, Subparagraph A; MC-10-2002, Amended, 11/19/2002)

## Section 15.32.150     Site management.

A.  Owner' s Responsibility.     The owner shall be responsible for maintaining the site of the permit work and adjoining public ways and public property in a safe and clean condition at all times, as specified in this code, in conditions attached to the building permit, and as the Director may require from time to time in the course of construction.  The owner shall also be responsible for maintaining all rights-of-way abutting upon or adjacent to the work site as required in Section 12.20.010 of this code. (Prior code § 23.23)

B.  Authority of Director.  In addition to any site management requirements provided in this code, the Director, in the exercise of his discretion, may impose such other and additional site management requirements as may be necessary to protect the general public and adjoining public and private property from damage, injury or undue inconvenience arising from the construction. Such site management requirements shall include, but not limited to, requirements pertaining to sanitation facilities, facilities for the removal of debris, construction access, areas for parking and loading, security fencing, litter control and clean-up. (Ord. MC-13-2004 § 5, 2004) (MC-13-2004, Amended, 12/07/2004)

## Section 15.32.160     Inspections.

A.  Inspections Required.

1.  All permit work and the premises on which the permit work is being performed shall be inspected by the Director or the appropriate building officer from time to time during the course of work until a final certificate of occupancy is issued, in order to determine that the permit work is being performed and has been completed in conformity with the approved construction documents and this code. The Director, in his or her discretion, may require that the permit work, or any part of such permit work, be inspected at one or more specific points in the course of the work before the work can proceed further.

Winnetka Village Code

2.  All construction activity, as well as the site of such work, shall also be subject to such inspections, even if no permit has been issued by the Village for such construction activity.

B.  Responsibility of Owner. The owner shall have the continuing responsibility for scheduling all inspections as required by the Director for all permits issued, from the time the permit work begins until such time as the Director and all appropriate building officers have determined that all of the permit work has been completed in conformity with the approved construction documents and this code. All such inspections shall be scheduled at least twenty-four (24) hours in advance. Notwithstanding the foregoing, no owner shall be entitled to request or schedule an inspection for any work or activity unless a valid permit for such work or activity is then in effect.

C.  Rough Inspections. Prior to insulating and walls or floors, rough inspections of plumbing, electrical and mechanical systems improvements must be conducted and the inspected work approved.

D.  Concealed Work. Any building officer, with approval of the Director, may require any work concealed prior to inspection and approval to be uncovered to the extent the Director deems it necessary to accommodate complete examination and approval of the work.

E.  Correction of Work. Any building officer may require the removal or replacement of any work or equipment which has not been performed, constructed or installed in compliance with this code.

F.  Additional Authority of Electrical Inspector. In addition to the foregoing inspections authority, the electrical inspector shall be authorized: (1) to order the removal or replacement of any installed electrical equipment, temporary or otherwise if, in the opinion of the electrical inspector and the Director, the electrical work performed or electrical equipment installed poses any threat of fire or any threat to the safety of the occupants of a structure or to any members of the public; (2) to order the removal or replacement of any exposed or encountered electrical installations or equipment which does not comply with the provisions of this code; and (3) in cases of emergency, to disconnect the electrical service to any electrical equipment if, in the opinion of the Director or Director of Water and Electric and the electric inspector, such installations or equipment pose any threat of fire or any threat to the safety of the occupants of a structure or to any members of the public.

G.  Inspection Records. Records of inspection shall be made and kept on file in such manner as the Village Manager may direct. (Prior code § 23.24)
(Ord. MC-13-2004 § 6, 2004)
(MC-3-2005, Amended, 06/21/2005; MC-13-2004, Amended, 12/07/2004)


### Section 15.32.170     Foundation inspections—Spot survey.

A spot survey certified by an Illinois registered land surveyor to show the exact location on the lot and full dimensions of a structure's foundation shall be required for all new primary structures upon completion of the structure's foundation. In addition, the Director may require the owner to submit such a survey, upon the completion of a foundation if the Director determines that such survey is necessary for an accurate inspection of the foundation and its size and location. When a spot survey is required by the Director or this section, no further work shall be done, other than installing drain tile and waterproofing the foundation, until the foundation has been inspected and the spot survey has been approved by the Village. (Prior code § 23.25)

Page 60 of Title 15

Winnetka Village Code

**Section 15.32.180       Posting of permit.**
The building permit placard and all other permits issued for the work shall be prominently displayed in a conspicuous location that is visible from the street, and shall be kept on the site until the completion of the project. (Prior code § 23.26)
(MC-3-2005, Amended, 06/21/2005)


**Section 15.32.190       Expiration, revival and extension of permits.**
    A.  Permit expiration.  Every permit approved pursuant to this chapter shall expire upon the occurrence of the earliest of any of the following:

        1.  If the permit has not been issued and permit work begun within 3 months after the date the permit is approved;

        2.  If substantial progress is not made on the permit work within 6 months after the date the permit is approved;

        3.  If the permit work is not completed within 15 months after the date the permit is approved; or

        4.  If the permit work is suspended, interrupted or abandoned for a period of three months after it has commenced.

    B.  Forfeiture of fees and deposits upon permit expiration.  Upon the expiration of any permit for any cause prior to issuance of the final certificate of occupancy, all retained fees and deposits shall be forfeited and any permit bonds shall be subject to forfeiture upon approval of such forfeiture by the Council.

    C.  Effect of permit expiration.

        1.  Upon the expiration of any permit, for any reason, the right of the permittee to perform further construction activity on, or to obtain any inspections of, the work that was the subject of the permit shall cease, unless and until the permit is first revived subject to the terms and conditions of subsection E of this section.

        .    Notwithstanding the foregoing, the Director shall have the discretion and authority to order the permittee to secure the construction site, to restore the construction site and to restore any public property or rights-of-way used in or affected by the work that was subject to the expired permit.  Any construction site that a permittee allows to remain unsecured or unrestored after receiving such an order from the Director, and any public right-of-way or property that the permittee allows to remain unrestored after receiving such an order from the Director, shall constitute a public nuisance under chapter 9.16 of this code.

    D.  Permit extension.  Subject to the terms and conditions of this section, a permittee holding an unexpired permit may apply for a permit extension of up to 9 months.

    E.  Permit revival.  Any application for a permit to allow the completion of any work that was the subject of a permit that has expired, shall be deemed a revival of the prior permit.

    F.  Standards for permit revival or extension.  All applications to revive or extend a permit shall be made in writing and shall be subject to the following terms and conditions.

        1.  The application shall include a detailed explanation of the reasons the revival or extension is necessary, and the reasons why the construction activity did not proceed within the time

Winnetka Village Code

periods specified in subsection A of this section, which detailed explanation shall include the date permit work began, the dates during which work was suspended or interrupted, and the last date on which work was performed, as well as the reasons for each such suspension, interruption or abandonment of the work.

2.   The application shall include a proposed, revised construction schedule.

3.   The application shall be accompanied by all applicable fees, which shall be set by resolution of the Village Council.  The Village reserves the right to impose additional fees and to require additional deposits for the revival or extension of any permit.

4.   Upon receiving a completed application for permit revival, the Director shall provide written notice of the application to the owners of record of all parcels of property located within 250 feet of the property that is the subject of the application,  The notice shall include a description of the remaining work and the proposed revised construction schedule.  The owners entitled to receive such notice may provide written comment on the requested permit revival.  The written comments shall be addressed to the Director, who shall consider such comments in determining the length of time the permit shall be in effect, and what, if any, site management requirements should be imposed as a condition of the permit.

5.   The Director may require such additional documentation as he deems reasonably necessary to provide a complete description of the remaining work, construction methods and construction schedule.

G.  Performance security.  In addition to payment of required fees, and in addition to any other form of security required by this code, the applicant shall provide additional performance security, in an amount that the Director determines is adequate to secure the timely completion of the permit work and restoration of the work site and affected public property and rights-of-way.

H.  Term of permit.  The Director shall set the term of all revived and extended permits, after considering the nature of the work to be completed, the impact of the construction on the adjoining public ways and properties, the number and length of interruptions in the progress of the work, and the reasons the work was not completed under the original permit.  In no event shall the term of a revived or extended permit allow a period of more than 24 months from the date of the approval of the original permit, unless such additional term is approved by the Village Manager.
(Ord. MC-13-2004 § 7, 2004)
(MC-13-2004, Amended, 12/07/2004)

**Section 15.32.200      Repealed by MC-13-2004**

Winnetka Village Code

# Chapter 15.36

# CERTIFICATES OF OCCUPANCY

**Sections:**

| | |
|---|---|
| **15.36.010** | **Certificate of occupancy required.** |
| **15.36.020** | **Application for certificate.** |
| **15.36.030** | **Occupancy permit procedures.** |
| **15.36.040** | **General criteria for issuance of certificate.** |
| **15.36.050** | **Criteria for change of use or occupancy.** |
| **15.36.060** | **Posting of certificate of occupancy** |
| **15.36.070** | **Temporary certificate of occupancy.** |

**Section 15.36.010        Certificate of occupancy required.**

A certificate of occupancy, indicating completion of the permit work or other construction activity, shall be obtained from the Village, as provided in this section, prior to any use or occupancy of a structure.
(MC-3-2005, Amended, 06/21/2005)

**Section 15.36.020        Application for certificate.**

The application for a building permit shall also be deemed to be an application for certificate of occupancy. Where no building permit is required, application for a certificate of occupancy shall be made directly to the Director, in writing.
(MC-3-2005, Renumbered, 06/21/2005)

**Section 15.36.030        Occupancy permit procedures.**

Upon completion of the permit work or other construction activity, and upon the written request of the owner, the Director shall cause the permit work to be inspected. If, upon inspection, the Director determines that the permit work has been completed in conformity with the approved construction documents, and there are no pending building or departmental orders or uncorrected violations of this code or statutory law, then the Director shall issue a certificate of occupancy. No work shall be inspected if any permit authorizing the work for which the inspection is requested has lapsed as provided in Section 15.32.190. If, upon inspection, the permit work does not qualify for a certificate of occupancy, the Director shall provide a written notice to the owner stating the reasons why a certificate of occupancy cannot be issued. If such written notice has not been given to the owner a certificate of occupancy has not been issued within a fourteen (14) days period, the certificate shall be deemed to have been denied.
(MC-3-2005, Renumbered, 06/21/2005)

**Section 15.36.040        General criteria for issuance of certificate.**

No certificate of occupancy for any permit work shall be issued unless (1) the Director has determined that the work has been completed in accordance with the permits and approved construction documents; (2) the permit work has been routinely inspected, as required by the Director in accordance with this code, and is found to be in compliance with this code and in conformity with the approved construction documents and, where applicable, with a certificate of appropriateness of

Winnetka Village Code

design issued for the permit work. The Director may require as-built drawings or surveys certified by an appropriate Illinois registered professional if he or she determines that such documentation is necessary for approval of the permit work. The Director may require a certificate of completion and compliance from an appropriate Illinois registered design professional prior to approval of the permit work.
(MC-3-2005, Renumbered, 06/21/2005)


**Section 15.36.050        Criteria for change of use or occupancy.**

No change shall be made in the use or occupancy of any land, structure or portion of such land or structure used wholly or partially for nonresidential purposes, unless the Director has first issued a certificate of occupancy for such change. No certificate of occupancy shall be issued regarding a change in use or occupancy of such land, structure or portion of such land or structure for which a building permit is not required unless (1) the proposed use and occupancy conform to all applicable provisions of this code; and (2) the structural, electrical, mechanical, health and sanitation, plumbing, HVAC and fire safety elements in the subject unit and in all common interior and exterior areas are inspected and all health and life-safety requirements are approved, as required by this code.
(MC-3-2005, Renumbered, 06/21/2005)


**Section 15.36.060        Posting of certificate of occupancy**

Every certificate of occupancy required as a result of a change in use or occupancy for home occupations, multifamily uses and all nonresidential uses, whether issued in connection with a building permit or not, shall be permanently posted in a prominent place on the premises at all times.
(MC-3-2005, Renumbered, 06/21/2005)


**Section 15.36.070        Temporary certificate of occupancy.**

    A.  Authority of Director.  Prior to final completion and full compliance of all permit work and the issuance of a final certificate of occupancy, a temporary certificate of occupancy may be issued, in the Director's discretion, provided all of the conditions in this section have been met.

    B.  Term of temporary occupancy permit.  The term of any temporary occupancy permit shall be set by the Director in the exercise of his or her discretion, after considering the nature of the work to be completed and whether the ability to complete the work is affected by weather conditions.  The temporary occupancy permit shall be for the shortest period of time necessary to complete the permit work, as determined by the Director..

    C.  Conditions for temporary occupancy permit.

        1.  The request for temporary certificate of occupancy is made in writing and includes a detailed completion schedule;

        2.  All applicable Village departments and building officers agree that the temporary occupancy will not create a hazard to the health, safety and welfare of the structure's occupants or the general public;

        3.  All standards for habitability, sanitation, life and fire safety have been satisfied;

        4.  A cash deposit has been posted with the Village in an amount that the Director has determined is sufficient to secure final completion of all outstanding work in  compliance with this code and the terms of the temporary certificate of occupancy.  The cash deposit shall be retained until

Winnetka Village Code

final completion of the outstanding work. The cash deposit shall be forfeited if final completion of all outstanding work does not occur before the temporary occupancy permit expires.

    5.   The applicant is not then the holder of a temporary certificate of occupancy for any other site in the Village;

    6.   The temporary certificate of occupancy is not for the partial occupancy of a new single-family residence; and

    7.   The temporary certificate of occupancy contains a statement, acknowledged in writing by the owner, that the certificate is not transferable without the approval of the Director. The Director shall not approve the transfer of a temporary certificate of occupancy unless the transferee agrees, in writing, to complete the permit work in accordance with the approved construction documents, the provisions of this code, and the conditions of the temporary certificate of occupancy.

    8.   The cash deposit shall be retained during any such extension. (Prior code § 23.33) (MC-3-2005, Amended, 06/21/2005)

**EXHIBIT 4**

**VILLAGE OF WINNETKA**
**APPLICATION FOR FOOD DEALER BUSINESS LICENSE**

**Description of Application and License:**  This application is made pursuant to the provisions of Chapter 5.24 of the Winnetka Village Code ("Food Businesses"), which regulates operation of restaurants, food stores and food vending machines.

Date _____

Name of Business: _____

Address: _____

Names of managers: _____

_____ Number of employees _____

Seating capacity _____

**Food Dealer License  - Restaurant - Fees set by resolution of the Winnetka Village Council:**

| | |
|---|---|
| **1-20 seats** | **$ 35.00** |
| **21-50 seats** | **45.00** |
| **51-100 seats** | **50.00** |
| **more than 100 seats** | **75.00** |
| **for each drive-in restaurant** | **75.00** |

Number of seats: _____      Fee enclosed: $_____

The undersigned applicant hereby agrees to conform to all laws, ordinances, rules and regulations concerning the conduct of the business for which the license herein applied for is to be issued.  The undersigned further consents to periodic inspection of the premises to ascertain such compliance and agrees that this license may be revoked in the event such inspection is refused.

Please print name and title _____

Address _____ Phone Number _____

Signature: _____

**VILLAGE OF WINNETKA**
**RETAIL LIQUOR LICENSE**
**APPLICATION FOR RENEWAL**

Local Liquor Control Commissioner                Date _____
Village of Winnetka, Illinois

Pursuant to the provision of Section 5.09.100, "Alcoholic Beverages," of the Winnetka Village Code, regulating the sale of alcoholic liquors in the Village of Winnetka, County of Cook, State of Illinois, the undersigned hereby applies/apply for the renewal of a license for the retail sale of alcoholic liquor for the term beginning April 1, 2006 and ending March 31, 2007. (See Appendix for listing of classifications and fees.) Applicant(s) further hereby certify/certifies to the following facts:

**Instructions:** This application must be completed in its entirety. Attach extra sheets as necessary. Applications will not be processed unless the following are also submitted.

❏  License Fee (Check as many boxes as apply):

| | | |
|---|---|---|
| ❏ | Class A-1 Restaurant with Limited Bar (Annual) | $1000.00 |
| ❏ | Class A Restaurant (Annual) | $750.00 |
| ❏ | Packaged Meal Rider (Take-out) | $150.00 |
| ❏ | Sidewalk Restaurant Rider | $150.00 |
| ❏ | Television Rider | No Fee |
| ❏ | Class B - Grocery Store (Annual) | $750.00 |
| ❏ | Class D – Package delivery service/mail | $150.00 |
| ❏ | Class E - Limited Food Products Store (wine only) | $500.00 |
| ❏ | Class E-1 - Limited Food Products Store (beer and wine) | $500.00 |
| ❏ | Class P – Park District | $500.00 |

❏  Copy of licensee's current State of Illinois Liquor License;

❏  Certificate of Dram Shop Insurance coverage, including name and address of insurance company, in effect and providing coverage **for a period of time that extends the full duration of the license**;

❏  Copies of current food preparation licenses from any off premises kitchens where food which may be served is prepared;

❏  Affidavit;

❏  Copy of current menu;

❏  Copy of lease, if applicable;

❏  Certified copy of Illinois Secretary of State's most recent certification of authority to do business as a corporation, *e.g.*, Articles of Incorporation, including amendments, or Certificate of Good Standing, if applicable;

❏  Fingerprint cards, if applicable.

❏  Attachments required for Sections II, III and XI, if applicable.

## I.  APPLICANT INFORMATION

1. Full name: _____

2. Applicant is:  ☐ an individual  (Complete all but Sections VII and VIII)
   ☐ a partnership  (Complete all but Sections V and VII)
   ☐ a corporation  (Complete all but Sections V and VIII)

3. Name under which business is to be conducted: _____

   _____

4. If name under which business is to be conducted differs from the name of applicant, has name of business been registered in the Assumed Name Registry of the Cook County Clerk's office?
   Yes ☐   No ☐

## II.  LICENSED PREMISES INFORMATION

5. Street address of licensed premises: _____

   _____

6. Describe nature of applicant's principal business conducted at licensed premises: _____

   _____

7. Hours of operation:  _____

8. State nature of applicant's interest in the premises for which this license is sought and attach documentation as necessary for information requested:

   ☐ Owner – Provide date acquired and Cook County Recorder's document number for recorded deed: _____

   ☐ Beneficiary – Provide name of trustee, date of acquisition by trust, and Cook County Recorder's document number for recorded deed: _____

   ☐ Lessee – Provide copy of lease.

## III.  QUALIFICATION OF BUSINESS AND SUITABILITY OF PREMISES

[NOTE: If the answer to any of questions 8 through 16 is "yes," use back of form to provide date(s) and full explanation.  Attach additional pages if necessary.]

9. Has any individual, organization, association or agent thereof other than applicant paid or agreed to pay, whether directly or indirectly, for the license being sought?   Yes ☐   No ☐

10. Has any manufacturer, importing distributor or distributor directly or indirectly paid or agreed to pay for this license, advanced money or anything of value, or any credit (other than merchandising credit in the ordinary course of business for a period not to exceed 30 days), or is such person directly or indirectly interested in the ownership, conduct or operation of the place of business?   Yes ☐   No ☐

11. Is the applicant or any affiliate, associate, subsidiary or officer, or other agent directly engaged in the manufacture of alcoholic liquors?   Yes ☐   No ☐

   If the answer is "yes," at what location or locations? _____

12. Is the applicant engaged in the business of an importing distributor or distributor of alcoholic liquors?   Yes ☐   No ☐

13. Has the individual applicant, any partner, or any officer, manager, director, or 20% stockholder of the corporation ever been convicted of any gambling offense?   Yes ☐   No ☐

14. Has the individual applicant, any partner, or any officer, manager, director, or 20% shareholder ever been issued a Federal Gaming Device Stamp or Federal Wagering Stamp?  Yes ☐   No ☐

15. Has the applicant ever had a previous liquor license revoked, suspended or been fined for a liquor violation by a local government or by any state or subdivision thereof?   Yes ☐   No ☐

16. Has the applicant ever received any notices or citations of violations from the Illinois Liquor Control Commission? Yes ☐ No ☐

17. Are you, or any other person with a direct interest in your place of business, an employee of the Village or a public official or law enforcement official in the Village of Winnetka? Yes ☐ No ☐

## IV. ADDITIONAL INFORMATION:

18. Location(s) where food will be prepared? _____

19. Is applicant licensed as a food dispenser? _____

20. Do you plan to have carry-out service?                    Yes ☐    No ☐

21. Do you plan to have delivery service?                     Yes ☐    No ☐

22. Do you plan to have a television set on the premises?     Yes ☐    No ☐

23. Will it be visible from any bar, counter or waiting area? Yes ☐    No ☐
    [Note: Signs, advertisements and promotions referring to the presence of a television on the premises are expressly prohibited.]

24. What is the diagonal measurement of the television screen? _____

25. What is the seating capacity of any proposed bar or counter? _____

26. What is proposed seating capacity of restaurant? _____

27. Describe the methods and procedures the applicant proposes to use in billing customers and maintaining records of sales to customers at any bar, counter, shelf, or substitute thereof:

_____

_____

_____

28. Describe the reservation and seating practices the applicant proposes to use so as to assure that any liquor-only service is segregated from the remaining portion of the restaurant.

_____

_____

_____

## NOTICE TO APPLICANT

- The Local Liquor Control Commissioner may also require the applicant to submit to any examination and to produce any books, records and information which, in the Commissioner's judgment, are material to the determination of whether the applicant is qualified to receive a license under Chapter 5.09 of the Winnetka Village Code, or whether the premises sought to be licensed are suitable for such purpose.

- In addition to the foregoing sections, the information in Sections V through XI is also required and to the extent possible, will be kept confidential.

- Failure to provide any required information will result in the non-issuance of the license.

- Applicant must complete and sign Sections IX and X on page 5. Section XI must also be completed and signed by all persons listed in Answers 28, 32, 41 and 46. Make additional copies of Section XI as necessary.

**V.  APPLICANT INFORMATION (INDIVIDUAL APPLICANT)**  Applicant must also complete applicable portions of Section XI of this application.

29. Full Name: _____ Home Phone #:_____

30. Home Address: _____

31. State the name, address and type of any business previously operated by applicant (Use back of form if necessary _____

_____

**VI.  MANAGER/AGENT INFORMATION -** Complete only if business will be conducted by manager or agent.  Manager/Agent must also complete applicable portions of Section XI of this application.

32. Full name: _____ Home Phone #:_____

33. Home Address: _____

**VII. APPLICANT INFORMATION (CORPORATIONS)** - All persons listed in answer to No. 41 in this Section must also complete applicable portions of Section XI of this Application.

34. Name of corporation: _____

35. Principal Place of Business: _____

Address _____ Phone _____

36. Date Incorporated:_____ State: _____

37. Date most recent annual report was filed: _____

38. Name of registered agent: _____

39. Address of registered agent: _____

40. Names and addresses of all officers and directors, and stockholders owning directly or beneficially, in the aggregate, more than 5% of the stock.

| Name | Address | Office and % of Stock Held |
|------|---------|----------------------------|
|      |         |                            |
|      |         |                            |
|      |         |                            |

**VIII. APPLICANT INFORMATION (PARTNERSHIP) -** All persons listed in answer to No. 46 in this Section must also complete applicable portions of Section XI of this Application.

41. Name of Partnership _____

42. Address of Partnership: _____

43. Date Partnership was formed: _____

44. Is Partnership registered in the Cook County Clerk's Assumed Name Registry?: Yes ☐  No ☐

45. Names and addresses of all general partners and all limited partners owning more than 5% of the aggregate limited partner interest in the partnership:

| Name | Address | % of Ownership Interest |
|------|---------|-------------------------|
|      |         |                         |
|      |         |                         |
|      |         |                         |

## IX. SIGNATURES

Signed this _____ day of _____, 20_____, by:

**Individual Applicant**                    **Partnership** (two general partners must sign)

By:_____              By: _____
            Applicant                                    Partner/Applicant

**Corporation**                           By: _____
                                         Partner/Applicant

By: _____
                         [Seal]

Attest: _____
           Secretary

## X.  AFFIDAVIT OF APPLICANT(S)

STATE OF ILLINOIS    )
                         ) ss
COUNTY OF COOK    )

      I/We, the undersigned applicant(s), or authorized agent thereof, swear or affirm that:  the matters stated in this application are true and correct; they are made upon my personal knowledge and information; they are made for the purpose of requesting the Village of Winnetka to issue the license herein applied for; the applicant is qualified and eligible to obtain the license applied for; and the applicant will not violate any of the laws of the Village of Winnetka, the State of Illinois or the United States of America in the conduct of the place of business described herein.

      Further, I/we agree to notify the Village of Winnetka within 30 days of changes in any of the information contained in this application.

                             _____

                             Signature of Applicant(s)

Subscribed and Sworn to before
me this _____ day of _____, 20___.         _____

_____
Notary Public

**FOR POLICE DEPARTMENT USE ONLY:**        **FOR LOCAL LIQUOR COMMISSIONER USE ONLY:**

☐    License Recommended                ☐    License Granted

☐    License Not Recommended            ☐    License Denied

_____            _____
Police Chief                              Local Liquor Commissioner

_____            _____
Date                                      Date

## XI. REQUIRED PERSONAL BACKGROUND AND QUALIFICATION INFORMATION

[Note: This section must be completed by each individual applicant, by any manager or agent who will be conducting the business on behalf of the applicant, as named in Answer 28 of Section V, above, and by all persons named in Answer 32 of Section VI, in Answer 41 of Section VII and in Answer 46 of Section VIII of this Application. Attach additional sheets if necessary.

The Local Liquor Control Commissioner may require the fingerprinting of any person who is required to complete this section. The cost of the fingerprint check shall be paid by the applicant at the time the fingerprints are taken.]

46. Name: _____
    (Last/First/M.I.)

47. Home Address: _____
    (Number/Street/City/Zip)

48. Years at this address: _____ Home Phone Number: _____

49. Social Security Number: _____ Date of Birth _____

    Driver's License Number: _____ State: _____

50. Place of Birth: _____ Are you a citizen of the United States? _____

51. If a naturalized citizen, state date/place: _____

52. Court in which (or law under which) naturalized _____

53. List residences for past 10 years:

| Address | City | State | Dates |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

54. List present and previous places of employment for the past 10 years:

| Name and Address | Dates of Employment | Type of work | Immediate Supervisor |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

55. Have you **ever**:

[NOTE: If the answer to any of the following is "yes," use back of sheet to provide date(s), offense(s) and full explanation. Use additional sheets as necessary.]

(a) been convicted of any felony under any Federal or State law?　　　　Yes ☐ No ☐

(b) been convicted of being a keeper of a house of ill fame; or of pandering or other crime or misdemeanor opposed to decency and morality?　　　　Yes ☐ No ☐

(c) been convicted of a violation of any Federal or state law or local ordinance concerning the manufacture, possession or sale of alcoholic liquor?　　　　Yes ☐ No ☐

(d) forfeited bond to appear in court to answer charges for such violation?　　　　Yes ☐ No ☐

[Note: You are not obligated to disclose sealed or expunged records of conviction.]

56. Do you hold any other business licenses?                                    Yes ☐  No ☐

Type(s): _____

Location(s): _____

Issuing Authority(ies): _____

57. Has any license issued to you by State, Federal or local authorities **ever** been revoked or suspended, or been the basis of a fine?                                    Yes ☐  No ☐

[NOTE: If the answer is "yes," use back of form to provide date(s) and explain in full.]

58. List 3 non-relative references who have known you for not less than 5 years:

| Name/Occupation | Address | Phone: |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

## Authorization and Acknowledgement

I, the undersigned, do hereby swear or affirm that the information furnished by me in the above Section XI is true and correct to the best of my knowledge and belief. I am aware that any falsification makes me liable under penalty and can result in the denial of my application or revocation of any license issued as a consequence of my misstatements.

I understand and agree that all information furnished in this application may by verified and a background investigation conducted by the Village or its authorized representative or agent, in conjunction with applicable law. I hereby authorize all individuals and organizations referred to in this application and any law enforcement organization to give to the Village all information relative to such verification and background check. I also authorize the Village to provide to each other, any and all information, whether oral or written, obtained by the Village during the application and licensing process, including information obtained in the course of a background check. Except as required by applicable law, I waive any right I may have to notice from any individuals or organizations named or referred to in this application or law enforcement organization prior to the release of any information to the Village. I hereby release such individuals, organizations, law enforcement organization and the Village from any and all resulting liability for any claim or damage arising from the verification and background check process, except such claims which cannot be waived by law.

I have read or had read to me this acknowledgement and authorization and I understand, consent and agree to it in full by my signature below.


_____          _____
Signature                                                Date

**APPENDIX**
**VILLAGE OF WINNETKA**
**LIQUOR LICENSE CLASSIFICATION AND FEE SCHEDULE**

**Note:** The classifications of licenses and number of available licenses in each classification are established in Chapter 5.09 of the Winnetka Village Code. The applicant is advised to refer to Chapter 5.09 for the detailed descriptions of license classification and for complete definitions of the terms used (such as restaurant, full service grocery store sale and retail sale). License fees are set pursuant to resolutions adopted by the Village Council. **Unless issued for a specific and limited period of time, all licenses expire on March 31 of each year.**

**CLASS A**        **$750 annually**

Class A licenses authorize the retail sale of alcoholic liquor by restaurants, but only when the sale is incidental and complementary to the sale and service of a complete meal for consumption only on the premises where sold, which incidental and complementary sales may include the occasional service of alcoholic liquor alone or with less than a full meal, subject to the provisions of Section 5.09.205 of the Winnetka Village Code. **[Note:** Limited food establishments such as luncheonettes, diners, "fast food" establishments and establishments serving food at bars or counters are not considered restaurants for purposes of Chapter 5.09.**]**

**CLASS A-1**        **$1,000 annually**

Class A-1 licenses authorize the retail sale of alcoholic liquor by restaurants, but only when the sale is incidental and complementary to the sale and service of complete meals served in multiple courses for consumption only on the premises where sold, which incidental and complementary sales may include the service of food or liquor at a counter, bar or waiting area, subject to the conditions listed below. Subject to the provisions of Section 5.09.205 of the Winnetka Village Code, such incidental and complementary sales of alcoholic liquor may include the occasional service of alcoholic liquor alone or with less than a full meal.

Except as provided in Section 5.09.205 of the Winnetka Village Code, the counter, bar or waiting area shall be restricted to patrons who have been seated by the restaurant's host or hostess.

The percentage of the total space available to patrons that is allocated to any lounge or waiting area in which a bar, counter or shelf or any substitute for such bar, counter or shelf will be located, shall not exceed ten (1) percent of the total space of the premises accessible to patrons.

**PACKAGED MEAL RIDER**        **$150.00 annually**

Packaged Meal Rider licenses authorize a Class A or Class A-1 licensee to sell, at retail, beer and wine in its original package, provided the sale is only for consumption off the premises where sold, and not for consumption on the premises. The sale of beer or wine is subject to the following conditions:

The sale of wine or beer must be incidental and complementary to the sale of a complete meal prepared on the licensed premises for consumption off the licensed premises.

It is unlawful for any holder of a Packaged Meal Rider license to render a bill for the sale of wine or beer in its original package which does not also include a charge for a complete meal.

All wine and beer sold under a Package Meal Rider license must be paid for and delivered to the purchaser only on the premises of the restaurant operated by the licensee.

The display of wine or beer offered for sale under a Package Meal Rider license is prohibited, except to the extent that wine or beer is displayed as part of the normal operations of the restaurant for which the Class A or Class A-1 license was issued.

Appendix

**SIDEWALK RESTAURANT RIDER**          **$150.00 per license term**

The Sidewalk Restaurant Rider license authorizes a Class A, Class A-1 or Class E-1 licensee to sell beer or wine at retail to customers seated at tables at a permitted sidewalk restaurant located on the public sidewalk adjacent to the premises for which the Class-A, Class A-1 or Class E-1 license was issued, subject to the following conditions:

The sale of the beer or wine must be incidental and complementary to the sale and service of a complete meal for consumption only at a table in the area defined in the license.

It is unlawful for any holder of a sidewalk restaurant rider license to render a bill for the sale of wine or beer that does not also include a charge for a complete meal.

Unless the Village Council specifies an earlier time in an ordinance adopted at the time it authorizes a sidewalk restaurant rider license, the service of beer or wine is authorized only between 11:00 a.m. and 9:00 p.m. Sunday through Thursday, and 11:00 a.m. to 10:00 p.m. Friday and Saturday.

The area for service must be contiguous to the premises for which the Class A, Class A-1 or Class E-1 license is issued, must be defined in the application and specified in the license, and must be separated from the pedestrian areas of the public sidewalk by fencing, planters or such other device as may be specified by the Local Liquor Commissioner in the license.

The licensee must indemnify and hold the Village, its officers and employees from any and all costs arising from claims for personal injury or property damage resulting in any way from the licensee's use of the public way, whether the claim, injury or damages arise from an incident on the licensed premises or on the adjacent portion of the public way that remains open for public use.

The licensee must maintain dram shop insurance in an amount specified by statute or ordinance, or by rule of the State Liquor Control Commission or the Local Liquor Commissioner, but in no event shall the amount of dram shop insurance be less than $1,000,000.

The licensee must maintain general liability insurance coverage of at least $2 million, with excess liability coverage of at least an additional $2 million, with the Village named as additional insured. The certificate of insurance shall be in a form acceptable to the Village.

The sidewalk restaurant area must be supervised at all times by an employee of the restaurant who is at least 21 years old.

The sidewalk restaurant rider license is issued for a term that begins no earlier than April 1 of any year and ends no later than November 30 of the same year, except that sidewalk liquor service is prohibited when weather conditions necessitate the removal of snow or other debris from the public sidewalks.

The sidewalk restaurant rider license is not renewable and being granted a sidewalk restaurant rider license in any year shall not be deemed to create a right or expectation of renewal or reissuance of the sidewalk restaurant rider license for the following or any subsequent year. Every sidewalk restaurant license expires no later than December 1 of the year it is issued. An application for the sidewalk restaurant rider license shall be de novo each year, although any Class A, Class A-1 or Class E-1 licensee who operates a permitted sidewalk restaurant may apply for a new sidewalk restaurant rider license when renewing the licensee's Class A, Class A-1 or Class E-1 license.

Any licensee who violates any provision of a sidewalk restaurant rider may be disqualified from receiving a sidewalk restaurant rider for any location in the Village for a period of up to 5 years.

The Local Liquor Commissioner, in the exercise of his or her discretion, shall have the authority to impose such other conditions for the issuance of a sidewalk restaurant rider license as he or she may deem reasonably necessary.

**TELEVISION RIDER.  No Additional Charge**

The television rider license authorizes a Class A or Class A-1 licensee to place a single television on the licensed premises in an area where patrons are served, subject to the following conditions: (i) the screen of the television may not have a diagonal measurement greater than 30 inches; (ii) the television screen may not be visible from any bar, counter or waiting area in the restaurant; (iii) signs advertising the presence of the television are prohibited (iv) promotions or advertisements for the restaurant shall not include reference to the presence of the television.  The Local Liquor Commissioner may impose such other conditions or limitations as he or she may deem necessary and appropriate, whether imposed in the general exercise of Commissioner's rulemaking powers, or as a specific condition or limitation related to the nature of the restaurant operated by the licensee.

**CLASS B          $750 annually**

Class B licenses authorizes the sale of package liquor in a full-service grocery store.  Class B licenses authorize the licensee to use no more than 10 percent of the total floor space of the full-service grocery store for the display and sale of alcoholic liquor in the original package.

**SPECIAL CLASS C - $25 per day, limited to $75 per event extending beyond two days.**

Special Class C licenses authorize the retail sale of alcoholic liquor by civic, fraternal, service or charitable not-for-profit organizations at picnics, outings, festivals, theatre nights or other such similar special occasions, for consumption on the premises or within the area specifically designated for the license.  No more than 7 such licenses shall be issued to any one licensee within any calendar year.

**CLASS D          $150 annually**

Class D licenses authorize the retail sale of wine in the original package for consumption off the premises where sold and where delivery is made exclusively through the mail or other similar package delivery service.

**CLASS D-1        $250 annually**

Class D-1 licenses authorize the sale of wine at wholesale in the original package by an importer/distributor to a Class D licensee as provided in Chapter 5.09 of the Winnetka Village Code.

**CLASS E          $500 annually**

Class E licenses authorize the retail sale of wine only, by a limited food products store, subject to all of the following conditions:

The wine must be sold in its original package, only for consumption off the premises where sold, and not for consumption on the premises where sold.

The sale of the wine must be incidental and complementary to the sale of food for consumption off the premises.  It is unlawful for any holder of a Class E license to render a bill of sale of wine in its original package that does not also include a charge for food to be consumed off the premises.

All wine sold under a Class E license must be paid for and delivered to the purchaser only on the premises of the limited food products store operated by the licensee.

No more than ten percent (10%) of the floor space of the limited food products store used by the licensee for the display and sale of merchandise may be used for the display and sale of wine.  The remainder of such floor space shall be for the display and sale of other merchandise.

A limited food products store may be operated in the same premises as a specialty restaurant, provided the food sales and display area is separate from the meal service area.

**Appendix**

**CLASS E-1        $500 annually**

Class E-1 licenses authorize the retail sale of beer or wine by a limited food products, store, subject to all of the following conditions:

The limited food products store must have a total area of at least 3,500 square feet, and must have an area for table seating of at least 18 customers.

The beer or wine must be sold in its original package.

The sale of the beer or wine must be incidental and complementary to the sale of food for consumption on or off the premises. Subject to the provisions of Section 5.09.205 of the Winnetka Village Code, such incidental and complementary sales may include the occasional sale of wine in its original package without the sale of food.

All beer or wine sold under a Class E-1 license shall be paid for and delivered to the purchaser only on the premises of the limited food products store operated by the licensee.

No more than ten (10 percent of the floor space of the limited food products store used by the licensee for the display and sale of merchandize may be used for the display and sale of wine.  The remainder of such floor space shall be for the display and sale of other merchandise, except that the display of beer for sale is prohibited.

**CLASS P LICENSE        - $500 annually**

The Class P License authorizes the Winnetka Park District to engage in the retail sale of alcoholic liquor in conjunction with the operation of the food service facility located in the clubhouses of the Winnetka Park District Golf Course, for consumption only in the food service area of the clubhouse, provided liquor sales are incidental and complementary to the sale and service of food, subject to the following terms and conditions and to Section 5.09.205 of the Winnetka Village Code:

Food and liquor may be served at a counter, bar or waiting area within the clubhouse food service facility.

Incidental and complementary sales of alcoholic liquor may include the occasional service of alcoholic liquor alone.

The counter, bar or waiting area shall be restricted to persons the attendant at the food service facility reasonably believes to be at the Winnetka Park District Golfing Facilities for the principal purpose of engaging in golfing activities.

The percentage of the total space available that is allocated to counter, bar and waiting area service shall not exceed ten (10) percent of the total space of the food service facility that is accessible to patrons.

The sale of alcoholic beverages shall be permitted only during the months of April through October.